1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

J.E.F.M., et al.,

8

Plaintiffs,

C14-1026 TSZ

9

v.

ORDER

10

ERIC H. HOLDER, et al.,

11

Defendants.

12    THIS MATTER comes before the Court on defendants' motion to dismiss, docket

13    no. 80, based on lack of jurisdiction and failure to state a claim.  Having considered all of

14    the materials filed in support of, and in opposition to, the motion, and the oral arguments

15    of counsel, the Court enters the following order.

16    **Background**

17    In this action, nine juveniles ranging in age from 3 to 17, on behalf of themselves

18    and others similarly situated,[1] assert both a statutory and a constitutional claim that they

19    _____

20    [1] According to a report cited by defendants, which was prepared by the Transactional Records Access
      Clearinghouse ("TRAC") at Syracuse University, the number of juvenile cases in immigration courts

21    increased dramatically over the last few years, jumping from 6,425 in 2011, to 11,411 in 2012, and
      21,351 in 2013.  *See* Surreply at 2 n.1 (docket no. 70) (citing http://trac.syr.edu/immigration/reports/359/).

22    In a different report, TRAC indicates that 59,394 immigration cases involving minors were filed  in 2014.
      *See* http://trac.syr.edu/phptools/immigration/juvenile/.

23

are entitled to have attorneys appointed to represent them at government expense in connection with their removal proceedings.[2]  They assert the statutory claim under § 240 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a, and they bring the constitutional claim under the Due Process Clause of the Fifth Amendment.  As to five of the nine plaintiffs, three of whom are siblings, removal proceedings are ongoing.  _See_ 2d Am. Compl. ¶¶ 13-16, 18, & 85 (docket no. 95).  As to the other four plaintiffs, however, removal proceedings are not currently pending.[3]

Under the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), an alien is "removable" if (i) he or she was not admitted to the United States and is "inadmissible" under 8 U.S.C. § 1182, or (ii) he or she was admitted to the United States and is "deportable" under 8 U.S.C. § 1227.  _See_ 8 U.S.C. § 1229a(e)(2).  Before the enactment of IIRIRA, a distinction had been drawn between "exclusion" and "deportation" of individuals.  _See Dormescar v. U.S. Att'y Gen._, 690 F.3d 1258, 1260 (11th Cir. 2012); _see also U.S. ex rel. Knauff v. Shaughnessy_, 338

---

[2] The parties agree that no Sixth Amendment right to counsel exists in removal proceedings, which are civil in nature.  _See United States v. Gasca-Kraft_, 522 F.2d 149, 152 (9th Cir. 1975); _see also Dearinger ex rel. Volkova v. Reno_, 232 F.3d 1042, 1045 (9th Cir. 2000); _Michelson v. INS_, 897 F.2d 465, 467 (10th Cir. 1990); _United States v. Saucedo-Velasquez_, 843 F.2d 832, 834 n.2 (5th Cir. 1988).

[3] With respect to G.D.S., who is currently in a juvenile rehabilitation facility, and A.E.G.E., who is 3 years old and living in Los Angeles with his mother, a permanent resident, plaintiffs do not allege that removal proceedings have commenced.  _See_ 2d Am. Compl. ¶¶ 79 & 100-101.  At the hearing held on March 6, 2015, plaintiffs' counsel suggested that a charging document has been filed against A.E.G.E., but defendants' attorney was adamant that removal proceedings are not pending as to A.E.G.E.  On the other end of the spectrum, plaintiffs indicate that G.J.C.P. and J.E.V.G. have already been ordered removed in absentia. 2d Am. Compl. ¶¶ 22 & 23.  A motion to reopen J.E.V.G.'s removal proceedings was filed by the government, _see_ Defs.' Supp. Br. at 10 n.6 (docket no. 97), and defendants' attorney represented during oral argument that a hearing concerning J.E.V.G. is currently scheduled in May 2015, but neither the anticipated nature of such hearing nor the exact status of J.E.V.G.'s removal proceedings are reflected in any pleading that has been filed in this action.

ORDER - 2

U.S. 537, 543 (1950).  "Excludable" aliens, meaning those who sought but had not yet achieved admission, were treated as though they were detained at the border, even if they were physically present within the United States, _Dormescar_, 690 F.3d at 1260, and "excludable" aliens were entitled to fewer procedural protections than "deportable" aliens, _Mariscal-Sandoval v. Ashcroft_, 370 F.3d 851, 854 (9th Cir. 2004).  When IIRIRA became effective on April 1, 1997, _see_ Pub. L. No. 104-208, § 309(a), 110 Stat. 3009 (1996), exclusion and deportation proceedings were merged into the broader category of "removal" proceedings.  _Mariscal-Sandoval_, 370 F.3d at 854 n.6.

Removal proceedings are conducted before an immigration judge, and such proceedings are "the sole and exclusive" means for determining whether an alien may be admitted to or removed from the United States.  8 U.S.C. §§ 1229a(a)(1) & (3).  Pursuant to INA § 240(b), an alien in a removal proceeding may offer evidence on his or her own behalf and may review the evidence and cross-examine the witnesses presented by the Government.  8 U.S.C. § 1229a(b)(4)(B).  An alien also has the statutory "privilege of being represented, at no expense to the Government, by counsel of the alien's choosing" in both "removal proceedings before an immigration judge" and "appeal proceedings before the Attorney General."  8 U.S.C. §§ 1229a(b)(4)(A) & 1362.  In this case, plaintiffs contend that, because they are unable to retain counsel, for either financial or other reasons, they cannot exercise their statutory right to present evidence and cross-examine witnesses and are being denied their constitutional right to due process of law.

1  **Discussion**

2      Defendants move to dismiss for lack of subject-matter jurisdiction and for failure

3  to state a claim.  Defendants' motion to dismiss was filed before the Court entered its

4  order denying plaintiffs' earlier motion for a preliminary injunction, _see_ Order (docket

5  no. 81), and before plaintiffs sought and were granted leave to file their Second Amended

6  Complaint.[4]  Although jurisdiction was addressed in the Court's prior order, additional

7  plaintiffs have now been named and the jurisdictional issues more squarely concern the

8  right-to-counsel claim, as opposed to the continuances or stays plaintiffs sought in their

9  motion for a preliminary injunction.  The Court will therefore consider defendants'

10  jurisdictional arguments anew.

11  **A.    Jurisdiction**

12      Defendants assert three overlapping reasons for dismissing this action for lack of

13  jurisdiction:[5]  (i) lack of ripeness; (ii) the jurisdiction-stripping and channeling provisions

14  of IIRIRA, as amended by the REAL ID Act of 2005; and (iii) sovereign immunity.

15  _____

16  [4] After joining three more juveniles in the Second Amended Complaint, plaintiffs voluntarily dismissed
    two of the original eight minors, namely G.M.G.C. and S.R.I.C.  _See_ Notice (docket no. 107).  Plaintiffs
17  provided no explanation for the voluntary dismissal.  According to defendants, however, S.R.I.C., who
    turned 18 in January, is now being represented by counsel.  _See_ Reply at 2 n.2 (docket no. 104).  During
    the hearing on March 6, 2015, defendants' attorney indicated that G.M.G.C. also now has a lawyer.

18  [5] In their Rule 12(b)(1) motion, defendants present a facial, rather than a factual, jurisdictional challenge.
    A facial attack asserts that the allegations of the complaint are insufficient on their face to invoke federal
19  jurisdiction, while a factual challenge disputes the truth of the allegations in the complaint, which would
    otherwise support subject-matter jurisdiction.  _See Safe Air for Everyone v. Meyer_, 373 F.3d 1035, 1038
20  (9th Cir. 2004).  With respect to a facial challenge under Rule 12(b)(1), a plaintiff is entitled to the same
    safeguards that apply to a Rule 12(b)(6) motion to dismiss for failure to state a claim.  _See Friends of
    Roeding Park v. City of Fresno_, 848 F. Supp. 2d 1152, 1159 (E.D. Cal. 2012).  The allegations of the
21  complaint are presumed to be true, _id._, and the Court may not consider matters outside the pleading
    without converting the motion into one for summary judgment, _see White v. Lee_, 227 F.3d 1214, 1242
22  (9th Cir. 2000).

23

ORDER - 4

Defendants' arguments can be distilled into one basic premise, namely that plaintiffs can and should be required to raise their right-to-counsel claim in their removal proceedings and then seek review of the predictably unfavorable result by the Board of Immigration Appeals ("BIA") and the appropriate court of appeals.

Plaintiffs appear to view defendants' analysis as stating a form of Catch-22.[6] Plaintiffs contend that, as children, they lack the capacity to request an attorney in the midst of a removal proceeding, to appeal to the BIA, or to petition for review by a court of appeals, and that they cannot be assisted in any of these endeavors by a lawyer without thereby forfeiting their claim to appointment of counsel.  In other words, according to plaintiffs, they cannot feasibly ask for an attorney without the help of an attorney, but if they receive the help of an attorney, then they cannot ask for an attorney at government expense.

This alleged paradox presupposes cognitive limitations on the part of all alien juveniles that the Court is not ready to accept.[7]  The Court is persuaded, however, that the jurisdictional hurdles defendants seek to erect would create a different unfair result.

---

[6] Since being coined by Joseph Heller in 1961, the term "Catch-22" has appeared in over two thousand opinions or orders issued by federal courts.  The term is a shorthand way of referring to a "paradox in which seeming alternatives actually cancel each other out, leaving no means of escape from a dilemma." WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 237 (1984); *see* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 327 (2d ed. 1987) ("a frustrating situation in which one is trapped by contradictory regulations or conditions" or "any illogical or paradoxical problem or situation; dilemma").

[7] The Court does not agree that requesting an attorney requires the skills of a "Doogie Howser," the fictional character mentioned by plaintiffs' counsel during oral argument, from a television series popular in the early 1990s, about a genius teenager with a medical degree, who is a surgeon at a Los Angeles hospital.  The Court is satisfied that many, if not most, youngsters are capable of uttering, in their native language if not in English, the words "I want a lawyer," and of inscribing that phrase on a notice of appeal or petition for review.

1   Assuming an alien minor, acting pro se, successfully navigated the immigration labyrinth

2   all the way to the appropriate court of appeals, he or she would arrive there without the

3   record necessary to conduct the balancing of interests required by _Mathews v. Eldridge_,

4   424 U.S. 319 (1976), in connection with a due process right-to-counsel claim.[8]  An

5   immigration judge, who has no authority to appoint an attorney at government expense,

6   would have no reason to hold an evidentiary hearing or engage in the _Mathews_ analysis.

7   Absent an endeavor by an immigration judge to weigh the _Mathews_ factors with regard to

8   a right-to-counsel claim, neither the BIA nor a court of appeals would have anything to

9   review.  Meanwhile, the petitioner would likely have turned 18 while the appeal was

10  pending, meaning that remand to develop a record would not be a viable option and the

11  claim of a right to counsel for alien juveniles would remain unresolved.  A different

12  youth might later take up the cause and run the same gauntlet, but with probably the same

13  result.

14      The Court is of the opinion that the due process question plaintiffs have raised in

15  this case is far too important to consign it, as defendants propose, to the perhaps perpetual

16  loop of the administrative and judicial review process.  A fundamental precept of due

17  process is that individuals have a right "to be heard 'at a meaningful time and in a

18  meaningful manner'" before "being condemned to suffer grievous loss of any kind, even

_____

19

20  [8] Under _Mathews_, in evaluating whether due process has been satisfied, the following factors must be weighed:  (i) the nature of the private interest affected by the government action; (ii) the risk of erroneous deprivation of such interest through the procedures used, as well as the probable value of additional or substitute safeguards; and (iii) the interest of the government, including the fiscal or administrative burdens that additional or different procedural requirements would entail.  424 U.S. at 335.  In _Turner v. Rogers_, 131 S. Ct. 2507 (2011), the Supreme Court indicated that the _Mathews_ factors are "useful" in determining whether due process requires the appointment of counsel in a civil proceeding.  _Id._ at 2517.

21

22

23

though it may not involve the stigma and hardships of a criminal conviction." _Mathews_, 424 U.S. at 333.  Unlike some other legal doctrines, due process is "not a technical conception with a fixed content unrelated to time, place and circumstances," but rather is "flexible and calls for such procedural protections as the particular situation demands." _Id._ at 334 (quoting _Cafeteria & Rest. Workers Union, Local 473 v. McElroy_, 367 U.S. 886, 895 (1961), and _Morrissey v. Brewer_, 408 U.S. 471, 481 (1972)).  Whether plaintiffs' constitutional due process right-to-counsel claim has merit cannot yet be determined, but plaintiffs deserve, and the Court concludes that it has jurisdiction (at least with respect to juveniles currently in removal proceedings) to eventually provide an answer.  With respect to plaintiffs' statutory claim, however, the Court lacks jurisdiction.

## 1.   Ripeness

Defendants contend that plaintiffs' right-to-counsel claim is not ripe because no named plaintiff has yet, during the course of removal proceedings, requested and been refused an attorney at government expense.  Defendants' argument has merit with respect to minors against whom removal proceedings have not yet been initiated.  A claim "is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" _Texas v. United States_, 523 U.S. 296, 300 (1998) (quoting _Thomas v. Union Carbide Agric. Prods. Co._, 473 U.S. 568, 580-81 (1985)).  Removal proceedings might never be commenced with respect to G.D.S. and A.E.G.E., and their claims asserting a constitutional or statutory right to the appointment of an attorney to represent them in removal proceedings are premature.  Thus, as to these two juveniles, the Court currently lacks jurisdiction, and defendants' Rule 12(b)(1)

ORDER - 7

1  motion to dismiss is GRANTED in part.  The claims of G.D.S. and A.E.G.E. are

2  DISMISSED without prejudice.

3      Defendants' ripeness challenge otherwise fails.  Exhaustion is not required to

4  make a claim ripe when the agency lacks authority to grant relief.  *See Xiao v. Barr*, 979

5  F.2d 151, 154 (9th Cir. 1992); *El Rescate Legal Servs., Inc. v. Exec. Office of*

6  *Immigration Review*, 959 F.2d 742, 746-47 (9th Cir. 1991); *see also Am.-Arab Anti-*

7  *Discrimination Comm. v. Reno ("AAADC I")*, 70 F.3d 1045, 1058 (9th Cir. 1995) ("[W]e

8  customarily decline to apply the prudential ripeness doctrine when exhaustion would be a

9  futile attempt to challenge a fixed agency position.").  Defendants concede that neither an

10  immigration judge nor the BIA "has the authority to appoint counsel" for an alien minor

11  or "to declare that 8 U.S.C. § 1362 is unconstitutional as applied to all minors."  Defs.'

12  Supp. Br. at 7 (docket no. 97).  Thus, any attempt by plaintiffs to secure from an

13  immigration judge or the BIA a government-compensated lawyer to assist them with

14  removal proceedings would be futile.

15      In *El Rescate*, the plaintiffs faced a similar issue of futility in challenging certain

16  practices of the Executive Office of Immigration Review ("EOIR"), namely the use of

17  incompetent translators and the failure to interpret many portions of immigration court

18  hearings.  959 F.2d at 745.  The district court granted summary judgment in favor of the

19  plaintiffs, and the EOIR appealed, arguing that the district court lacked jurisdiction

20  because the plaintiffs did not exhaust their administrative remedies.  *Id.* at 745-46.  In

21  holding that exhaustion was not required, the Ninth Circuit focused on the distinction

22  between claims attacking the validity of an individual order of deportation or exclusion

23

ORDER - 8

(now known collectively as removal) and claims predicated on "an alleged pattern and practice of constitutional or statutory violations." <u>Id.</u> at 746.  With regard to the latter, the Ninth Circuit held that exhaustion is unnecessary when "the agency's position on the question at issue 'appears already set,'" and resort to administrative remedies is "very likely" to produce an unfavorable result or be futile.  <u>Id.</u> at 747; <u>see also</u> <u>AAADC I</u>, 70 F.3d at 1058 (observing that exhaustion is futile when no "genuine doubt" exists as to "what is going to happen in the administrative process" (quoting <u>Rafeedie v. INS</u>, 880 F.2d 506, 514 (D.C. Cir. 1989))).  In this case, as in <u>El Rescate</u>, the remaining plaintiffs present a "pattern and practice" claim as to which recourse to the administrative process is guaranteed to fail.  Thus, defendants' attack on the ripeness of plaintiffs' claim lacks merit.

> ## 2. **IIRIRA and the REAL ID Act**

Ripeness is not, however, the only obstacle that the remaining plaintiffs' statutory and constitutional right-to-counsel claims must overcome.  As explained in more detail below, IIRIRA's jurisdiction-stripping provision, as amended by the REAL ID Act, 8 U.S.C. § 1252(g), requires the Court to dismiss at least G.J.C.P.'s claim because it seeks to collaterally attack an order of removal entered in absentia.  In addition, the REAL ID Act's and IIRIRA's channeling mechanism, 8 U.S.C. §§ 1252(a)(5) and (b)(9), removes plaintiffs' first cause of action for violation of INA § 240 from the purview of this Court.  As to the second cause of action, however, brought under the Due Process Clause of the Fifth Amendment, the Court concludes that neither IIRIRA's jurisdiction-

stripping provision nor the Real ID Act's and IIRIRA's channeling mechanism compel

dismissal.

a.   __Section 1252(g)__

Section 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision
> of law (statutory or nonstatutory), including section 2241 of Title 28, or any
> other habeas corpus provision, and sections 1361 and 1651 of such title, no
> court shall have jurisdiction to hear any cause or claim by or on behalf of
> any alien arising from the decision or action by the Attorney General to
> commence proceedings, adjudicate cases, or execute removal orders against
> any alien under this chapter.

8 U.S.C. § 1252(g).  Section 1252(g) is narrow and "applies only to three discrete

actions" that the Attorney General might take, namely to "'*commence* proceedings,

*adjudicate* cases, or *execute* removal orders.'"  *Reno v. Am.-Arab Anti-Discrimination*

*Comm. ("AAADC II")*, 525 U.S. 471, 482 (1999) (emphasis in original) (quoting

8 U.S.C. § 1252(g)).  Section 1252(g) is aimed solely "at preserving prosecutorial

discretion."  *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 (9th Cir. 1999).  Because

immigration courts may not decline to hear cases, after a removal proceeding has been

initiated, discretion no longer plays a role.  *Id.* at 1120.  Thus, § 1252(g) does not deprive

federal courts of jurisdiction to hear constitutional challenges to the manner in which

removal proceedings are conducted.  *Id.* at 1119-21; *Walters v. Reno*, 145 F.3d 1032,

1052 (9th Cir. 1998); *see also Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1049

(C.D. Cal. 2010).

With regard to J.E.F.M., J.F.M., D.G.F.M., F.L.B., and M.A.M., who are subject

to ongoing removal proceedings, as well as J.E.V.G., whose removal proceeding will be

or has been reopened, the right-to-counsel claim does not implicate the Attorney

General's discretion to commence proceedings, adjudicate cases, or execute removal

orders.  Thus, as to these six plaintiffs, § 1252(g) does not operate as a bar to the Court's

jurisdiction.

The same is not true for G.J.C.P., who has already been ordered removed in

absentia.  An order of removal issued in absentia may be rescinded only upon an

immigration judge's grant of a motion to reopen filed within the time limits set forth in

8 U.S.C. § 1229a(b)(5)(C).[9]  Absent such reopening, any review by a court of appeals

must be confined to the validity of the notice of the hearing, the reasons for failing to

appear, and the removability of the alien.  8 U.S.C. § 1229a(b)(5)(D).  In asserting her

right-to-counsel claim, G.J.C.P. is attempting to circumvent the statutory restrictions on

challenging a removal order issued in absentia, and she seeks relief that would hamper

the Attorney General's discretion to execute such removal order, _i.e._, relief that § 1252(g)

prohibits the Court from granting.  Thus, defendants' Rule 12(b)(1) motion to dismiss is

GRANTED in part, and G.J.C.P.'s claims are DISMISSED without prejudice.

### b.   <u>Sections 1252(a)(5) and (b)(9)</u>

In "stark contrast" to § 1252(g), which categorically excludes from judicial review

only "certain specified decisions and actions," _AAADC II_, 525 U.S. at 482-83, the REAL

---

[9] A motion to reopen must be filed within 180 days of the date of the removal order if the motion asserts that the failure to appear was caused by "exceptional circumstances."  8 U.S.C. § 1229a(b)(5)(C).  If the motion to reopen is, however, based on a lack of notice of the hearing or on confinement in federal or state custody at the time of the hearing, then the motion may be filed "at any time."  _Id._  The filing of a motion to reopen automatically stays the removal of the alien pending disposition of the motion by an immigration judge.  _Id._

ORDER - 11

ID Act's and IIRIRA's channeling mechanism, §§ 1252(a)(5) and (b)(9), is broad in

scope.  Section 1252(a)(5) indicates in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter . . . .

8 U.S.C. § 1252(a)(5).  Section 1252(b)(9) reads:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.  Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order of such questions of law or fact.

8 U.S.C. § 1252(b)(9).  The Supreme Court has characterized § 1252(b)(9) as an

"unmistakable 'zipper' clause," _see_ _AAADC II_, 525 U.S. at 483, while the First Circuit

has described the expanse of § 1252(b)(9) as "breathtaking," _Aguilar v. U.S. Immigration_

_& Customs Enforcement Div. of the Dep't of Homeland Sec._, 510 F.3d 1, 9 (1st Cir.

2007).

Sections 1252(a)(5) and (b)(9) were "designed to consolidate and channel review

of _all_ legal and factual questions that arise from the removal of an alien into the

administrative process, with judicial review of those decisions vested exclusively in the

courts of appeal."  _Aguilar_, 510 F.3d at 9 (emphasis in original); _see also, e.g._, _Iasu v._

_Smith_, 511 F.3d 881, 886-87 (9th Cir. 2007).  The purpose was to "put an end to the

ORDER - 12

1   scattershot and piecemeal nature of the review process that previously had held sway in

2   regard to removal proceedings." _Aguilar_, 510 F.3d at 9 (citing H.R. Rep. No. 109-72,

3   at 174 (2005), _reprinted in_ 2005 U.S.C.C.A.N. 240, 299); _see also_ _Iasu_, 511 F.3d at 887

4   (Congress's "explicit intent [was] to give 'every alien one day in the court of appeals'").

5   In _Aguilar_, however, the First Circuit recognized that certain denial-of-due-process

6   claims "are beyond the authority of the agency to adjudicate," 510 F.3d at 18 n.4, and in

7   those rare circumstances, any exhaustion requirements may be excused if the claims

8   satisfy the standards articulated in _McNary v. Haitian Refugee Ctr., Inc._, 498 U.S. 479

9   (1991), and its progeny.

10          In _McNary_, the plaintiffs sought relief on behalf of a class of undocumented aliens

11   who had applied for special agricultural worker ("SAW") status under amnesty programs

12   enacted in 1986. _Id._ at 482-87.  They alleged that the Immigration and Naturalization

13   Service ("INS") had adopted unlawful practices and policies for administering the SAW

14   program, including denying applicants an opportunity to challenge adverse evidence on

15   which denials were based, failing to provide competent interpreters, and interviewing

16   applicants in an arbitrary fashion without making a verbatim recording and thereby

17   inhibiting meaningful administrative review. _Id._ at 487-88.  A provision of the amnesty

18   statute prohibited judicial review of a denial of SAW status, except in an appeal from an

19   order of exclusion or deportation. _Id._ at 485-86 (citing 8 U.S.C. § 1160(e)).

20          The _McNary_ Court held that the statutory restriction on jurisdiction applied only to

21   "direct review of individual denials of SAW status," and not to "collateral challenges to

22

23

1   unconstitutional practices and policies used by the agency in processing applications."

2   _Id._ at 492.  The Supreme Court reasoned:

3           To establish the unfairness of the INS practices, respondents in this case
            adduced a substantial amount of evidence, most of which would have been
4           irrelevant in the processing of a particular individual application.  Not only
            would a court of appeals reviewing an individual SAW determination
5           therefore most likely not have an adequate record as to the pattern of INS'
            allegedly unconstitutional practices, but it also would lack the factfinding
6           and record-developing capabilities of a federal district court.

7   _Id._ at 497.  The _McNary_ Court therefore refused to apply the statutory restriction on

8   challenges to the denial of SAW status because doing so would have been "the practical

9   equivalent of a total denial of judicial review of generic constitutional and statutory

10  claims."  _Id._

11          The Ninth Circuit has "distilled two 'guiding principles'" from _McNary_ and

12  related decisions.  _See_ _City of Rialto v. W. Coast Loading Corp._, 581 F.3d 865, 874 (9th

13  Cir. 2009).  First, to avoid a channeling mechanism, the claim at issue must challenge "a

14  'procedure or policy that is collateral to an alien's substantive eligibility,' for which 'the

15  administrative record is insufficient to provide a basis for meaningful judicial review.'"

16  _Id._ (quoting _Proyecto San Pablo v. INS_, 189 F.3d 1130, 1138 (9th Cir. 1999) (quoting

17  _Ortiz v. Meissner_, 179 F.3d 718, 722 (9th Cir. 1999))).  Second, the plaintiffs' claim must

18  be ripe, meaning that the plaintiffs have "taken 'the affirmative steps that [they] could

19  take before the INS blocked [their] path.'"  _Id._ (alterations in original).  This second

20  requirement is derived from _Reno v. Catholic Soc. Servs., Inc._, 509 U.S. 43 (1993), which

21  observed that injunctive and declaratory judgment remedies are "discretionary, and courts

22

23

ORDER - 14

1   traditionally have been reluctant to apply them to administrative determinations unless

2   these arise in the context of a controversy 'ripe' for judicial resolution."  509 U.S. at 57.

3        In conducting the _McNary_ analysis, the Ninth Circuit has focused on whether the

4   claim at issue would become moot if subjected to the administrative and judicial review

5   process.  For example, in _Ortiz_, the plaintiffs filed suit to enforce a statutory provision

6   that allowed persons who had filed non-frivolous applications under an amnesty program

7   promulgated in 1986 to receive authorization to work in the United States pending the

8   "final determination" on their applications.  179 F.3d at 719.  In concluding, despite the

9   channeling provision of the amnesty program, that the district court had properly

10  exercised jurisdiction over the plaintiffs' interim-status claim, the Ninth Circuit reasoned:

11          Plaintiffs, according to the government, must wait until they have been
            ordered deported to seek interim work authorization in a court of appeals
12          review of the deportation proceeding.  Yet by that time, the period in which
            plaintiffs claim they are entitled to work authorization would already have
13          passed.  The legal issue would be moot.

14  _Id._ at 722.

15        The Ninth Circuit reached a similar result in _Proyecto_.  In _Proyecto_, the plaintiffs

16  sought access to their prior deportation files, the contents of which were considered by

17  the INS in denying their applications for legalization under the amnesty scheme

18  implemented in 1986.  189 F.3d at 1134, 1137-38.  Under the _McNary_ doctrine, the Ninth

19  Circuit held that the district court had jurisdiction to consider the plaintiffs' challenge to

20  the procedures for obtaining prior deportation files, observing that any judicial review of

21  a denial of a legalization application would be limited to the administrative record, and

22

23

ORDER - 15

1 thus, prior deportation files received by the plaintiffs after the INS issued a final order

2 would be "of no use." _Id._ at 1138.

3       With respect to the _McNary_ inquiries and the mootness concerns expressed in

4 _Ortiz_ and _Proyecto_, plaintiffs' constitutional right-to-counsel claim differs from their

5 statutory claim alleging violation of INA § 240.  With respect to the constitutional claim,

6 both prongs of the _McNary_ standard are satisfied.  First, the alleged right to counsel

7 involves a "procedure or policy" (or perhaps, the absence of one) that is collateral to the

8 substance of the underlying removal proceedings and, because an immigration judge is

9 unlikely to conduct the requisite _Mathews_ balancing, the administrative record would be

10 insufficient to provide a basis for meaningful judicial review.[10]  Second, although no

11 named plaintiff has yet asked an immigration judge to appoint counsel, the constitutional

12 right-to-counsel claim is ripe because such request would be futile in light of the current

13 immigration laws and regulations.

14

15

16 _____

17 [10] In a pre-IIRIRA case, the Fifth Circuit held that, by pressing forward in removal proceedings without
an attorney, the plaintiff waived any right to counsel.  _Barthold v. INS_, 517 F.2d 689 (5th Cir. 1975).  The

18 plaintiff in _Barthold_ was advised by the immigration judge that the proceedings could be adjourned so
that he could contact "Legal Services" to "see whether or not they will provide an attorney" for him.  _Id._

19 at 691.  The Fifth Circuit reasoned that the plaintiff was thereby offered the opportunity to obtain free
legal services, and it concluded that the record did not support the plaintiff's appellate attorney's
suggestion that the plaintiff, who had been assisted by an interpreter, did not understand "Legal Services"

20 operated pro bono.  _Id._  The potential, in light of the analysis used in _Barthold_, for a juvenile to be
deemed to have waived the right-to-counsel claim by undergoing removal proceedings without an

21 attorney or by failing to persuade an immigration judge to hold an evidentiary hearing on the _Mathews_
factors also argues in favor of the conclusion that plaintiffs should be excused from exhaustion, under the

22 _McNary_ doctrine, with respect to their due process claim.

23

1    In addition, because plaintiffs base their constitutional right-to-counsel claim on

2    their particular interests, and the risks of erroneous deprivation they face, as juveniles,[11]

3    they are confronted with the type of mootness dilemma that _Ortiz_ and _Proyecto_ employed

4    _McNary_ to solve.  Plaintiffs will not remain minors for long.  Four of the six remaining

5    named plaintiffs are already 16, and they are likely to become adults before having the

6    opportunity to present their right-to-counsel claim to an appropriate court of appeals.

7    Moreover, even if these four plaintiffs were to reach the court of appeals before

8    turning 18, chances are high that the clock would still wind down on their due process

9    right-to-counsel claim.  Assuming that no _Mathews_ balancing occurred during the

10   removal proceedings, the court of appeals would not have an adequate record, and

------

[11] In asserting that minors have interests different from those of adults, plaintiffs rely heavily on _In re Gault_, 387 U.S. 1 (1967).  _Gault_ concerned juvenile delinquency proceedings, which were considered civil, but were punitive in their effect.  In _Gault_, the juvenile was alleged to have engaged in lewd telephone calls, which might have subjected an adult to a maximum penalty of $50 and imprisonment for two months, but the juvenile was committed to the "State Industrial School" for the next six years, until he reached the age of 21.  _Id._ at 4, 7-9.  Contrary to plaintiffs' suggestion, _Gault_ does not stand for the proposition that minors are entitled to special treatment in the due process arena; rather _Gault_ supports the converse concept that juveniles should have the safeguards available to adults when they face similar penal consequences.  _See id._ at 29.  Reference to _Gault_ was equally unpersuasive in _Machado v. Ashcroft_, E.D. Wash. Case No. 2:02-cv-66-FVS.  _See_ Order at 18-21, copy attached as Ex. A to Resp. to Mot. for Prelim. Inj. (docket no. 51-1).  In _Machado_, having considered _Gault_ and similar authorities, Judge Van Sickle reasoned that the juvenile plaintiff had not sufficiently distinguished between children and adults to justify disregarding Ninth Circuit precedent holding that adults have no due process right to counsel in removal proceedings.  _Id._  He left open the possibility, however, that a different result might be reached under _Mathews_:

> If the Court had concluded that it was appropriate to examine whether due process required that counsel be appointed under the factors elucidated in _Mathews_ . . . , these features may have proven determinative.  However, the Court does not reach that analysis.  The Court is bound by the Ninth Circuit's precedent on this issue, and the plaintiff has failed to demonstrate that this precedent should be ignored even under the most compelling of facts.

_Id._ at 23.  When Judge Van Sickle issued this decision, he did not have the benefit of the Supreme Court's guidance in _Turner_.  _See supra_ note 8.

ORDER - 17

lacking the necessary "factfinding and record-developing capabilities," _McNary_, 498 U.S. at 497, the court of appeals would need to remand for an immigration judge to conduct the requisite hearing.  As a result, prior to or during the course of any proceedings on remand, most, if not all, of the remaining plaintiffs would cease to be juveniles.  Thus, channeling plaintiffs' right-to-counsel claim to the court of appeals would be "the practical equivalent of a total denial of judicial review."  _See_ _id._  The Court therefore holds that, pursuant to the _McNary_ doctrine, plaintiffs are not required by §§ 1252(a)(5) and (b)(9) to administratively exhaust their due process claim to appointment of counsel at government expense.

The Court, however, reaches the opposite conclusion with respect to plaintiffs' statutory claim that, absent an appointed attorney, they cannot take advantage of their rights under INA § 240(b) to present evidence and cross-examine witnesses.  Although this claim involves a "procedure or policy" collateral to plaintiffs' substantive eligibility, it does not meet the other _McNary_ criteria.  Because the claim is predicated on statutory rather than due process rights, the _Mathews_ balancing standard does not apply and, as a result, concerns about the adequacy of the administrative record are not warranted.  In addition, because the claim involves statutory rights, which an immigration judge must and has authority to honor, plaintiffs cannot show ripeness by establishing the requisite futility.

The conclusion that the Court lacks jurisdiction over plaintiffs' statutory claim is supported by _Ching v. Mayorkas_, 725 F.3d 1149 (9th Cir. 2013).  In _Ching_, the plaintiffs were a U.S. citizen and his wife, on whose behalf the husband sought an I-130 visa.  _Id._

at 1153.  The wife had lawfully entered the United States as a nonimmigrant visitor and then dated, married, and divorced another U.S. citizen.  _Id._  During an investigation, United States Citizenship and Immigration Services ("USCIS") officers obtained a sworn statement from the first husband indicating that the first marriage was a sham, and the second husband's I-130 visa petition was denied.  _Id._  The plaintiffs sued, alleging that USCIS had violated INA § 240(b) by not affording the plaintiffs an opportunity to cross-examine the first husband about his sworn statement.  _Id._ at 1154.  The Ninth Circuit held that, to the extent the plaintiffs claimed USCIS violated INA § 240(b), the district court properly granted summary judgment because it lacked jurisdiction to consider the claim, a petition for review to the court of appeals being the "sole and exclusive means" for judicial review.  _Id._ (citing 8 U.S.C. § 1252(a)(5)).  _Ching_ requires that plaintiffs' statutory claim, which likewise asserts a violation of INA § 240(b), be channeled via § 1252(a)(5) to the appropriate court of appeals.

        _Ching_ also supports the distinction being drawn here between plaintiffs' statutory and constitutional claims.  In _Ching_, in addition to their assertion that USCIS violated INA § 240(b), the plaintiffs alleged that their due process rights were infringed when they were not permitted to cross-examine the first husband or the USCIS officer who took his statement.  The district court granted summary judgment against the plaintiffs, finding that the opportunity to respond in writing to the first husband's statement was sufficient for due process.  _Id._ at 1154.  The Ninth Circuit employed the three-part balancing test

ORDER - 19

1    articulated in _Mathews_[12] to reverse the district court's decision on the due process claim.

2    _Id._ at 1157-59.  In other words, in _Ching_, although the statutory and constitutional claims

3    sought identical relief, the channeling of the statutory claim to the court of appeals did

4    not affect the constitutional claim.[13]  The Court is persuaded that, in this case, the same

5    result is appropriate.

6        Channeling the statutory claim but not the constitutional claim is also consistent

7    with the First Circuit's decision in _Aguilar_.  Unlike plaintiffs in this case, the plaintiffs in

8    _Aguilar_ did not seek counsel at government expense.  Rather, the plaintiffs in _Aguilar_,

9    who were detained following a raid of a government contractor's factory, alleged that the

10

11   _____

12   [12] With regard to the first _Mathews_ factor concerning the plaintiffs' interests in _Ching_, the Ninth Circuit
     observed that the right "to live with and not be separated from one's immediate family is 'a right that
13   ranks high among the interests of the individual' and that cannot be taken away without procedural due
     process."  725 F.3d at 1157.  As to the second prong of the _Mathews_ analysis, the Ninth Circuit concluded
     that the risk of erroneously finding a prior marriage fraudulent is "high" when the only evidence of fraud
14   is a six-sentence written statement of an ex-spouse, who might be motivated by malice, vindictiveness, or
     jealously, and/or who might have been intimidated by an unexpected visit from government officers.  _Id._
15   at 1157-58.  Finally, in assessing the third _Mathews_ component, the Ninth Circuit considered the fact that
     the process sought by plaintiffs, namely to cross-examine witnesses presented by the government, was
     already statutorily guaranteed to aliens in removal proceedings, and thus, in the different context of
16   adjudicating an I-130 visa petition, such process would not likely pose "practical problems" or entail
     significant financial or administrative burdens.  _Id._ at 1158-59.

17   [13] Indeed, because the district court in _Ching_ addressed the merits of the plaintiffs' due process claim, the
     Ninth Circuit had an adequate record for engaging in the _Mathews_ balancing.  In _Ching_, however, the
18   _Mathews_ analysis was relatively straightforward, involving primarily the events leading to USCIS's
     procurement of the first husband's statement, evidence proffered by the plaintiffs to rebut the allegation
19   that the previous marriage was a sham, and inferences about the manner in which an ex-spouse might
     behave, particularly if the prior relationship was bona fide and intimate.  _See_ 725 F.3d at 1158.  In
     contrast, in this case, the _Mathews_ inquiry is anticipated to be complex, perhaps requiring statistical
20   comparisons and expert testimony.  Unlike the husband and wife in _Ching_, plaintiffs in this case seek
     process that is not already available or statutorily authorized, and the evaluation of financial and
21   administrative burdens associated with the additional or alternative procedural safeguards proposed in this
     case might necessitate far more factfinding than transpired in _Ching_.  The intricacies of applying _Mathews_
22   in this case precisely illustrate the point made in _McNary_ about a district court, rather than a court of
     appeals, constituting the appropriate forum for developing the requisite record.  _See_ 498 U.S. at 497.

23

government infringed their statutory rights by "barring their access to lawyers, interfering with preexisting attorney-client relationships, and making it difficult to secure counsel of their choosing."  510 F.3d at 13.  The First Circuit viewed the statutory right-to-counsel claims as "commonplace," frequently featured in petitions for judicial review of removal orders, and thus not "sufficiently separate from removal proceedings to be considered either 'independent' or 'collateral.'"  _Id._  In the First Circuit's view, aliens "can receive effective relief for their alleged violations of the right to counsel simply by navigating the channels deliberately dredged by Congress," as evidenced by the experiences of the plaintiffs in _Aguilar_, who received continuances when requested for the purpose of retaining counsel, and who generally secured changes in venue back to Massachusetts, where they had been working and residing.  _Id._ at 14.  These same or similar methods might be equally effective in ensuring that the statutory rights of plaintiffs in this case, to present evidence and cross-examine witnesses during the course of removal proceedings, are protected.  Because continuances, changes of venue, and the like might enable at least some alien minors to gather the relevant materials and prepare to adequately confront the government's evidence, including any witnesses, the Court concludes that § 1252(b)(9) requires plaintiffs to exhaust these avenues of possible relief.

In rejecting the contention that _McNary_ allowed the plaintiffs in _Aguilar_ to circumvent the channeling mechanism of § 1252(b)(9), the First Circuit observed:

> As the Supreme Court suggested in _McNary_, requiring exhaustion of certain pattern and practice claims might result in a total denial of meaningful judicial review.  The trick is to distinguish wheat from chaff, that is, to distinguish what must be exhausted from what need not be exhausted.  In that endeavor, the most salient questions involve whether the

1
2

> underlying claims are cognizable within the review process established by
> Congress, and if so, whether enforcement of the exhaustion requirement
> will allow meaningful judicial review without inviting an irreparable injury.

3   510 F.3d at 17 (citations omitted).  The First Circuit distinguished, as does this Court,

4   between statutory claims that an immigration judge can adequately address during the

5   course of removal proceedings and the "rare" denial-of-due-process claims "that are

6   beyond the authority of the agency to adjudicate." _Id._ at 18 n.4.  With regard to the

7   former "commonplace" claims, the "vise-like grip of § 1252(b)(9)" cannot be avoided.

8   _Id._ at 9.  As to the latter claims, which, if they exist at all, must include the constitutional

9   right-to-counsel claim asserted in this case, _McNary_ preserves the "strong presumption in

10  favor of judicial review of administrative action."  _See_ 498 U.S. at 498.  Having thus

11  separated the proverbial wheat from chaff, the Court GRANTS in part defendants'

12  Rule 12(b)(1) motion and DISMISSES for lack of jurisdiction plaintiffs' first claim for

13  violation of INA § 240.[14]  The Court further HOLDS that §§ 1252(a)(5) and (b)(9) do not

14  bar plaintiffs' second claim under the Due Process Clause of the Fifth Amendment, and

15  now turns its attention to the issue of sovereign immunity.

16  **3.    Sovereign Immunity**

17          The United States, as sovereign, is immune from suit "save as it consents to be

18  sued," and any waiver of sovereign immunity must be "unequivocally expressed."

19  _United States v. Testan_, 424 U.S. 392, 399 (1976).  An action seeking injunctive relief

20

21  ─────────────────────

22  [14] The Court need not address the parties' arguments concerning the Criminal Justice Act ("CJA") because plaintiffs "nowhere allege that the CJA creates a freestanding right to appointed counsel."  _See_ Plas.' Supp. Br. at 12-13 (docket no. 98).

23

ORDER - 22

against a federal officer in his or her official capacity is equivalent to an action against

the United States.  _Stimac v. Haag_, 2010 WL 3835719 at *2 (N.D. Cal. Sep. 29, 2010)

(citing _Larson v. Domestic & Foreign Commerce Corp._, 337 U.S. 682, 687-88 (1949)).

In this case, defendants are each sued in their official capacity.  _See_ 2d Am. Compl.

¶¶ 24-31 (docket no. 95).  Plaintiffs therefore bear the burden of establishing the

existence of an unequivocal waiver of sovereign immunity.  _See_, _e.g._, _Baker v. United

States_, 817 F.2d 560, 562 (9th Cir. 1987).

        The only basis for jurisdiction pleaded by plaintiffs that might serve as a waiver

of sovereign immunity[15] is a provision of the Administrative Procedures Act ("APA"),

namely 5 U.S.C. § 702, which reads in relevant part:

> An action in a court of the United States seeking relief other than money
> damages and stating a claim that an agency or an officer or employee
> thereof acted or failed to act in an official capacity or under color of legal
> authority shall not be dismissed nor relief therein be denied on the ground
> that it is against the United States or that the United States is an
> indispensable party.

The case on which plaintiffs principally rely, _The Presbyterian Church (U.S.A.) v. United

States_, 870 F.2d 518 (9th Cir. 1989), predates IIRIRA and the REAL ID Act, but more

recent authorities support plaintiffs' position that sovereign immunity has been waived.

---

[15] Plaintiffs have also pleaded that jurisdiction exists under 28 U.S.C. §§ 1331, 1651, & 2241, _see_ 2d Am. Compl. ¶ 8 (docket no. 95), but none of these statutes operates as a waiver of sovereign immunity.  _See Holloman v. Watt_, 708 F.2d 1399, 1401 (9th Cir. 1983) ("Section 1331 does not waive the government's sovereign immunity from suit."); _Stimac_, 2010 WL 3835719 at *2 (Section 1651 "does not constitute a waiver of sovereign immunity."); _see also Rumsfeld v. Padilla_, 542 U.S. 426, 447 (2004) (holding that the proper respondent in a matter brought under § 2241 is the warden who has physical custody over the habeas petitioner); _O'Brien v. Moore_, 395 F.3d 499, 508 (4th Cir. 2005) (Equal Access to Justice Act's "waiver of sovereign immunity for awards of attorneys fees does not extend to habeas corpus proceedings").

Historically, courts relied on the "fiction" articulated in _Ex parte Young_, 209 U.S. 123 (1908), to permit claims for prospective injunctive relief against government officials despite sovereign immunity.  _EEOC v. Peabody W. Coal Co._, 610 F.3d 1070, 1085 (9th Cir. 2010).  Since 1976, however, courts have looked to § 702 of the APA to serve the purposes of the _Ex parte Young_ fiction in suits against federal officers; section 702 is viewed as the requisite waiver of sovereign immunity for equitable actions brought under 28 U.S.C. § 1331.  _See id._ at 1085-86; _Gallo Cattle Co. v. U.S. Dep't of Agric._, 159 F.3d 1194, 1198 (9th Cir. 1998); _see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak_, 132 S. Ct. 2199, 2204 (2012); _Pullman Constr. Indus., Inc. v. United States_, 23 F.3d 1166, 1168 (7th Cir. 1994) (observing that "the United States is no stranger to litigation in its own courts" and that "Congress has consented to litigation in federal courts seeking equitable relief from the United States" (citing 5 U.S.C. § 702 and _Bowen v. Mass._, 487 U.S. 879 (1988))); _Shanti, Inc. v. Reno_, 36 F. Supp. 2d 1151, 1159-60 (D. Minn. 1999).

The APA contains explicit exceptions to, and thereby limits, its waiver of sovereign immunity.  _See Gallo_, 159 F.3d at 1198; _see also Patchak_, 132 S. Ct. at 2204-05.  Section 702's waiver of sovereign immunity does not extend to (i) claims as to which a statute precludes judicial review, (ii) claims that challenge an action committed by law to agency discretion, or (iii) claims that seek review of a decision that is not final within the meaning of the APA.  _See_ 5 U.S.C. § 701(a) ("This chapter applies, according to the provisions thereof, except to the extent that-- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."); 5 U.S.C. § 704 ("Agency

1    action made reviewable by statute and final agency action for which there is no other

2    adequate remedy in a court are subject to judicial review."); *see also* *Patchak*, 132 S. Ct.

3    at 2204-05; *Gallo*, 159 F.3d at 1198; *Shanti*, 36 F. Supp. 2d at 1160.  An action is final if

4    it "mark[s] the consummation of the agency's decision making process," is not "merely

5    tentative or interlocutory" in nature, and is "one by which rights or obligations have been

6    determined, or from which legal consequences will flow." *Gallo*, 159 F.3d at 1198-99.

7          The Court is satisfied that the exceptions to § 702's waiver of sovereign immunity

8    do not apply with regard to plaintiffs' constitutional right-to-counsel claim.  Having

9    performed the *McNary* analysis, the Court concludes that no statute precludes judicial

10   review of such claim, and thus § 701(a)(1) is no obstacle.  Moreover, the issue of whether

11   plaintiffs are entitled to an attorney at government expense is undisputedly not committed

12   to agency discretion by law and, as a result, § 701(a)(2) has no relevance.  Finally, the

13   matter comports with § 704's finality requirement because neither immigration judges

14   nor the BIA have the authority to grant plaintiffs the relief they seek.  In essence, as noted

15   by plaintiffs' counsel during oral argument, the answer to the sovereign immunity

16   question tracks the result of the *McNary* inquiry; because §§ 1252(a)(5) and (b)(9) do not

17   channel plaintiffs' constitutional right-to-counsel claim away from this Court, sovereign

18   immunity is waived.  *Cf. Morrison-Knudsen Co. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1214

19   (9th Cir. 1987) ("[The Federal Savings and Loan Insurance Corporation's] effort to

20   recharacterize its essential argument as a sovereign immunity claim is disingenuous.  If

21   the pertinent statutes indeed confer upon FSLIC exclusive jurisdiction over the matters at

22   issue, then the sovereign immunity issue does not arise.  If they do not, then the immunity

23

1    contention is unavailing.  The sovereign immunity terminology . . . adds nothing to

2    FSLIC's argument.").

3         The finding of sovereign-immunity waiver in this case is consistent with other

4    decisions.  For example, with regard to the claims of a minor, who was an American

5    citizen seeking to prevent the removal of his undocumented alien mother on the ground

6    that his mother's removal would violate his own constitutional rights, the Sixth Circuit

7    held that the district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331,

8    and that the APA operated to waive sovereign immunity.  _See_ _Hamdi ex rel. Hamdi v._

9    _Napolitano_, 620 F.3d 615 (6th Cir. 2010).  Like remaining plaintiffs in this case, the

10   plaintiff in _Hamdi_ had no other avenue for presenting his constitutional claims; he could

11   not have raised them in either his mother's removal proceedings or on judicial review.

12   _See_ _id._ at 620-24.

13        Neither _Ardestani v. INS_, 502 U.S. 129 (1991),[16] which was cited by the Sixth

14   Circuit in _Hamdi_, nor _Al-Nashiri v. MacDonald_, 2012 WL 1642306 (W.D. Wash.

15   May 10, 2012),[17] require a different result.  Although both _Ardestani_ and _Al-Nashiri_ rely

16

17
_____

18   [16] In _Ardestani_, the petitioner successfully sought asylum during the course of deportation proceedings
     and was awarded attorney fees by the immigration judge pursuant to the Equal Access to Justice Act
     ("EAJA") on the ground that she was the prevailing party and the INS's position had not been
19   "substantially justified."  502 U.S. at 131.  The Supreme Court concluded that EAJA, which operates as a
     waiver of sovereign immunity, did not extend to administrative deportation proceedings.  _Id._ at 132-34,
20   137-38.  In reaching this decision, the _Ardestani_ Court reiterated that the INA "expressly supersedes" the
     APA.  _Id._ at 133.

21   [17] In _Al-Nashiri_, the plaintiff argued that the APA waived sovereign immunity as to his claim that the
     official who convened a military commission against him, relating to his alleged role in al Qaeda terrorist
22   attacks, acted in an unconstitutional manner.  2012 WL 1642306 at *1, *4, & *8.  The district court ruled
     that 28 U.S.C. § 2241(e)(2), which relates to certain claims of an alien "enemy combatant," constituted a

23

ORDER - 26

1  on jurisdiction-stripping or channeling provisions to reject assertions of a waiver of

2  sovereign immunity, the cases are distinguishable because neither case involved a claim,

3  like the one at issue here, that is eligible for _McNary_ treatment.  Moreover, neither case

4  concerned IIRIRA or the REAL ID Act, _Ardestani_ having been decided before those

5  statutes were enacted and _Al-Nashiri_ dealing exclusively with the Military Commissions

6  Act of 2006.  Thus, with respect to remaining plaintiffs' constitutional claim, the Court is

7  persuaded that sovereign immunity has been unequivocally waived, and to the extent

8  defendants' Rule 12(b)(1) motion to dismiss is premised on sovereign immunity, it is

9  DENIED.

10  **B.**     **Failure to State a Claim**

11       Without conceding that the _Mathews_ balancing standard applies to plaintiffs' due

12  process claim, defendants contend that plaintiffs do not state a "plausible" basis for relief

13  under _Mathews_.[18]  Defendants' Rule 12(b)(6) motion, however, ignores the allegations of

14  the Second Amended Complaint, relies on facts outside the pleadings, and invites the

15  Court to engage in the type of analysis more appropriately reserved for summary

16

17  statute precluding judicial review that thwarted the plaintiff's invocation of APA § 702.  _Id._ at *8 (citing APA § 701(a)(1)).

18  [18] A complaint must offer "more than labels and conclusions," contain more than a "formulaic recitation of the elements of a cause of action," and indicate more than mere speculation of a right to relief.  _Bell
19  Atl. Corp. v. Twombly_, 550 U.S. 544, 555 (2007).  A complaint may be lacking for one of two reasons: (i) absence of a cognizable legal theory, or (ii) insufficient facts under a cognizable legal claim.  _See
20  Robertson v. Dean Witter Reynolds, Inc._, 749 F.2d 530, 534 (9th Cir. 1984).  In ruling on a motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences
21  in the plaintiff's favor.  _Usher v. City of Los Angeles_, 828 F.2d 556, 561 (9th Cir. 1987).  The question for the Court is whether the facts in the complaint sufficiently state a "plausible" claim.  _Twombly_, 550 U.S.
22  at 570 ("we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face").

23

ORDER - 27

judgment or trial.  The Court declines to prematurely evaluate the merits of plaintiffs'

constitutional claim and, for the reasons discussed below, DENIES defendants'

Rule 12(b)(6) motion.

Historically, right-to-counsel claims under the Due Process Clause of the Fifth

Amendment in the immigration context were analyzed under a two-part standard:

(i) whether the proceedings were rendered "fundamentally unfair," and (ii) whether the

alien was thereby prejudiced.  *See, e.g.*, *Lin v. Ashcroft*, 377 F.3d 1014, 1023-24 (9th Cir.

2004); *Dearinger ex rel. Volkova v. Reno*, 232 F.3d 1042, 1045 (9th Cir. 2000).  The

procedural postures of previous right-to-counsel cases, however, differ from that of the

one before the Court.  Those cases all involved either direct review of a removal or other

BIA order or collateral attack of a removal order being used as evidence in a prosecution

for illegal reentry.[19]

Cases more procedurally analogous to the matter before the Court indicate that

*Mathews* sets forth the appropriate test.  *See* *Walters v. Reno*, 145 F.3d 1032, 1043-44

(9th Cir. 1998); *see also* *Ching v. Mayorkas*, 725 F.3d 1149, 1157-59 (9th Cir. 2013).  At

oral argument, counsel for defendants seemed to suggest that *Mathews* would apply with

respect to "deportable" aliens, but not as to "inadmissible" aliens.  Defendants, however,

---

[19] *See* *Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005) (review of BIA decisions); *Lin*, 377 F.3d at 1019 (review of BIA decision); *United States v. Gasca-Kraft*, 522 F.2d 149, 150 (9th Cir. 1975) (appeal from conviction for illegal reentry); *Murgia-Melendrez v. INS*, 407 F.2d 207 (9th Cir. 1969) (review of BIA decision); *see* *Michelson v. INS*, 897 F.2d 465, 466 (10th Cir. 1990) (review of deportation order); *United States v. Saucedo-Velasquez*, 843 F.2d 832, 833 (5th Cir. 1988) (appeal from conviction for illegal reentry); *Aguilera-Enriquez v. INS*, 516 F.2d 565 (6th Cir. 1975) (review of deportation order); *see also* *Dearinger*, 232 F.3d at 1043-44 (habeas review of denial of asylum); *United States v. Segundo*, 2010 WL 4791280 (S.D. Tex. Nov. 16, 2010) (dismissal of indictment charging illegal reentry).

ORDER - 28

1    have cited no authority to support the proposition that such distinction can now be drawn,

2    in the context of analyzing what process is due to such individuals, in light of IIRIRA's

3    merger of matters involving inadmissible and deportable aliens into one proceeding

4    known as "removal."   The Court is satisfied that plaintiffs' due process right-to-counsel

5    claim requires a weighing of the three factors articulated in _Mathews_, namely, the nature

6    of plaintiffs' interest, the risk of erroneous deprivation, and the fiscal or administrative

7    burdens on the government associated with additional or substitute safeguards.  _See_ 424

8    U.S. at 335; _see also_ _Turner v. Rogers_, 131 S. Ct. 2507, 2517-18 (2011).

9          In _Turner_, in which the Supreme Court employed _Mathews_, a noncustodial parent,

10   who was incarcerated until he "purged" himself of contempt by making the requisite

11   child support payments, asserted that his due process rights had been violated by South

12   Carolina's failure to appoint counsel to represent him.  131 S. Ct. at 2512-13, 2515-16.

13   In concluding that due process "does not _automatically_ require the provision of counsel at

14   civil contempt proceedings . . . even if [the indigent] individual faces incarceration," _id._

15   at 2520 (emphasis in original), the _Turner_ Court was persuaded that a substitute set of

16   safeguards[20] would sufficiently reduce the risk of erroneous deprivation, and that,

17   because the opposing party (the custodial parent) was likewise unrepresented by counsel,

18   the playing field was appropriately level, _id._ at 2519.  The Supreme Court expressed

19   concern that requiring South Carolina to provide counsel to noncustodial parents would

---

20

21   [20] The alternatives to the appointment of counsel included (i) providing notice to the noncustodial parent
     that "ability to pay" constitutes a critical issue, (ii) using a form to elicit relevant financial information,
22   (iii) allowing the noncustodial parent to be heard about his or her financial status, and (iv) requiring the
     court to enter findings about the "ability to pay."  131 S. Ct. at 2519.

23

ORDER - 29

"create an asymmetry" unfavorable to the custodial parent to whom child support payments are owed.  *Id.*

In *Turner*, the Supreme Court left open the issue of whether, when the government has "counsel or some other competent representative" in the proceeding, the individual involved is owed more process than the privilege of retaining an attorney.  *See id.* at 2520.  The *Turner* Court similarly reserved ruling on "what due process requires in an unusually complex case" when the individual "can fairly be represented only by a trained advocate."  *Id.*  The right-to-counsel claim asserted by plaintiffs in this case falls squarely within the intersection of the questions unanswered in *Turner*.  The removal proceedings at issue in this case pit juveniles against the full force of the federal government – the government initiates the proceedings, it is represented in them, and its discretion in executing removal orders is insulated from judicial review.[21]  Moreover, courts have repeatedly recognized "[w]ith only a small degree of hyperbole" that the immigration laws are "second only to the Internal Revenue Code in complexity."[22]  *Baltazar-Alcazar*

---

[21] Prior to the passage of IIRIRA, an alien who appealed a decision of the BIA was automatically entitled to a stay of removal; IIRIRA eliminated this statutory provision.  *Andreiu v. Ashcroft*, 253 F.3d 477, 479-80 (9th Cir. 2001).  A stay of removal must now be obtained from a court of appeals; in the Ninth Circuit, the standard for obtaining such stay is a showing of either (i) probable success on the merits and the possibility of irreparable injury or (ii) serious legal questions on the merits and a balance of hardships tipping sharply in the movant's favor.  *Id.* at 480-84; *see also Nken v. Holder*, 556 U.S. 418 (2009).

[22] For example, navigating just through the provisions relating specifically to juveniles is itself difficult.  In defining "inadmissible" aliens as those "present without admission or parole," Congress included an exception for certain battered women and children, which applies when (i) the alien is a petitioner under the Violence Against Women Act of 1994, (ii) the alien or the alien's child has been "battered or subjected to extreme cruelty" by an enumerated household member, and (iii) a "substantial connection" exists between such battery or extreme cruelty and the alien's unlawful entry into the United States.  8 U.S.C. § 1182(a)(6)(A)(ii); *see* 8 U.S.C. § 1229b(b)(2)(A) (allowing the Attorney General to "cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence" an alien

1   *v. INS*, 386 F.3d 940, 948 (9th Cir. 2004).  With this perspective in mind, the Court turns

2   to the *Mathews* factors.

3       **1.       First *Mathews* Factor: Nature of Interest**

4       In their motion to dismiss, defendants contend that the requisite liberty interest is

5   not at stake, stating that "deportation is not punishment."  Defs.' Mot. at 21 (docket

6   no. 80).  Defendants' assertion misses the mark.  Deportation has been described as "a

7   drastic measure and at times the equivalent of banishment or exile" – it is a "forfeiture for

8   misconduct" and "a penalty."  *INS v. Errico*, 385 U.S. 214, 225 (1966).  In contrast,

9   "exclusion" requires no showing of wrongdoing, only a finding of inadmissibility.  *See*

10  *Dormescar*, 690 F.3d at 1260; *see also* 8 U.S.C. § 1229a(e)(2)(A).  The terms

11  "deportation" and "exclusion," however, no longer play their historical roles because of

12  the changes wrought by IIRIRA, and plaintiffs in this case are facing "removal."

13

14

---

15  qualifying as a battered spouse or child); *see also Lopez-Birrueta v. Holder*, 633 F.3d 1211, 1216 (9th
    Cir. 2011) (differentiating between "battery," which involves an act or threatened act of violence, and
16  "extreme cruelty," which connotes "something other than physical assault, presumably actions in some
    way involving mental or psychological cruelty").  Congress has also provided a mechanism for certain
    juveniles to obtain "special immigrant" status and thereby apply for permanent residency.  *See Perez-*
17  *Olano v. Gonzalez*, 248 F.R.D. 248, 252 (C.D. Cal. 2008).  For a minor to be eligible for "special
    immigrant" status, (i) the minor must be dependent on a juvenile court or state agency and qualify for
18  long-term foster care because of abuse, neglect, or abandonment, (ii) an administrative or judicial
    determination must be made that the minor's best interest would not be served by return to his or her
    home country, and (iii) the Secretary of Homeland Security must consent.  *Id.* at 253; *see* 8 U.S.C.
19  § 1101(a)(27)(J); *see also* 8 C.F.R. § 204.11(c).  A minor granted "special immigrant" status may apply
    for adjustment to permanent residence status pursuant to 8 U.S.C. § 1255; however, once a minor is in
20  removal proceedings, he or she may seek an adjustment of status only from the immigration judge or
    BIA.  8 C.F.R. §§ 245.2(a)(1) & 1245.2(a)(1)(i).  In addition, Congress has crafted special rules for
21  children from contiguous countries who are unaccompanied and (i) have been victims of trafficking in
    persons, (ii) have credible fear of persecution if returned to their country of nationality or last residence,
22  or (iii) are unable to make independent decisions to withdraw applications for admission to the United
    States.  8 U.S.C. § 1232; *see infra* note 27.

23

ORDER - 31

In discounting the nature of plaintiffs' interest, defendants rely on *Turner*, in which the Supreme Court observed that, in the civil context, incarceration has been deemed a necessary, but not sufficient, prerequisite to finding a right to counsel under the Due Process Clause.  *See* 131 S. Ct. at 2517.  Defendants, however, cite no authority for the proposition that the Court must focus on the "administrative act" of removal itself, *see* Defs.' Mot. at 21, and ignore the potential effect of removal, which might be the same or worse than incarceration for some minor aliens.[23]  Thus, for purposes of ruling on defendants' motion to dismiss, the allegations in the Second Amended Complaint, which the Court must accept as true, support the likely consequences of plaintiffs returning to their homelands.[24]

## 2.   **Second *Mathews* Factor: Risk of Erroneous Deprivation**

Defendants offer three reasons why plaintiffs cannot establish the requisite risk of erroneous deprivation:  (i) the risk of error in removal decisions is the same for juveniles

---

[23] Indeed, defendants do not, and cannot on a Rule 12(b)(6) motion, contest the allegations of the Second Amended Complaint.  The operative pleading indicates that the three siblings, J.E.F.M., J.F.M., and D.G.F.M., fled El Salvador because they had become targets of a gang, which had murdered their father in front of them.  2d Am. Compl. ¶¶ 66-73 (docket no. 95).  Their parents, both pastors, had been working to encourage youth to leave gangs, and after their father was killed, their mother fled the country, leaving them in the care of their grandmother.  *Id.* at ¶ 66.  They were threatened with harm if they did not join the gang; at the time, the youngest sibling was only nine years old.  *Id.* at ¶¶ 67, 70, & 72.  J.E.V.G. similarly alleges that he left El Salvador because he feared gang violence.  *Id.* at ¶ 109.  F.LB. indicates that he was a victim of abuse at the hands of his alcoholic father in Guatemala, *id.* at ¶ 74, and M.A.M. expresses concern about his inability to adapt to his country of origin in light of the tender age at which he left and about the absence of a caretaker in his native land, *id.* at ¶¶ 81-86 (indicating that, shortly before M.A.M. turned eight, his father was attacked with a machete and became, as a result, profoundly disabled; his grandmother having grown elderly and ill, and having no one else in Honduras to care for him, M.A.M. came to the United States to be reunited with his mother).

[24] Defendants' argument that the interests of the named plaintiffs are not typical of those of the members of the putative class does not negate the dire predictions of harm, and is more appropriately addressed in connection with a motion to certify a class, *see* Fed. R. Civ. P. 23(a), or at a later stage of this litigation.

as it is for adults; (ii) children already receive additional process designed to reduce the

risk of erroneous removal decisions; and (iii) the availability of appellate and judicial

review is a sufficient substitute for the assistance of counsel in removal proceedings.  The

first two arguments require evidentiary support[25] and are not properly before the Court on

a Rule 12(b)(6) motion.[26]  The third contention runs contrary to common sense.  Under

---

[25] In response to defendants' arguments, plaintiffs have submitted five declarations, three from attorneys, one from a law student, and one from a volunteer for a faith-based organization, concerning the manner in which particular immigration judges handle removal proceedings.  *See* Dubale Decl. (docket no. 99); Flores Decl. (docket no. 100); Gaughan Decl. (docket no. 101); Pollman Decl. (docket no. 102); Scholtz Decl. (docket no. 103).  The Court DECLINES to consider these declarations because doing so would convert the pending motion to dismiss into one for summary judgment.  *See* Fed. R. Civ. P. 12(d).

[26] In addition, defendants' assertion of equivalent risk among minors and adults is inconsistent with their representation that special treatment is afforded to children in removal proceedings.  If the risk was in fact comparable for the two populations, then presumably no additional procedural protections would exist for juveniles.  Youth, however, generally correlates with a lack of proficiency in reading and comprehension, even in a native language.  For those whose school-age years were stained by violence, poverty, parental neglect, or similar hardships, literacy might be an as-yet unachieved goal.  Even if minors are, however, able to understand the notices to appear and other documents related to removal proceedings, they are not necessarily the household members who retrieve or sort the mail, and the presumptions usually made when materials are properly addressed to adults might not be appropriate.  Moreover, even assuming children receive hearing notices and grasp their meaning, they might lack the ability to travel to and attend such hearings, particularly if they are of an age rendering them ineligible to drive or to travel unaccompanied by air.  Finally, even when juveniles successfully navigate themselves to removal proceedings, age might still play a role in increasing their risk of receiving an erroneous ruling.  *See* 2d Am. Compl. ¶ 42 (suggesting that children are taught not to challenge adult authority and are more susceptible to leading questions and other forms of adult influence).  The question that must be addressed in this case is whether the appointment of counsel at government expense is the only effective means of reducing the risk of erroneous removal decisions for minors.  Defendants' contention that the special rules governing "juvenile dockets" serve as an effective substitute for the appointment of counsel currently lacks statistical support.  In opposing plaintiffs' earlier motion for a preliminary injunction, defendants cited a report indicating that, in the first half of 2014, 42% of children having no attorney were permitted to remain in the United States.  *See* http://trac.syr.edu/immigration/reports/359/.  Defendants argued these statistics show that not every minor lacking legal representation will suffer a due process violation.  The same report, however, revealed that, over the same period, juveniles having counsel received a favorable ruling 66% of the time.  *Id.*  In focusing on the percentage of unrepresented minors who avoided removal, defendants ignored the disparity in outcomes between those who have counsel and those who do not.  When the statistics for the years 2005 through 2014 are considered, the gap is even wider, *i.e.*, 10% versus 47% success rates for unrepresented and represented juveniles, respectively.  *Id.*  If counsel was indeed unnecessary, the percentages would presumably be more comparable.

ORDER - 33

1   this theory, counsel would be unnecessary even in a criminal proceeding because the

2   accused, if convicted, could always appeal.  Moreover, the argument ignores the fact that

3   review is generally limited to the administrative record, *see* 8 U.S.C. § 1252(b)(4)(A),

4   and that the absence of counsel in the underlying proceeding is likely to affect the shape

5   and scope of such record.  The Court also observes that, despite the safeguards touted by

6   defendants, at least one named plaintiff, J.E.V.G., was improperly ordered removed in

7   absentia.  Defendants' concession in this regard supports a "plausible" claim that the

8   current procedures available to juveniles[27] are not an adequate substitute for the

9   appointment of counsel at government expense.  Whether plaintiffs can ultimately prevail

10  on this issue is a question for another day.

11      **3.      Third *Mathews* Factor: Fiscal and Administrative Burdens**

12      Although plaintiffs' right-to-counsel claim poses significant questions about

13  feasibility and cost, the Court cannot resolve those issues in the context of defendants'

14  Rule 12(b)(6) motion.  The parties have not indicated either the percentage of cases

15  involving unaccompanied minors or the percentage of cases in which an attorney was

16  retained, secured from a pro bono panel, or provided under either HHS's or the justice

---

[27] Pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), the Secretary of Health and Human Services ("HHS") is "authorized to appoint independent child advocates for child trafficking victims and other vulnerable unaccompanied alien children." 8 U.S.C. § 1232(b)(6)(A); *see also* 6 U.S.C. § 279(g)(2) (an "unaccompanied alien child" is an individual who "has no lawful immigration status" in the United States, has not attained the age of 18, and has no parent or legal guardian in the United States available to "provide care and physical custody").  Child advocates have historically been sited only in Chicago, Illinois and Harlingen, Texas, but in 2013, Congress required that, within two years, the Secretary of HHS appoint child advocates at three new detention locations, and that, within three years, child advocates be available at yet another three sites. 8 U.S.C. § 1232(c)(6)(B)(i)&(ii).  Defendants' Rule 12(b)(6) motion is not the appropriate vehicle for considering whether child advocates can sufficiently reduce the risk of error in removal proceedings.

ORDER - 34

1  AmeriCorps program.  Moreover, no estimates have been provided concerning either the

2  amount of funding necessary to appoint counsel for each juvenile desiring an attorney but

3  lacking the means to retain one[28] or the financial burden that might be associated with

4  less expansive schemes.[29]

5      Rather than attempting to quantify the financial and administrative burdens

6  associated with plaintiffs' requested relief or possible alternatives, defendants speak

7  broadly in "slippery slope" terms.  They express concern about the wheels of removal

8  proceedings involving minors grinding to a halt if the government is required to provide

9  counsel for every juvenile in a removal proceeding.  Defendants assert that the effect of a

10  ruling favorable to plaintiffs would be to encourage even more youngsters to journey

11  illegally to the United States.  They also seem to fear that the Court will inadvertently

12  _____

13  [28] The TVPRA requires the Secretary of HHS to "ensure, to the greatest extent practicable and consistent with" INA § 292 (8 U.S.C. § 1362) that all unaccompanied minors "have counsel to represent them in

14  legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  Defendants represent that $9 million has been allocated to perform this mandate and provide attorneys to 2,600 unaccompanied minors.  See Reply at 2 n.2 (docket no. 104).  Defendants have

15  also indicated that, in the fall of 2014, the Department of Justice and the Corporation for National and Community Service implemented a program known as "justice AmeriCorps," which will enroll approximately 100 lawyers and paralegals to provide services to "certain children who have crossed the

16  U.S. Border without a parent or legal guardian."  See http://www.nationalservice.gov/newsroom/press-releases/2014/justice-department-and-cncs-announce-new-partnership-enhance.  Defendants have offered

17  no projections concerning the anticipated number of indigent juveniles who are not eligible for either the HHS or justiceAmeriCorps program or the amount needed to provide attorneys to all such youngsters.

18  [29] For example, an alternative might be to employ, for the purposes of assisting minors demonstrating

19  financial need, one attorney for each site at which removal proceedings are conducted.  Such safeguard would presumably entail much less cost than the remedy plaintiffs seek, but it might provide equally

20  effective relief.  Another possibility would be to appoint counsel only during administrative appeals and/or for purpose of judicial review.  If a lawyer concluded that no colorable argument could be made

21  before the BIA and/or a court of appeals, then he or she could simply file a statement to that effect, in the same manner that appointed counsel in criminal cases handle frivolous appeals.  Under this scheme,

22  juveniles whose claims could be quickly and favorably adjudicated would not be unnecessarily provided an attorney, and cases involving youngsters having no legitimate basis for remaining in the United States would be efficiently handled.

23

ORDER - 35

create a loophole through which parents, guardians, or other adult aliens might receive

the services of an appointed attorney.  _Cf._ 8 U.S.C. § 1101(a)(27)(J)(iii)(II) (explicitly

addressing a similar concern:  "no natural parent or prior adoptive parent of any alien

provided special immigrant status . . . shall thereafter, by virtue of such parentage, be

accorded any right, privilege, or status under this chapter").  Although the financial

constraints and border-policing concerns raised by defendants must play a role in any

analysis concerning plaintiffs' assertion of a right to appointed counsel under the Due

Process Clause of the Fifth Amendment, at this juncture, they are not sufficiently

quantified or developed to allow the Court to engage in the balancing required by

_Mathews_.

## C.   __Classwide Relief__

In their supplemental brief in support of their motion to dismiss, defendants ask

the Court to strike plaintiffs' request for injunctive relief on behalf of the putative class.

The INA makes clear that the Court lacks jurisdiction to grant classwide injunctive relief.

_See_ _Rodriguez v. Hayes_, 591 F.3d 1105, 1119 (9th Cir. 2009) (quoting _AAADC II_, 525

U.S. at 481-82).  The Court may, however, enter a classwide declaratory judgment.  _Id._

In _Rodriguez_, the Ninth Circuit interpreted 8 U.S.C. 1252(f)(1), which provides:

> Regardless of the nature of the action or claim or of the identity of the party
> or parties bringing the action, no court (other than the Supreme Court) shall
> have jurisdiction or authority to enjoin or restrain the operation of the
> provisions of part IV of this subchapter [8 U.S.C. §§ 1221-1232], as
> amended by the Illegal Immigration Reform and Immigrant Responsibility
> Act of 1996, other than with respect to the application of such provisions to
> an individual alien against whom proceedings under such part have been
> initiated.

ORDER - 36

1    8 U.S.C. § 1252(f)(1).  The Ninth Circuit concluded that the terms "enjoin" and

2    "restrain," as used in § 1252(f)(1), have different meanings, and that neither encompasses

3    declaratory relief.  591 F.3d at 1119.  Enjoin refers to permanent injunctions, while

4    restrain connotes temporary or preliminary injunctive relief.  _Id._ (citing _Arevalo v._

5    _Ashcroft_, 344 F.3d 1, 7 (1st Cir. 2003)).  Unlike provisions relating to state taxes[30] and

6    state public utility rates,[31] § 1252(f)(1) does not also include the word "suspend," which

7    has been interpreted to cover declaratory relief, and the Ninth Circuit reasoned that

8    Congress knew it was leaving open the possibility of classwide declaratory relief when it

9    omitted the term "suspend" from § 1252(f)(1).  _Id._ (citing _Cal. v. Grace Brethren Church_,

10   457 U.S. 393, 408 (1982)).

11        The Third Circuit has reached a similar result.  _See Alli v. Decker_, 650 F.3d 1007,

12   1014-15 (3d Cir. 2011) ("declaratory relief will not always be the functional equivalent of

13   injunctive relief" and the "distinct purpose and effect of a declaration, as compared to an

14   injunction, presents an entirely plausible basis upon which Congress might choose to bar

15   one form of relief but not the other").  In _Alli_, the Third Circuit explained that, although

16   the district court could enter declaratory judgment in favor of the class, such declaration

---

18   [30] 28 U.S.C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment, levy or
19   collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts
     of such State.").

20   [31] 28 U.S.C. § 1342 ("The district courts shall not enjoin, suspend or restrain the operation of, or
     compliance with, any order affecting rates chargeable by a public utility and made by a State
21   administrative agency or a rate-making body of a State political subdivision, where:  (1) Jurisdiction is
     based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
     (2) The order does not interfere with interstate commerce; and, (3) The order has been made after
22   reasonable notice and hearing; and, (4) A plain, speedy and efficient remedy may be had in the courts of
     such State.").

23

"would not – indeed, by the plain terms of the statute, could not – form the basis for classwide injunctive relief." *Id.* at 1015.  Rather, after securing a declaratory judgment, each individual class member would have to separately invoke it as a ground for individual injunctive relief, which "is expressly permitted under § 1252(f)(1)." *Id.*; *see also id.* at 1015 n.13 (observing that, although "the judiciary has 'long presumed that officials of the Executive Branch will adhere to the law as declared by the court'" the recent position of the Department of Justice is that, "at least under certain circumstances, this presumption applies only after appellate review is exhausted").

In sum, § 1252(f)(1) does not preclude the Court from granting a preliminary or permanent injunction as to "an individual alien against whom proceedings . . . have been initiated."  Section 1252(f)(1), however, deprives the Court of jurisdiction to provide injunctive relief to a class.  If appropriate, the Court could enter a classwide declaratory judgment, but the enforcement of such decision would have to be on a case-by-case basis.  The Court therefore GRANTS in part defendants' Rule 12(b)(6) motion to dismiss, and STRIKES plaintiffs' request for classwide injunctive relief.

**Conclusion**

For the foregoing reasons, defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), docket no. 80, is GRANTED in part and DENIED in part.  The claims of G.D.S., A.E.G.E., and G.J.C.P. are DISMISSED without prejudice.  Plaintiffs' first claim for violation of INA § 240 is DISMISSED for lack of jurisdiction pursuant to 8 U.S.C. §§ 1252(a)(5) and (b)(9).  Plaintiffs' request for classwide injunctive relief is STRICKEN pursuant to 8 U.S.C. § 1252(f)(1), but

1   plaintiffs' prayer for a classwide declaratory judgment and individual injunctive relief

2   will remain in the case.  Defendants' motion to dismiss is otherwise DENIED.

3        IT IS SO ORDERED.

4        Dated this 13th day of April, 2015.

5

6                                          _____

7                                          Thomas S. Zilly
                                           United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23