# Exhibit A

ALDANA MADRID DECL.- 6
(Case No. 2:14-cv-01026-TSZ)

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025



# Juveniles — Immigration Court Deportation Proceedings
### Court Data through September 2015 — see About the Data

**Measure:**

○ Initial Filing

◉ Current Status



**Time Series:**

◉ Number

○ Percent

| Fiscal Year Case Began ▼ | | Represented ▼ | | Outcome ▼ | |
|---|---|---|---|---|---|
| *click on column headings to sort* | | **Fiscal Year=2014**  *click on column headings to sort* | | **Fiscal Year=2014, Represented=Represented**  *click on column headings to sort* | |
| **Fiscal Year** | **Total** | **Represented** | **Total** | **Outcome** | **Total** |
| All | 170,466 | All | 62,651 | All | 31,689 |
| 2014 | 62,651 | Represented | 31,689 | Pending | 19,531 |
| 2015 | 24,612 | Not Represented | 30,962 | Terminate Proceedings | 5,027 |
| 2013 | 22,268 | | | Other Closure | 4,594 |
| 2012 | 11,472 | | | Removal Order | 1,359 |
| 2005 | 8,912 | | | Voluntary Departure | 479 |
| 2006 | 7,909 | | | Pros. Discretion | 427 |
| 2010 | 7,176 | | | Grant Relief | 272 |
| 2007 | 7,052 | | | | |
| 2011 | 6,436 | | | | |
| 2008 | 6,250 | | | | |
| 2009 | 5,728 | | | | |

Copyright 2015, TRAC Reports, Inc.

**ALDANA MADRID DECL.- 7**
**(Case No. 2:14-cv-01026-TSZ)**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

http://trac.syr.edu/phptools/immigration/juvenile/    1/1

# Exhibit B





# Juveniles — Immigration Court Deportation Proceedings
### Court Data through September 2015 — see About the Data

**Measure:**

○ Initial Filing

◉ Current Status

**Time Series:**

◉ Number

○ Percent



2014 - Not Represented - All

| Fiscal Year Case Began ▼ | | Represented ▼ | | Outcome ▼ | |
|---|---|---|---|---|---|
| *click on column headings to sort* | | **Fiscal Year=2014** *click on column headings to sort* | | **Fiscal Year=2014, Represented=Not Represented** *click on column headings to sort* | |
| Fiscal Year | Total | Represented | Total | Outcome | Total |
| All | 170,466 | All | 62,651 | All | 30,962 |
| 2014 | 62,651 | Represented | 31,689 | Pending | 16,858 |
| 2015 | 24,612 | Not Represented | 30,962 | Removal Order | 12,330 |
| 2013 | 22,268 | | | Other Closure | 755 |
| 2012 | 11,472 | | | Terminate Proceedings | 543 |
| 2005 | 8,912 | | | Voluntary Departure | 360 |
| 2006 | 7,909 | | | Pros. Discretion | 99 |
| 2010 | 7,176 | | | Grant Relief | 17 |
| 2007 | 7,052 | | | | |
| 2011 | 6,436 | | | | |
| 2008 | 6,250 | | | | |
| 2009 | 5,728 | | | | |

TRAC

Copyright 2015, TRAC Reports, Inc.

**ALDANA MADRID DECL.- 9**
**(Case No. 2:14-cv-01026-TSZ)**

http://trac.syr.edu/phptools/immigration/juvenile/

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

1/1

# Exhibit C

ALDANA MADRID DECL.- 10
(Case No. 2:14-cv-01026-TSZ)

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025



## Juveniles — Immigration Court Deportation Proceedings
### Court Data through September 2015 — see About the Data

**Measure:**
- ○ Initial Filing
- ● Current Status

**Time Series:**
- ● Number
- ○ Percent



| Fiscal Year Case Began ▼ | | Represented ▼ | | Outcome ▼ | |
|---|---|---|---|---|---|
| *click on column headings to sort* | | **Fiscal Year=2015** *click on column headings to sort* | | **Fiscal Year=2015, Represented=Represented** *click on column headings to sort* | |
| Fiscal Year | Total | Represented | Total | Outcome | Total |
| All | 170,466 | All | 24,612 | All | 9,259 |
| 2014 | 62,651 | Not Represented | 15,353 | Pending | 7,272 |
| 2015 | 24,612 | Represented | 9,259 | Other Closure | 726 |
| 2013 | 22,268 | | | Terminate Proceedings | 541 |
| 2012 | 11,472 | | | Removal Order | 441 |
| 2005 | 8,912 | | | Voluntary Departure | 192 |
| 2006 | 7,909 | | | Grant Relief | 56 |
| 2010 | 7,176 | | | Pros. Discretion | 31 |
| 2007 | 7,052 | | | | |
| 2011 | 6,436 | | | | |
| 2008 | 6,250 | | | | |
| 2009 | 5,728 | | | | |

TRAC

Copyright 2015, TRAC Reports, Inc.

**ALDANA MADRID DECL.- 11**
**(Case No. 2:14-cv-01026-TSZ)**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

http://trac.syr.edu/phptools/immigration/juvenile/        1/1

# Exhibit D

ALDANA MADRID DECL.- 12
(Case No. 2:14-cv-01026-TSZ)

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025



# Juveniles — Immigration Court Deportation Proceedings
### Court Data through September 2015 — see About the Data

**Measure:**

○ Initial Filing

◉ Current Status

**Time Series:**

◉ Number

○ Percent



2015 - Not Represented - All

| Fiscal Year Case Began ▼ | |
|---|---|
| *click on column headings to sort* | |
| Fiscal Year | Total |
| All | 170,466 |
| 2014 | 62,651 |
| 2015 | 24,612 |
| 2013 | 22,268 |
| 2012 | 11,472 |
| 2005 | 8,912 |
| 2006 | 7,909 |
| 2010 | 7,176 |
| 2007 | 7,052 |
| 2011 | 6,436 |
| 2008 | 6,250 |
| 2009 | 5,728 |

| Represented ▼ | |
|---|---|
| **Fiscal Year=2015** | |
| *click on column headings to sort* | |
| Represented | Total |
| All | 24,612 |
| Not Represented | 15,353 |
| Represented | 9,259 |

| Outcome ▼ | |
|---|---|
| **Fiscal Year=2015, Represented=Not Represented** | |
| *click on column headings to sort* | |
| Outcome | Total |
| All | 15,353 |
| Pending | 11,870 |
| Removal Order | 3,148 |
| Terminate Proceedings | 140 |
| Voluntary Departure | 98 |
| Other Closure | 85 |
| Pros. Discretion | 8 |
| Grant Relief | 4 |

Copyright 2015, TRAC Reports, Inc.

**ALDANA MADRID DECL.- 13**
**(Case No. 2:14-cv-01026-TSZ)**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

# Exhibit E

ALDANA MADRID DECL.- 14
(Case No. 2:14-cv-01026-TSZ)

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

J.E.F.M. a minor, by and        |
through his Next Friend,        |  Case No. 2:14-cv-01026-TSZ
Bob Ekblad; et al.,             |
                                |
     Plaintiffs-Petitioners,    |
                                |
        v.                      |
                                |
LORETTA E. LYNCH, et al.,       |
                                |
     Defendants-Respondents.    |
_____ |


DEPOSITION OF STEVEN C. LANG, ESQUIRE

October 15, 2015

Washington, DC


Reported by:

Ann Medis

Job no: 15047

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    BY MR. ARULANANTHAM:

2        Q.    The program also excludes children who

3    are in consolidated proceedings, that is, who are

4    in a proceeding along with their parents; is that

5    correct?

6        A.    We exclude those.

7        Q.    What's the rationale for that?

8        A.    We want to focus our limited resources

9    on children whose cases were not consolidated with

10   an adult.  Because once the child had an adult,

11   chances of them being represented by counsel

12   through pro bono counsel and so forth we believe

13   were greater.

14       Q.    What's the basis for that belief that

15   the likelihood of finding representation is higher

16   if a child's case is consolidated with an adult?

17       A.    You have an adult, typically the parent,

18   who's looking after the best interest of the

19   child.

20       Q.    So is there data that you guys have

21   looked at on the representation rate for the two

22   groups, or it's just you're assuming that that

23   would be true?

24       A.    I'm not aware of data that we examined

25   comparing groups, but we believe children who

1    appear on their own without an adult there, we

2    would limit our representation efforts to those

3    children based upon them being more alone.

4         Q.   The program is limited to children who

5    are classified as unaccompanied children; is that

6    correct?

7         A.   Let me also add on one more thing to

8    what I just ended there.  Oftentimes when a

9    child's case is consolidated with an adult, it's

10   the adult's case that matters.  The child no

11   longer pursues their own independent claim for

12   relief.

13        And we wanted to work -- we wanted the

14   program to focus on children who had their own

15   independent claim for relief.

16        Q.   But you acknowledge that sometimes

17   children have independent claims for relief even

18   when they're in a consolidated proceeding with an

19   adult; correct?

20        A.   Yes.

21        Q.   The program also, I think, provides

22   counsel for children designated as unaccompanied

23   children; is that correct?

24        A.   Correct.

25        Q.   What's the rationale for that?

ALDANA MADRID DECL.- 17
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 77

1    BY MR. ARULANANTHAM:

2         Q.   When you said there was confusion before

3    this guidance went out, you're talking about

4    September 10, 2014; is that right?

5         A.   Yes.   There was some confusion that I

6    was aware of before this was issued in

7    September 2014.

8         Q.   If a Friend of the Court provider, say,

9    discussed with a child available relief but failed

10   to mention relief which was, in fact, available to

11   that child, is there any remedy if the child then

12   doesn't apply for that relief even though it was

13   available?

14        A.   I'm not aware.

15        Q.   You're not aware?

16        A.   I'm not -- I don't believe there's any

17   remedy to address a form of relief that wasn't

18   explained by the Friend of the Court.

19             MR. SILVIS:   Again, he's answering

20   subject to the limitation that we discussed off

21   the record.

22   BY MR. ARULANANTHAM:

23        Q.   When you train LOPCs on the Friend of

24   the Court process, do you ever discuss whether the

25   presence of the Friend of the Court allows the

ALDANA MADRID DECL.- 18
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

# Exhibit F

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

J.E.F.M. a minor, by and        |
through his Next Friend,        | Case No. 2:14-cv-01026-TSZ
Bob Ekblad; et al.,             |
                                |
    Plaintiffs-Petitioners, |
                                |
      v.                     |
                                |
LORETTA E. LYNCH, et al.,       |
                                |
    Defendants-Respondents. |
_____|


DEPOSITION OF HONORABLE JACK H. WEIL

October 15, 2015

Washington, DC


Reported by:

Ann Medis

Job no: 15047

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    all judges, not just those who handle juvenile

2    dockets.

3         Q.   So every judge in the August 2015

4    training, all the immigration judges in the entire

5    system were trained on child specific practices?

6         A.   No.  It was offered as a course.  For

7    example, when I did my docket, I didn't see any

8    children.  So I'm not going to going sit in that

9    particular training.  I'm going to attend one that

10   fits the type of cases and dockets.

11        Q.   Do you have any data or evidence as to

12   the prevalence of children's case that are not on

13   the juvenile dockets?

14        A.   Only from when I spoke to the judges.

15   It's very, very rare.  They said it's really an

16   exceptional circumstance that that would happen.

17        Q.   The judges you spoke to are judges that

18   are handling the juvenile docket; correct?

19        A.   Correct.  It's not commonplace.

20        Q.   I'm going to hand you what we will mark

21   as Exhibit 12.  It's page EOIR254.  It's an email

22   from you to a number of people starting with Juan

23   Osuna, Ana Kocur.  It says, "Attached is final

24   copy of the agenda for the April 23-24

25   training..."

```
 1        And then behind that there are a number of
 2   pages which include in them an agenda for
 3   training.  Do you see that?
 4        A.   Yes.
 5             (Exhibit 12 was marked.)
 6   BY MR. ARULANANTHAM:
 7        Q.   You spoke at this training; correct?
 8        A.   Correct.
 9        Q.   Is this the training that was for judges
10   who are handling juvenile docket?
11        A.   Correct.
12        Q.   On Thursday -- this is on EOIR257 -- the
13   second session is Children Are Not Little Adults:
14   Child Development and Functionality.  Do you see
15   that?
16        A.   Yes.
17        Q.   Did you attend that?
18        A.   I did.
19        Q.   What was said by Dr. Mack at that
20   training?
21        A.   In a very general summary, what it did
22   is it tracked children from the time of birth up
23   through adulthood and tracked the development of
24   the child.
25        Q.   When you say tracked, did it the discuss
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    the different capacities that children have at

2    different ages?

3         A.    Yes.

4         Q.    Do you remember what age was considered

5    adulthood in the context of the presentation?

6         A.    I don't remember that being specified.

7         Q.    What did it say about children's

8    capacity and functionality relative to adults?

9         A.    What it did is it tracked that as a

10    child got older.  It talked about verbal

11    communication.  It talked about different

12    cognitive abilities, the way the children react,

13    their perceptions at different ages.  It was

14    really a continuum of how people develop into

15    adulthood.

16         Q.    Was the description broken down even by

17    blocks of ages, by infancy, early childhood,

18    adolescent, or no?

19         A.    I think the continuum was there.  I

20    don't recall exactly how it was -- what labels

21    were put on the different stages, whether it was a

22    continuous continuum or whether it broke into

23    segments.  I'd have to look back at his slides.

24         Q.    This was a PowerPoint?

25         A.    This was a PowerPoint.

ALDANA MADRID DECL.- 23
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 60

1       Q.    There's another one at 2:30 where you

2    were on the panel called Decidedly Different:

3    Presiding Over Proceedings Involving Children.

4       A.    Yes.

5       Q.    What was the content of that

6    presentation?

7       A.    I was afraid you were going to ask me

8    that because I don't recall specifically what was

9    covered at that presentation.  I'd have to look

10   at.  I don't even know if I have speaking notes at

11   this point.

12      Q.    Do you recall what you presented?

13      A.    I don't recall whether I was the

14   moderator or presenter.  Some of the people listed

15   may have been moderators.  I thought about that

16   because I expected you were going to ask that.

17   Unfortunately, I just can't recall.

18      Q.    There's the second session of the same

19   one.  It's on the next day at 11:00.  Do you

20   remember that?

21      A.    I remember the session and I remember

22   hearing them speak generally I think probably

23   because I was in charge of the administration of

24   the whole program.  I honestly don't recall having

25   any notes of the presentation.  I don't even

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    recall today whether I was the moderator.

2        Q.   And no recollection as to the contents

3    of the presentations by anyone, either by you or

4    the other speakers?

5        A.   I recall generally Maria Woltjen spoke

6    about child advocates, and Jennifer Nagda also

7    spoke about child advocates, which is why the

8    title is Decidedly Different, because child

9    advocates don't exist in the adult process.  As a

10   total resource, it just doesn't exist there.

11       I remember Steve talked about -- Steven Lang

12   spoke about representation and what resources are

13   available for representation.  He spoke about the

14   LOPC program.  I'm sure Frank Travieso spoke about

15   handling the juvenile dockets.  I have general

16   recollection of why they were on the panel.  I

17   don't remember what Rene Cutlip-Mason spoke about.

18       Q.   You don't remember what you spoke about?

19       A.   I don't, which is unusual for me, but

20   honestly I don't.

21       Q.   MaryBeth Keller on the first one, do you

22   remember what she spoke about?

23       A.   In preparing and looking at the

24   documents, I don't even know why she was on the

25   agenda for that topic.  She is the ACIJ for

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    conduct and professionalism, and that was not the

2    topic here.  And I have no idea why -- the

3    embarrassing thing about that is because I was the

4    one who invited her, and I don't know what I asked

5    her to speak about or why I put her on the agenda.

6         Q.   You are not listed on the speakers, but

7    did you attend that?

8         A.   I'm sorry?

9         Q.   Friday at 9:00.

10        A.   I did attend that.

11        Q.   Do you remember what was discussed on

12   that panel?

13        A.   The availability of resources to assist

14   in the representation of children.  And the reason

15   I actually came up with the title Representation

16   of Children and their Interests is because it was

17   designed not to just cover legal representation

18   and what pro bono -- legal representation or

19   representation resources were available.  But it

20   was also covered to talk about representation of

21   interests, such as the best interest

22   determinations of children.

23        But also we get -- we were getting a lot of

24   concern over abused children, trafficked children.

25   So it was also to cover representation of those

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    interests as well.  It was kind of protection

2    topics, trafficking topics.

3         Q.   Recognizing that your memory of those

4    three is fuzzy, do you recall any discussion in

5    any of them about whether judges should handle

6    cases involving children differently and, if so,

7    how?

8         A.   So in the representation of children and

9    their interests, this one was designed to identify

10   what pro bono resources were available and what

11   representation resources were available.  It was

12   designed to cover what child advocate resources

13   were available to cover bests interests.

14        It was also designed to basically give an

15   idea, for lack of a better word, a cafeteria

16   approach of what is out there and who is out there

17   in the community that focuses their work on

18   children's cases.

19        Q.   So what about what judges should do

20   differently, was there any discussion of that on

21   these panels that you can recall?

22        A.   The reason I put this one together was I

23   wanted the judges to know what is in their

24   toolbox.

25        Q.   I'm not just talking about that one.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    I'm talking about decidedly different.  It may be

2    confusing.  Even if you include the two decidedly

3    different ones -- let's talk about those.  Was

4    there any discussion in there, in those panels,

5    about what judges should do differently?

6         A.   I mean, in the sense that I see child

7    advocates is in there, so obviously that's

8    something judges are going to do differently.

9         Q.   What else?

10        A.   I think Frank Travieso spoke largely

11   about best practices in handling the cases, many

12   of the recommendations that were in the OPPM

13   07-01, things that he was doing in his court to

14   ensure the fairness, probably kind of a practical

15   experience.

16        Q.   Do you recall if the OPPM 07-01 was

17   discussed?

18        A.   I believe it was, but I can't say with

19   absolute certainty.

20        Q.   So they're still training on the

21   contents of 07-01 in April 2015; is that right?

22        A.   Yeah.  07-01 is still in place, and I

23   think what's being trained on is the techniques.

24   And really the idea is to pull together all of the

25   tools and resources and information that a judge

1    can use to assess in an individual case what is

2    available to me.

3         So Steve would talk, for example, about

4    justice AmeriCorps so that judges knew do I have a

5    respondent that that does cover or would know if

6    they want to consider whether a child advocate is

7    appropriate, what is a child advocate, how do I

8    get a child advocate, what is a difference between

9    child advocate and a legal advocate.

10        That's really what the discussions were, what

11   is available that you can use.  In addition to

12   07-01 is some things, and you can reach out to

13   them to make sure the hearing is fair.

14        Q.   The one from the morning on Friday

15   Proceed or Not To Proceed:  In Absentia,

16   Continuances and Administrative Closure.  You were

17   listed as one of the presenters on that.

18        A.   Um-hum.

19        Q.   Do you remember what that panel was

20   about?

21        A.   Yeah.  It looked at whether to -- if a

22   child doesn't show up, whether to proceed in the

23   child's absence if DHS made a request to proceed

24   in absentia.

25        Q.   Can you tell me what the content of the

ALDANA MADRID DECL.- 29
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    training was in that regard?

2         A.   Yes.   That one I do remember.   We

3    covered the requirements for proceeding in

4    absentia.   We covered verifying the notice to

5    appear was served on the child, verifying that the

6    notice of the hearing was correct and accurate,

7    whether there were circumstances to explain why

8    the child did not show up.   We looked at the

9    requirement of that even if the child did not show

10   up and the judge did proceed to go in the case,

11   the DHS had the burden of proving the allegations

12   and charges.   It's not just don't show up and go

13   forward.

14        Q.   You mean by that that the DHS has to

15   prove that before the absentia order is entered?

16        A.   Right.   There's no default judgment,

17   right.   There's still a burden of proof that needs

18   to be established in the case.

19        Q.   The audience of this would have been

20   judges?

21        A.   With juvenile dockets.

22        Q.   Did you also discuss service issues?

23        A.   Yes.

24        Q.   What was discussed about that?

25        A.   We talked about the requirements, the

ALDANA MADRID DECL.- 30
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 67

1    recent case regarding -- it's not so recent

2    anymore -- regarding proper service on a child.

3         Q.   What case was that?

4         A.   I don't remember the name.  It's a Board

5    of Immigration Appeals.  Let me go back.  That's

6    not correct.  I'm confusing with the case on

7    service of mental competence.

8         Q.   Is it Cougar Cruz?

9         A.   I'm really bad.  As long as I've been

10   doing immigration cases, I'm not good at

11   remembering the names.  I can get the law right

12   which is important.

13        We talked about making sure the child was

14   served with the notice to appear because it's

15   important the child be aware of the allegations

16   and the charges.

17        Q.   Do you also train on a requirement that

18   the EOIR custodian receive service?

19        A.   A requirement?  Am I training that ORR

20   must receive service of the notice?

21        Q.   In any cases, yes.

22        A.   No.  I don't train that ORR must receive

23   service.

24        Q.   I take it the ORR custodian is required

25   to receive service?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 68

1          MR. SILVIS:  Is this a training issue?

2    I want clarification on the question.  Are we

3    still talking about training or just talking about

4    DOJ broader?

5    BY MR. ARULANANTHAM:

6          Q.   You can answer the question if you

7    understand it.

8          MR. SILVIS:  We'll just object, outside

9    of the topic.  So answer for yourself.

10         A.   I am aware that DHS does serve in some

11   cases the notice to appear on ORR.

12   BY MR. ARULANANTHAM:

13         Q.   But you don't train that that's ever a

14   requirement; is that right?

15         A.   No.  I don't train that you must serve a

16   child's notice to appear on ORR.

17         Q.   That's because it is your understanding

18   that there is no such requirement; is that

19   correct?

20         MR. SILVIS:  Same objection.

21         A.   My training is that you have to have

22   real service notice, that a person must be aware

23   of the allegations and charges against them.  And

24   so if ORR, for example, was served with a notice

25   to appear and the child does not recall receiving

ALDANA MADRID DECL.- 32
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 69

1    it or the child did not recall getting it, that's

2    what our training would be concerned.

3        So I would not teach that you must serve ORR.

4    What I'm concerned is that the child is getting

5    proper service, do they really know what is going

6    on, what the proceeding is about.

7    BY MR. ARULANANTHAM:

8        Q.   Do you train that's the rule regardless

9    of the age of the child?

10       A.   All respondents, yes.  I think all

11   respondents for a fundamentally fair hearing need

12   to be advised of the allegations and the charges

13   that are pending against them.  The way we do that

14   is by serving a notice to appear, but then there's

15   also the legal requirement in the regulations that

16   the judge must explain the allegations in plain

17   language that the respondent can understand.

18       Q.   It must be true that there's some

19   children that are so young that even if they

20   receive the notice and even if they're given an

21   explanation by the judge, they're still not going

22   to understand what's going on; right?

23       A.   I have to do a case-by-case basis

24   determination.  I've taught immigration law

25   literally to three year olds and four year olds.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 70

1    It takes a lot of time.  It takes a lot of

2    patience.  They get it.  It's not the most

3    efficient, but it can be done.

4        Q.   I understand that you think it can be

5    done.  Are you aware of any experts in child

6    psychology or comparable experts who agree with

7    the assessment that three and four year olds can

8    be taught immigration law?

9        A.   I haven't read any studies one way or

10   another.

11       Q.   What about like a one year old?

12       A.   I mean, I think there's a point that

13   there has to be communication.  There has to be

14   communication at some point.

15       Q.   So what do you train judges as to cases

16   in which communication is impossible because the

17   child is too young?

18       A.   What we train is if a respondent, child

19   or adult, cannot perform functions necessary for

20   the hearing to be fair, the judge should not

21   proceed.

22       Q.   That's true regardless of whether

23   there's some other individual who may be able to

24   understand the proceeding?

25       A.   What is required at that point is

ALDANA MADRID DECL.- 34
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 78

1          MR. SILVIS:  Objection.

2      A.   It's one that can be considered.  That's

3  why 07-01 and all these other things, the child

4  advocate, I think together -- in the training we

5  try to give a tool kit so that you can find the

6  resource that you believe is necessary and that is

7  the appropriate safeguard and protection in that

8  case.

9  BY MR. ARULANANTHAM:

10     Q.   So you would train that then sometimes

11 judges should take steps to ensure representation

12 for a child because that safeguard is needed to

13 ensure the child has a fair hearing?

14         MR. SILVIS:  Objection.  Outside the

15 topics.

16     A.   So we start with the supposition that

17 judges should always encourage where possible pro

18 bono representatives.  We always want -- in all

19 cases to the extent possible, we would like the

20 respondents to be represented.

21 BY MR. ARULANANTHAM:

22     Q.   Why is that?

23     A.   It's much more effective.  It makes a

24 much more efficient, effective proceeding.  Using

25 the example that I mentioned, could I explain

ALDANA MADRID DECL.- 35
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    immigration concepts to a preschool class of three

2    year olds and four year olds?  Yes, but it took me

3    a long, long time to do it.  And so having a

4    representative that can do a lot of work -- it's

5    my obligation to make sure the hearing is fair,

6    but if there's somebody that can do part of that

7    work for me, it makes my life a whole lot easier.

8    That doesn't mean --

9         Q.   You were saying that you encourage pro

10   bono representation as a general matter.

11        A.   Um-hum.

12        Q.   But do you also then train that in the

13   context of children's cases that sometimes the

14   safeguard needed to ensure that the hearing is

15   fair is counsel?

16        A.   In all cases we say that a safeguard and

17   protection should be considered is representation,

18   and we work hard to try to make as many pro bono

19   resources available.  We will ask the judge if

20   they believe that in a particular child's case, if

21   there is no pro bono representative available, to

22   reach out to the Office of Legal Access Programs

23   to see if we can get help for the child in that

24   circumstance.

25        Q.   Would you train that there may be some

ALDANA MADRID DECL.- 36
(Case No. 2:14-cv-01026-TSZ)
TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

1    those cases, in every case, an immigration judge

2    can slow down and spend a lot of time and continue

3    the case.

4         I've told you I have trained three year olds

5    and four year olds in immigration law.  You can do

6    a fair hearing.  It's going to take you a lot of

7    time.  But I really think that a great alternative

8    to terminating a case for a child who may be

9    eligible for relief where there's no counsel is

10   proceed very slowly, very carefully, and I'm going

11   to tap every single resource I can to see if I can

12   get the some help.

13        Q.   By help you mean counsel?

14        A.   All of the tools that I mentioned,

15   anybody to show up that can assist, whether it be

16   a Friend of the Court, whether it be a family

17   member, whether it be somebody from a church,

18   anybody that was willing to step in, I'm going to

19   do that if I can.

20        I told you I think counsel allows me to be

21   effective.  They allow me to be efficient, but I

22   can trudge on.  It's going to take me a lot of

23   hearing time, but you can do it.  You can do it.

24        Q.   Do you think you can have a fair hearing

25   with an unrepresented four year old in an

ALDANA MADRID DECL.- 37
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

Page 162

1     application for asylum?

2              MR. SILVIS:  Objection.  Topic.

3        A.   It will take me a long, long, long, long

4     time because I'm going to have to use every skill

5     and every technique and every bit of training.

6     Again, we're assuming my toolbox is empty.  But it

7     will be hours and hours and days and days and

8     continuances, but I can get to make a finding of

9     fact that is not clearly erroneous.  I can make a

10    conclusions of law in the case and then make a

11    determination as to the case.

12        That's the role of the immigration judge, is

13    to identify reasonable forms of relief, and my

14    obligation is to develop the record.  And we're

15    used to and part of the training is working with

16    very difficult respondents, whether it's due to a

17    mental disorder, an uncooperative person, a child.

18    Good attorneys and good judges are used to working

19    with difficult respondents.

20    BY MR. ARULANANTHAM:

21        Q.   So what if a child's only relief is

22    special immigrant juvenile status and they're four

23    years old and there's nobody to litigate the case

24    in state court.  How can the immigration judge

25    give that child a fair hearing?

ALDANA MADRID DECL.- 38
(Case No. 2:14-cv-01026-TSZ)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

# Exhibit G

**ALDANA MADRID DECL.- 39**
**(Case No. 2:14-cv-01026-TSZ)**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**



**DCS Legal Access Project**

**Final Report: August 1, 2009 – January 31, 2015**

Vera Institute of Justice

May 2015

**ALDANA MADRID DECL.- 40**
(Case No. 2:14-cv-01026-TSZ)

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

## Table of Contents

I.    Introduction ......................................................................................................... 1

II.   Setting the Context: A Changing Landscape for Unaccompanied Children .................... 1

  A.   Important Changes in the Field ............................................................................ 2

    1.   Admissions to ORR Custody ............................................................................. 2

    2.   Number of ORR-Contracted Facilities and Beds ................................................. 3

    3.   Length of Stay in ORR Custody ......................................................................... 3

    4.   Reunifications from ORR Custody ..................................................................... 4

    5.   Court Appearances in ORR Custody ................................................................... 5

  B.   Changes within the DCS Legal Access Project ("Vera Network") ............................. 6

    1.   Expansion of Vera Network Subcontractors ....................................................... 6

    2.   Description and Expansion of Services ............................................................... 7

      a.   Core Services for Detained Children ............................................................ 7

      b.   Legal Representation for Detained and Released Children ............................. 9

        1)   Changes in Representation for Detained Children ..................................... 10

        2)   Changes in Representation for Released Children ...................................... 11

      c.   Child Advocate Services ........................................................................... 12

III.  Successful Delivery of Contracted Services ........................................................... 14

  A.   Services Delivered to Children in ORR Custody ................................................... 14

    1.   Core Services: KYRs and Legal Screenings ...................................................... 16

    2.   Representation in Short-Term Facilities ............................................................ 20

    3.   LTFC Services ............................................................................................... 23

    4.   Continued Representation ............................................................................... 25

  B.   Released Services ............................................................................................ 27

  C.   Child Advocate Services ................................................................................... 30

  D.   Vera's Program Management: Vera Provided Expert Technical Assistance to its Network of Providers ..................................................................................................................... 34

    1.   Site Visits ..................................................................................................... 34

      a.   Vera-Produced Legal and Programmatic Resources ..................................... 35

      b.   Practice Advisories .................................................................................. 36

      c.   On-Site Training Programs ........................................................................ 36

**ALDANA MADRID DECL.- 41**
(Case No. 2:14-cv-01026-TSZ)

i

HHS002850

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

        d.     Bi-Monthly Calls .................................................................................... 37

        e.     Extra Legal: Vera's Online Resource ..................................................... 37

        f.     Language Access Resources ................................................................... 38

        g.    Regular Reporting to ORR .................................................................... 38

IV.     Vera's Analysis and Recommendations ..................................................... 38

    A.    Impact of Core Services Provided in ORR Custody ................................. 38

    B.    Impact of Representation ............................................................................. 41

      1.    Lower *In Absentia* Rates ......................................................................... 41

      2.    Better Legal Case Outcomes .................................................................. 42

    C.    Challenges Related to *Pro Bono* Representation ..................................... 45

      1.    Case Processing Times ............................................................................ 45

      2.    *Pro Bono* Trainings Do Not Result in Equivalent *Pro Bono* Matches ......................................... 46

      3.    Mitigating the Challenges Inherent in *Pro Bono* Representation and Developing Creative Alternative Uses for *Pro Bono* Interest .......................................... 48

    D.    Impact of Child Advocate Services ............................................................ 49

      1.    Outcomes of BIRs ................................................................................... 50

      2.    Identifying Appropriate Children for Appointment of Child Advocates with Limited Available Resources .............................................................. 51

    E.    Identification of Other "Gaps" in the System for Unaccompanied Children ................ 52

V.     Conclusion ...................................................................................................... 54

**ALDANA MADRID DECL.- 42**
**(Case No. 2:14-cv-01026-TSZ)**

ii

**HHS002851**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

### 3. LTFC Services

The LTFC Initiative—through which children in long-term foster care are guaranteed a match with an attorney within 30 days of placement—began with one LTFC program in Option Year III and expanded to include all LTFC programs nationwide in Option Year IV. Prior to the expansion of network services in the form of the LTFC Initiative, staff at many LTFC programs were tasked with finding *pro bono* attorneys for children, which could take several months or more depending on the location. In addition, there was no established mechanism in place to ensure that a child who was accepted into a LTFC program would be eligible for relief in that particular jurisdiction.[10] This occasionally resulted in children ending up in LTFC programs in jurisdictions where they were not able to pursue any form of relief from removal, despite being eligible for relief under the immigration law. With the expansion of the LTFC Initiative, ORR required its LTFC programs to obtain confirmation from their Vera subcontractors that a child would be eligible for relief locally before accepting the child into the program. Once a child was placed in the LTFC program, Vera subcontractors were required to represent that child within 30 days of his or her arrival.

Figure 18 below shows that the number of case file reviews increased significantly from Option Year III to Option Year IV, as would be expected as a result of the expansion of the LTFC Initiative during Option Year IV. Interestingly, however, although covering only a six-month period, the number of case file reviews conducted during the Extension Period constituted 75 percent of the total number conducted during all of Option Year IV. It is unclear whether this is a by-product of the availability of this service, a change in how early LTFC programs are seeking the local eligibility for relief determination in the process, or simply the result of more LTFC placements being available during the Extension Period.

**Figure 18. Number of Case File Reviews for Children in Long-Term Foster Care Programs, by Year**

(Years defined by date of case file review)



The expansion of the LTFC Initiative also led to an increase in the percentage of children represented in LTFC. Arguably, children in LTFC are some of the most vulnerable, as they are screened to have been eligible for relief from removal and are completely dependent on the federal government because they

---

[10] The majority of children in LTFC are eligible for Special Immigrant Juvenile Status (SIJS), a form of relief available for children who were abused, neglected or abandoned by one or both parents. However, in order to pursue SIJS, the child must be able to access the state court in the state in which he or she resides and meet that state's definitions of abuse, neglect or abandonment. Differences in both jurisdictional and substantive requirements among states often result in the same child being able to pursue SIJS in certain states, but not others.

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

have no viable family support in the United States. Although LTFC programs did their best to locate *pro bono* representation for children in LTFC prior to the LTFC Initiative, such representation could not always be found in time for children's court appearances. As demonstrated by Figure 19 below, the percentage of children in LTFC who appeared in court with representation prior to the beginning of the LTFC Initiative ranged from a low of 80 percent in the Base Year to a high of 91 percent in Option Year I. That percentage rose to 94 percent in Option Year IV after the LTFC Initiative was expanded to the entire country and 100 percent during the Extension Period.

**Figure 19. Percentage of Children Admitted to Long-Term Foster Care Programs Who Appeared in Court with Representation, by Year**



Figure 20 on the next page shows the breakdown of case outcomes for children in LTFC by representation status. The vast majority of children represented by subcontractors through the LTFC Initiative had positive legal outcomes: 72 percent of cases resulted in termination or administrative closure[11] and 11 percent resulted in legal relief. Only eight percent of children had legal case outcomes that required return to their home country.

---

[11] Termination and administrative closure are the two most common legal case outcomes recorded by EOIR for children who are granted relief through SIJS, asylum, T-visas or U-visas. The reason for this is that these are forms of legal relief that are granted by the United States Citizenship and Immigration Services (USCIS). Cases may also be terminated or administratively closed for reasons such as due process violations or ICE's exercise of prosecutorial discretion.

**ALDANA MADRID DECL.- 44**
(Case No. 2:14-cv-01026-TSZ)

24

HHS002875

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

**Figure 20. Legal Case Outcomes for Children in LTFC,[12] By Representation Status**





In comparison, ==of the unrepresented children, 76 percent ended up with legal case outcomes that required return to their home country.== This disparity is particularly concerning considering that in order to be eligible for LTFC placement, a ==legal service provider must have screened the child to be eligible for relief from removal.== While some of these negative outcomes are likely the result of the fact that prior to the LTFC Initiative, "local" eligibility for relief was not taken into consideration as a placement factor (see footnote 10 above), ==the reality is that without counsel, it is extremely difficult for children to establish the proof necessary to obtain legal relief, even when they are eligible for such relief.== Additional information regarding the impact of representation on legal case outcomes is available in Section IV.B.2.

> **LESSON LEARNED**:
>
> *Representation of children in LTFC ensures that some of the most vulnerable children – those who have no one in the United States to care for them – are able to obtain the legal protection to which they are entitled under U.S. law.*

### 4.  Continued Representation[13]

Continued representation—mandatory representation provided to children detained and released locally in the same area where the child was detained—is another representation-related success of the program. This is a particularly efficient model of representation that ultimately serves both detained and released children in that the representation starts while a child is in ORR custody and continues after the child's release. The efficiencies built into this model include: (1) elimination of the time and work

---

[12] The "represented" pie chart includes all children in LTFC represented by Vera subcontractors through the LTFC Initiative at the time of their legal outcome. The "unrepresented" pie chart includes all children in LTFC over the 5.5-year contract period who were unrepresented at the time of their legal case outcome.

[13] Continued representation includes the mandatory representation component of the Houston and Los Angeles Initiatives (by Cabrini and Esperanza, respectively), the voluntary representation done by subcontractors after January 2012 for children detained and released locally, and the expanded Continued Representation Program which made continued representation mandatory for all subcontractors serving short-term facilities as of August 2014.

**ALDANA MADRID DECL.- 45**
**(Case No. 2:14-cv-01026-TSZ)**

25

**HHS002876**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

### B.  Impact of Representation

Finding representation more quickly <mark>helps to ensure a child's continued participation in removal proceedings.</mark> As explained above, at the point of six months after a child's release from ORR custody, those who received legal services in custody are just over half as likely as those who never received services to obtain an *in absentia* order. However, by 12 months after release, they are only 14 percent less likely to obtain an *in absentia* order, and by two years, the difference between children who received legal services in custody and those who did not is effectively gone. For this reason alone, it <mark>is critical to ensure that a child be connected with a legal service provider upon release as soon as possible so as to maintain the benefit of the original legal intervention. In addition, representation itself has a number of significant positive effects in children's cases, including lower *in absentia* rates overall, and better legal case outcomes.</mark>

#### 1.  Lower *In Absentia* Rates

<mark>The fact of representation itself dramatically lowers a child's likelihood of receiving an *in absentia* order.</mark> As shown in Figure 32 below, only seven percent of children who received representation by released Vera subcontractors received *in absentia* orders, as compared to 34 percent of released children who were unrepresented. Therefore, having an attorney helps to ensure a child's continued participation in his or her removal proceedings.

**Figure 32.** *In Absentia* Rates Nationwide for Children Released from ORR Custody after August 1, 2009, by Representation Status



> **LESSON LEARNED:**
>
> *The fact of representation is critical to ensure a child's continued participation in removal proceedings; a child who is represented is significantly less likely to obtain an* in absentia *order than an unrepresented child.*

**ALDANA MADRID DECL.- 46**
(Case No. 2:14-cv-01026-TSZ)

41

**HHS002892**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957-8611
Fax (206) 587-4025

## 2. Better Legal Case Outcomes

Not only are children more likely to continue appearing at immigration court if they have representation, but they are also significantly more likely to obtain a positive legal case outcome if they are represented. Figure 33 on the next page shows that for children who were represented by or through a Vera subcontractor (e.g., represented direct by in-house legal counsel, or by a *pro bono* attorney that was mentored by a Vera subcontractor), 12 percent of cases resulted in relief, while an additional 61 percent of cases resulted in administrative closure or termination.[18] By comparison, for cases represented by other attorneys, two percent of cases resulted in relief, and 67 percent of cases resulted in either administrative closure or termination. Most importantly, for children who were unrepresented, zero percent of the cases resulted in relief and only ten percent resulted in administrative closure or termination. An overwhelming 90 percent of unrepresented cases resulted in removal or voluntary departure as compared to 30 percent for cases represented by non-Vera network attorneys, and 26 percent for cases represented or mentored by Vera subcontractors.

---

[18] The vast majority of forms of relief available to unaccompanied children are ultimately granted by USCIS as opposed to the immigration judge. In those cases, the immigration court "outcomes" would typically be termination or administrative closure, so that USCIS could adjudicate the case.

**ALDANA MADRID DECL.- 47**
**(Case No. 2:14-cv-01026-TSZ)**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

**HHS002893**

**Figure 33. Legal Outcomes for All Reunified Children, by Representation Status**



**Represented or Mentored by Vera Subcontractors (N=1,207)**



**Represented by Other Attorneys (N=11,752)**



**Released and Unrepresented (N=15,296)**

**ALDANA MADRID DECL.- 48**
**(Case No. 2:14-cv-01026-TSZ)**

**HHS002894**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**

Acknowledging the fact that case selection criteria were implemented for released children in December 2010, making them more likely to be relief eligible, Vera re-ran the above analysis taking into account only those cases that were referred prior to December 2010 so as to more accurately compare the three cohorts of children. As shown in Figure 34 below, the positive effects of representation on legal case outcomes continue to be apparent. Sixty-eight percent of children represented by or through Vera subcontractors had a positive legal case outcome (relief, termination or administration closure), as compared with 51 percent of children represented by other attorneys and only six percent of unrepresented children. In other words, a child represented by the Vera network was more than eleven times more likely to obtain a favorable legal case outcome than an unrepresented child.

**Figure 34. Legal Outcomes for Children Referred Prior to December 2010 (before relief eligibility criteria were introduced), by Representation Status[19]**



---

[19] Children represented by other attorneys, or unrepresented, were reunified prior to December 2010.

**ALDANA MADRID DECL.- 49**
**(Case No. 2:14-cv-01026-TSZ)**

**HHS002895**

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
**615 Second Ave., Ste. 400**
**Seattle, WA 98104**
**Telephone (206) 957-8611**
**Fax (206) 587-4025**