1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

J.E.F.M., a minor, by and through his Next Friend, Bob Ekblad; J.F.M., a minor, by and through his Next Friend, Bob Ekblad; D.G.F.M., a minor, by and through her Next Friend, Bob Ekblad; F.L.B., a minor, by and through his Next Friend, Casey Trupin; M.A.M., a minor, by and through his mother and Next Friend, Rosa Pedro; A.E.G.E., a minor, by and through his Next Friend, Ana Deutsch; G.J.C.P., a minor, by and through her grandmother and Next Friend, Blanca Griselda Zelaya; J.E.V.G., a minor, by and through his sister and Next Friend, Santos Angela Vasquez; E.G.C., a minor, by and through his Next Friend, Sonia McLeod; A.F.M.J., by and through her mother and Next Friend, Maria Jimenez; L.J.M., a minor, by and through her mother and Next Friend, Maria Jimenez; M.R.J., a minor, by and through his mother and Next Friend, Maria Jimenez; J.R.A.P., a minor by and through his Next Friend, Katherine Peguero; K.N.S.M., a minor, by and through her Next Friend, Eloisa Sarahi Mejia Sevilla, on behalf of themselves as individuals and on behalf of others similarly situated,

Plaintiffs-Petitioners,

v.

Loretta E. LYNCH, Attorney General, United States; Juan P. OSUNA, Director, Executive Office for Immigration Review; Jeh C. JOHNSON, Secretary, Homeland Security; Sarah R. SALDAÑA, Director,

Case No. 2:14-cv-01026-TSZ

**THIRD AMENDED COMPLAINT— CLASS ACTION**

THIRD AMENDED COMPLAINT - 1 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

U.S. Immigration and Customs Enforcement; León RODRIGUEZ, Director, U.S. Citizenship and Immigration Services; Lisa McDANIEL, Field Office Director, ICE ERO; Bryan WILCOX, AFOD, ERO; Sylvia M. BURWELL, Secretary, Health and Human Services; Robert CAREY, Director, Office of Refugee Resettlement,

Defendants-Respondents.

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs are fourteen immigrant children, ranging in age from one to 17. The Government has begun proceedings to deport each of them; they have been or will soon be called to appear before an Immigration Judge. In court, the Department of Homeland Security ("DHS") is represented by a trained lawyer who argues for the child's deportation. But no lawyer stands with the child. Every child is required to respond to the charges against him or her, and, in theory, afforded an opportunity to make legal arguments and present evidence on his or her own behalf. But in reality those rights are meaningless because children are not competent to exercise them. Each child has attempted to find representation, including through pro bono legal service providers, but none of them have found anyone with the resources to take on their cases. Absent this Court's intervention, these children were or will be forced to defend themselves pro se under the immigration laws—a legal regime that, as the courts have recognized, rivals the Internal Revenue Code in its complexity.[1]

2.    The plight of these children is not unique. Plaintiffs seek to represent a class of indigent unrepresented children, all of whom face deportation. Each year the Government initiates immigration proceedings against thousands of such children, and in each case the purpose of the proceedings is to determine whether the child may remain in the United States. Although a remarkable network of pro bono service providers, working in concert with (and in some cases funded directly by) the Government, has endeavored to represent as many of these children as

---

[1] One Plaintiff, J.E.V.G., was under 18, without legal representation, and financially unable to pay for such representation at the time he became a Plaintiff, but has since turned 18 and hired an attorney. This Court has held that "his claim that, while still a juvenile, he should have received the assistance of an attorney at government expense constitutes a 'live' controversy." Dkt. 174 at 6.

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

possible, thousands of children appearing in immigration court still do so without an attorney.[2] At the present time, legal service organizations representing immigrant children throughout the country have nowhere near the capacity to meet the demand. The significant number of children fleeing to this country and the Government's decision to prioritize children's cases will likely maintain that shortfall.[3] The Government, in contrast, is represented in every case.

3.     Neither the Constitution nor the immigration laws permit this state of affairs. More than four decades ago, the Supreme Court recognized that when the Government initiates proceedings against children facing juvenile delinquency charges, the Due Process Clause requires the Government to provide those children with legal representation to ensure that the proceedings are fundamentally fair. *In re Gault*, 387 U.S. 1, 41 (1967). The Court held that "[t]he juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it. The child requires the guiding hand of counsel at every step in the proceedings against him." *Id.* at 36 (citation and quotation marks omitted). The Constitution guarantees children this safeguard notwithstanding the civil, rather than criminal, character of juvenile delinquency proceedings.

---

[2] Center for Gender & Refugee Studies & Kids in Need of Defense, *A Treacherous Journey: Child Migrants Navigating the U.S. Immigration System* at iii-iv (Feb. 2014) [hereinafter "*A Treacherous Journey*"] *available at* http://www.uchastings.edu/centers/cgrs-docs/treacherous_journey_cgrs_kind_report.pdf. *See also* Transactional Records Access Clearinghouse, *Juveniles — Immigration Court Deportation Proceedings*, http://trac.syr.edu/phptools/immigration/juvenile/ (last visited Oct. 16, 2015) (indicating that almost 50% of pending cases with a "juvenile" case flag involve unrepresented children).

[3] For a description of the government's decision to expedite adjudication of children's cases, *see* Press Release, Dep't of Justice Office of Public Affairs, Department of Justice Announces New Priorities to Address Surge of Migrants Crossing into the U.S. (Jul. 9, 2014), *available at* http://www.justice.gov/opa/pr/department-justice-announces-new-priorities-address-surge-migrants-crossing-us (linking to factsheet describing Government prioritization of recently-arrived unaccompanied children and families with children). Regarding the continuing shortfall, *see* Mara Gay, *As Child Immigrants Await Fate, A Race for Counsel*, Wall St. J. (Oct. 1, 2014), *available at* http://online.wsj.com/articles/immigrant-children-in-new-york-city-face-a-shortage-of-attorneys-1412100510 ("Just under half of the children appearing before the New York City Immigration Court have no attorney, according to The Legal Aid Society. The children are far more likely to be deported without an attorney, and advocates say the situation is desperate.").

THIRD AMENDED COMPLAINT - 3 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

4.      Immigrants, including immigrant children, are also entitled to Due Process when facing deportation. *Reno v. Flores*, 507 U.S. 292, 306 (1993). Both the Constitution and the immigration laws guarantee all children the right to a full and fair removal hearing, including the opportunity to defend against deportation and seek any forms of relief that would enable them to remain in the United States. And just as in juvenile delinquency proceedings, children cannot receive that fair hearing without legal representation. As the Supreme Court stated in discussing proceedings of similarly "tremendous consequences," for children in immigration proceedings "[t]he right to representation by counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice." *Kent v. United States*, 383 U.S. 541, 554, 561 (1966) (addressing child's right to appointed counsel in proceedings to determine whether juvenile court should waive its jurisdiction in favor of criminal court).

5.      Yet every day in courts throughout the country, children represent themselves in deportation cases that are often more complex and more serious than most juvenile delinquency cases.[4] The resulting adjudications are fundamentally unfair. Children are forced to admit or deny allegations against them, compile evidence in support of their claims to remain in the United States, and articulate legal arguments on their own behalf, when in reality they "are unlikely to understand the complex procedures they face and the options and remedies that may be available to them under the law."[5]

6.      To fulfill its statutory and constitutional obligations, the Government must ensure that no child faces the life-altering prospect of deportation without legal representation.

---

[4] Julia Preston, *Young and Alone, Facing Court and Deportation*, N.Y. Times, Aug. 25, 2012, at A1, *available at* http://www.nytimes.com/2012/08/26/us/more-young-illegal-immigrants-face-deportation.html?pagewanted=all (describing six-year-old child in removal proceedings without counsel); *see also* Julie Myers Wood & Wendy Young, *Children Alone and Lawyerless in a Strange Land*, The Wall Street Journal, Sept. 22, 2013, *available at* http://online.wsj.com/news/articles/SB10001424127887324492604579083400349940432 ("We've seen children as young as 5 facing an immigration judge with no representation.").

[5] *A Treacherous Journey* at iii.

THIRD AMENDED COMPLAINT - 4 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

## II.    JURISDICTION AND VENUE

7.      Plaintiffs challenge the federal Government's failure to provide appointed legal representation for indigent children in immigration proceedings on federal statutory and constitutional grounds.[6]

8.      This court has subject matter jurisdiction pursuant to the general federal question statute, 28 U.S.C. § 1331, the federal habeas statute, 28 U.S.C. § 2241, et seq., the All Writs Act, 28 U.S.C. § 1651, and 5 U.S.C. § 702 (waiver of sovereign immunity).

9.      This court has personal jurisdiction over the Defendants because of, *inter alia*, the nationwide reach of Defendants' conduct and the presence of courts operated by Defendants within the Western District of Washington where immigration proceedings involving members of the Plaintiff Class are held.

10.     Sovereign immunity does not prevent this Court from exercising jurisdiction over these claims. Plaintiffs have brought suit against various federal officials, and it is well established that sovereign immunity does not bar claims against federal officials seeking solely to prevent future violations of federal law (rather than monetary relief). *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697-99 & nn.18-19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183-84 (1938) (holding that the court had jurisdiction to consider a claim seeking to enjoin government officials' actions); Erwin Chemerinsky, *Federal Jurisdiction* § 9.1, at 588 (4th ed. 2003) ("[T]he Supreme Court long has held that federal officers may be sued for injunctive relief."); James E. Pfander, *The Limits of Habeas Jurisdiction and the Global War on Terror*, 91 Cornell L. Rev. 497, 528-29 (2006) ("[H]igh government officials in Washington, D.C. cannot invoke the doctrine of official immunity against constitutional challenges to government action" even outside the habeas context.) (footnotes omitted).

11.     In addition, in 1976, the United States broadly and explicitly waived all immunity from suit in any action requesting non-monetary relief (including injunctive and declaratory relief) in 5 U.S.C. § 702, 90 Stat. 2721 (1976) ("An action in a court of the United States seeking relief

---

[6] Plaintiffs define "immigration proceedings" as any proceeding that occurs before an Immigration Judge or the Board of Immigration Appeals ("BIA"). Where the reference is ambiguous, the term "Immigration Judges" should be understood to refer to both individual Immigration Judges and members of the BIA.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."); *see also Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) ("[T]he time [has] now come to eliminate the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer in an official capacity.") (alternations and emphasis in original) (quoting H.Rep. No. 1656, 94th Cong., 2d Sess. 9, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6121, 6129).

12.     Venue is proper in the Western District of Washington under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this district. Plaintiff F.L.B. and E.G.C. reside in this district, and Plaintiffs J.E.F.M., J.F.M., D.G.F.M., F.L.B., E.G.C., A.F.M.J., L.J.M, and M.R.J. all have immigration proceedings scheduled to occur in this district. In addition, venue is proper under 28 U.S.C. §§ 2242-43 because Plaintiffs J.E.F.M., J.F.M., D.G.F.M., F.L.B., E.G.C., A.F.M.J., L.J.M, and M.R.J. are in the constructive custody of immigration authorities by virtue of immigration proceedings in this district.

### III.    PARTIES

#### A.    Plaintiffs[7]

13.     Plaintiff J.E.F.M. is an 11-year-old native and citizen of El Salvador.[8] He now resides in Washington State. J.E.F.M. had a removal hearing scheduled for September 2014 at the time

---

[7] This Court previously dismissed the claims of Plaintiffs J.E.F.M., J.F.M., D.G.F.M., G.J.C.P., and A.E.G.E. *See* Dkt. 114 at 7-8, 11; Dkt. 174 at 7. A.E.G.E. has since been scheduled for a removal hearing in April 2016 before the Los Angeles Immigration Court. Because removal proceedings have now undoubtedly commenced against A.E.G.E., he has a live claim as a Named Plaintiff in this action. With respect to J.E.F.M., J.F.M., D.G.F.M., and G.J.C.P., Plaintiffs assert their claims here only to preserve them for review. In contrast, former Plaintiffs G.M.G.C. and S.R.I.C. no longer wish to pursue their claims and therefore do not appear in this complaint. *See, e.g.*, Dkt. 107.

[8] To protect the privacy of the child Plaintiffs in this case, this complaint refers to them using their initials. *See* Fed. R. Civ. P. 5.2(a)(3). For the same reason, this complaint also does not provide as much detail as is available concerning the harms they have suffered in their home countries, during their journeys here, and since their arrivals in the United States.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Plaintiffs filed the original complaint in this case. The day after the Court heard Plaintiffs' motion for preliminary injunction on his behalf, the Immigration Judge presiding over his case rescheduled his removal hearing for May 2015. J.E.F.M.'s hearings were set in Seattle, Washington, and he did not have an attorney to represent him in his immigration case. J.E.F.M. appears by his next friend Bob Ekblad, a minister who has worked closely with J.E.F.M. and his family. J.E.F.M. was granted asylum in May 2015 by United States Citizenship and Immigration Services ("USCIS"), before which he was represented by pro bono counsel. Subsequently, the Immigration Judge terminated his case. This Court subsequently dismissed his claims as moot. Dkt. 174 at 7.

14.    Plaintiff J.F.M. is a 14-year-old native and citizen of El Salvador. He is the older brother of J.E.F.M. He now resides in Washington State. J.F.M. had a removal hearing scheduled for September 2014 at the time Plaintiffs filed the original complaint in this case. The day after the Court heard Plaintiffs' motion for preliminary injunction on his behalf, the Immigration Judge presiding over his case rescheduled his removal hearing for May 2015. J.F.M.'s hearings were set in Seattle, Washington, and he did not have an attorney to represent him in his immigration case. J.F.M. appears by his next friend Bob Ekblad, a minister who has worked closely with J.F.M. and his family. Like his brother, J.F.M. was granted asylum in May 2015 by USCIS, before which he was represented by pro bono counsel. Subsequently, the Immigration Judge terminated his case. This Court dismissed his claims as moot. Dkt. 174 at 7.

15.    Plaintiff D.G.F.M. is a 17-year-old native and citizen of El Salvador. She is the older sister of J.F.M. and J.E.F.M. She now resides in Washington State. She had a removal hearing scheduled for September 2014 at the time Plaintiffs filed the original complaint in this case. The day after the Court heard Plaintiffs' motion for preliminary injunction on her behalf, the Immigration Judge presiding over her case rescheduled her removal hearing for May 2015. D.G.F.M.'s hearings were set in Seattle, Washington, and she did not have an attorney to represent her in her immigration case. D.G.F.M. appears by her next friend Bob Ekblad, a minister who has worked closely with D.G.F.M. and her family. Like her brothers, D.G.F.M. was granted asylum in May 2015 by USCIS, before which she was represented by pro bono counsel.

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Subsequently, the Immigration Judge terminated her case. This Court dismissed her claims as moot. Dkt. 174 at 7.

16.     Plaintiff F.L.B. is a 16-year-old native and citizen of Guatemala. He now resides in Seattle, Washington. He had a removal hearing scheduled for September 2014 at the time Plaintiffs filed the original complaint in this case. Two weeks after the Court heard Plaintiffs' motion for preliminary injunction on his behalf, the Immigration Judge presiding over his case rescheduled his removal hearing for May 2015. His next hearing is scheduled for August 2016. F.L.B.'s hearings are set in Seattle, Washington, and he does not have an attorney to represent him in his immigration case. F.L.B. appears by his next friend Casey Trupin. Mr. Trupin is the Project Coordinator for the Children and Youth Project at Columbia Legal Services in Seattle, Washington.

17.     Plaintiff M.A.M. is a 17-year-old native and citizen of Honduras. M.A.M. has resided in the United States since he was eight years old. M.A.M. resides in Oxnard, California. M.A.M. had a removal hearing scheduled for August 2014 at the time Plaintiffs filed the original complaint in this case. M.A.M.'s removal proceedings remain ongoing. His next removal hearing is scheduled for February 2016. M.A.M. does not have an attorney to represent him in his immigration case. M.A.M. appears by his next friend and mother, Rosa Pedro.

18.     Plaintiff A.E.G.E. is a four-year-old native and citizen of El Salvador. He came to the United States in 2014 and now resides in Los Angeles, California. At the time Plaintiffs filed the Second Amended Complaint in this case, A.E.G.E. was awaiting his first court date in Los Angeles, California, and did not have an attorney to represent him in his immigration case. As a result, this Court dismissed A.E.G.E. from this suit over Plaintiffs' objection. Dkt. 114 at 7-8. A.E.G.E. has since had a removal hearing scheduled for April 2016. He does not have an attorney to represent him. A.E.G.E. appears by his next friend, Ana Deutsch. Ms. Deutsch is a Co-Founder and Clinical Director at the Program for Torture Victims in Los Angeles, California.

19.     Plaintiff G.J.C.P. is a 15-year-old native and citizen of El Salvador. She came to the United States in 2014 and now resides in Van Nuys, California. An Immigration Judge in Los Angeles, California ordered G.J.C.P. removed in absentia in August 2014. She does not have an

THIRD AMENDED COMPLAINT - 8 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

attorney to represent her in her immigration case. G.J.C.P. appears by her next friend and grandmother, Blanca Griselda Zelaya. This Court has dismissed G.J.C.P. from this suit over Plaintiffs' objection. Dkt. 114 at 7-8.

20.     Plaintiff J.E.V.G. is an 18-year-old native and citizen of El Salvador. He came to the United States in 2014 and now resides in Houston, Texas. In September 2014, an Immigration Judge in Houston, Texas ordered J.E.V.G. removed in absentia, at which time he was 17 years old and did not have an attorney to represent him in his immigration case. After he became a Plaintiff in this case, the government moved to reopen J.E.V.G.'s removal order and the Immigration Judge granted the motion. Subsequently, J.E.V.G. turned 18 years old and obtained counsel to represent him in his removal proceedings. J.E.V.G. appears by his next friend and sister, Santos Angela Vasquez.

21.     Plaintiff E.G.C. is an 11-year-old native and citizen of Mexico. He came to the United States in 2013 with his mother, but his mother returned to Mexico without him. He presently resides in Snohomish, Washington. E.G.C. has a removal hearing scheduled for December 2015. He does not have an attorney to represent him in his immigration case. E.G.C. appears by his next friend, Sonia McLeod. Ms. McLeod is a case manager at the University District Youth Center.

22.     Plaintiff A.F.M.J. is an 11-year-old native and citizen of Mexico.  She came to the United States in 2014 with her mother and two siblings L.J.M. and M.R.J., and presently resides in Royal City, Washington. A.F.M.J., with her mother and two siblings, has a removal hearing scheduled in late October 2015. She does not have an attorney to represent her in her immigration case. A.F.M.J. appears by her next friend and mother, Maria Jimenez.

23.     Plaintiff L.J.M. is a 3-year-old native and citizen of Mexico. She is the younger sister of A.F.M.J. She came to the United States in 2014 with her mother and two siblings, and presently resides in Royal City, Washington. L.J.M., with her mother and two siblings, has a removal hearing scheduled in late October 2015. She does not have an attorney to represent her in her immigration case. L.J.M. appears by her next friend and mother, Maria Jimenez.

24.     Plaintiff M.R.J. is a 1-year-old native and citizen of Mexico. He is the younger half-

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

brother of A.F.M.J. and L.J.M. He came to the United States in 2014 with his mother and two siblings, and presently resides in Royal City, Washington. M.R.J., with his mother and two siblings, has a removal hearing scheduled in late October 2015. He does not have an attorney to represent him in his immigration case. M.R.J. appears by his next friend and mother, Maria Jimenez.

25.     Plaintiff J.R.A.P. is a seven-year-old native and citizen of Honduras. J.R.A.P. came to the United States in 2013 and now resides in Miami, Florida. J.R.A.P. has a removal hearing scheduled for March 2016. He does not have an attorney to represent him in his immigration case. J.R.A.P. appears by his next friend Katherine Peguero. Ms. Peguero is a close friend of J.R.A.P.'s family.

26.     Plaintiff K.N.S.M. is a nine-year-old native and citizen of Honduras. K.N.S.M. came to the United States in 2014 and now resides in Ontario, California. K.N.S.M. has a removal hearing scheduled for April 2016. She does not have an attorney to represent her in her immigration case. K.N.S.M. appears by her next friend and mother Eloisa Sarahi Mejia Sevilla.

## B.     Defendants

27.     Defendant Loretta E. Lynch, is the Attorney General of the United States and the head of the U.S. Department of Justice ("DOJ"). Ms. Lynch shares responsibility for implementing and enforcing the immigration laws. Ms. Lynch is sued in her official capacity.

28.     Defendant Juan P. Osuna is the Director of the Executive Office for Immigration Review ("EOIR"), which is the federal agency within DOJ that operates the immigration courts. Mr. Osuna is responsible for the supervision of the Deputy Director, the Chairman of the Board of Immigration Appeals ("BIA"), the Chief Immigration Judge, the Chief Administrative Hearing Officer, and all EOIR agency personnel in the execution of their duties. Mr. Osuna is sued in his official capacity.

29.     Defendant Jeh C. Johnson is the Secretary of DHS and is the highest-ranking member of DHS, which is the arm of the federal government responsible for enforcing the immigration laws. Mr. Johnson is sued in his official capacity.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

30.     Defendant Sarah R. Saldaña is the Director of U.S. Immigration and Customs Enforcement ("ICE"), which is the principal investigative, enforcement, and prosecutorial arm of DHS. ICE attorneys represent the Government in immigration proceedings. Director Saldaña is sued in her official capacity.

31.     Defendant León Rodríguez is the Director of USCIS, which is the arm of DHS responsible for granting various forms of immigration and citizenship benefits. USCIS is responsible for adjudicating applications for certain forms of relief from removal for children in immigration proceedings. Mr. Rodriguez is sued in his official capacity.

32.     Defendant Sylvia M. Burwell is the Secretary of Health and Human Services ("HHS") and is the highest-ranking member of HHS, which is the arm of the federal Government responsible for the care and custody of unaccompanied immigrant minors under the Trafficking Victims Protection Reauthorization Act. Ms. Burwell is sued in her official capacity.

33.     Defendant Robert Carey is the Director of the Office of Refugee Resettlement ("ORR"), which is the division of HHS directly responsible for the care and custody of unaccompanied immigrant minors. Mr. Carey is sued in his official capacity.

34.     Defendant Bryan Wilcox is the Acting Field Office Director for the Seattle Field Office of ICE, which has custody of Plaintiffs J.E.F.M., J.F.M., D.G.F.M., F.L.B., E.G.C., A.F.M.J., L.J.M, and M.R.J., by virtue of immigration proceedings in this district. Mr. Wilcox is sued in his official capacity.

35.     Defendant Lisa McDaniel is the Field Office Director for the Seattle Field Office of ICE, which has custody of Plaintiffs J.E.F.M., J.F.M., D.G.F.M., F.L.B., E.G.C., A.F.M.J., L.J.M., and M.R.J., by virtue of immigration proceedings in this district. Ms. McDaniel is sued in her official capacity.

## IV.     FACTUAL BACKGROUND

### A.     Children Facing Deportation

THIRD AMENDED COMPLAINT - 11 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

36.     Every year, the Government initiates immigration proceedings to deport thousands of children, ranging from toddlers to teenagers.[9] Children enter the immigration enforcement system in several ways. Thousands are arrested at or shortly after crossing the United States-Mexico border, often after having survived treacherous and difficult journeys from their countries of origin. Many of them have fled persecution by their governments or their own families, rising rates of extreme violence (much of it caused by the escalating influence of powerful gangs), or economic conditions that make life unsustainable in their countries of origin.[10] Some of these children have experienced trauma in the form of rape, kidnapping, abandonment, or physical abuse inflicted in their home countries or by smugglers and traffickers during their journey to the United States.[11]

37.     Other children are apprehended after spending years in the United States, some having grown up almost entirely in this country. Many of them attend school alongside other children in this country, speak fluent English, and are fully integrated into their communities. Others are not

---

[9] *See supra* note 4 (news articles reporting cases of children as young as five or six years old in removal proceedings); *Matter of Gomez-Gomez*, 23 I. & N. Dec. 522 (BIA 2002) (en banc) (addressing case of eight-year-old child ordered removed in absentia based on report of arresting officer); *Matter of Ponce-Hernandez*, 22 I. & N. Dec. 784, 785 (BIA 1999) (en banc) (describing 15-year-old child charged with removability); *A Treacherous Journey* at 11-12 (noting case stories of girls aged 12 and 14 who appeared before Immigration Judges).

[10] Women's Refugee Commission, *Forced from Home: The Lost Boys and Girls of Central America* 7 (2012), http://womensrefugeecommission.org/resources/migrant-rights-and-justice/844-forced-from-home-the-lost-boys-and-girls-of-central-america/file. This report found that more than 77% of a sample of 151 children cited violence as their primary reason for fleeing their countries of origin. *See also* United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* 6 (2014), http://www.unhcrwashington.org/sites/default/files/1_UAC_Children%20on%20the%20Run_Full%20Report.pdf [hereinafter UNHCR Report] (finding that no less than 58% of the children interviewed for the report "were forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection").

[11] The United States Conference of Catholic Bishops Migration and Refugee Services, *The Changing Face of the Unaccompanied Alien Child* 8 (2012), http://www.usccb.org/about/children-and-migration/unaccompanied-refugee-minor-program/upload/A-Portrait-of-Foreign-Born-Children-in-Federal-Foster-Care-and-How-to-Best-Meet-Their-Needs_USCCB-December-2012.pdf.

THIRD AMENDED COMPLAINT - 12 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

so lucky, suffering abuse, neglect, or abandonment within the United States itself. Some of these children are turned over to DHS after contact with the juvenile justice system, while DHS arrests others during general immigration enforcement activities.

38.     Although they have entered the immigration system in different ways, Plaintiffs and the putative class they seek to represent share two fundamental characteristics. First, the Government has initiated immigration proceedings in order to remove them from the United States and, despite their inability to secure counsel, will force them to appear unrepresented in complex, adversarial court proceedings against trained ICE attorneys. Second, all of them are under the age of 18, and therefore lack the intellectual and emotional capacity of adults.

## B.     The Structure of Immigration Proceedings for Children

39.     Immigration proceedings pit the Government against the child in an adversarial process where each side is presumed to have the ability to represent its own interests. An attorney trained in substantive immigration law and immigration court procedures represents the Government. This attorney acts as a prosecutor, and seeks to establish the child's removability. Each side is expected to present facts and legal arguments to an Immigration Judge, after which the Judge ultimately makes a determination in favor of the Government or the child. In most cases, either side can then appeal the decision to the BIA. A litigant may obtain judicial review of removal orders issued by the BIA by filing a "petition for review" in the federal court of appeals governing the place of the removal hearing. As explained below (and as should be obvious), unrepresented children are not capable of filing such petitions.

40.     The facts and legal arguments at issue in immigration cases are often complex. The federal courts have repeatedly observed that "the immigration laws have been termed second only to the Internal Revenue Code in complexity." *Baltazar-Alcanzar v. INS*, 386 F.3d 940, 948 (9th Cir. 2004) (citation and quotation marks omitted); *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010) ("Immigration law can be complex, and it is a legal specialty of its own."). The same substantive immigration law generally governs the cases of both adults and children. Decl. of David O. Thronson, Dkt. 59, ¶11.

THIRD AMENDED COMPLAINT - 13 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

41.     A child's lack of legal representation in immigration proceedings dramatically undermines her ability to present defenses to and seek relief from removal, even at the earliest stages. At initial hearings, an Immigration Judge may ask the child to accept or deny the Government's charges and may accept factual testimony or evidence that allows the Government to meet its burden of establishing the child's removability, such as the record of deportability. *Id.* ¶13; Decl. of Eve Stotland, Dkt. 33, ¶¶5-8.

42.     In addition, without the assistance of an attorney, children are unlikely to be aware of procedural defenses against removal that must be raised in these initial hearings. For example, some children have arguments that the immigration proceedings must be terminated because of constitutional or regulatory violations. *See, e.g.*, *Matter of Mejia-Andino*, 23 I. & N. Dec. 533, 536 (BIA 2002) (en banc) (concluding that proceedings against seven-year-old child were properly terminated due to failure to properly serve the charging document). Even if a child is aware of such a defense, moving an Immigration Judge to terminate the proceedings on such grounds requires the ability to gather and understand facts surrounding one's arrest, the interaction between different state and federal agencies, and complex regulatory and constitutional law. The child bears the burden of establishing that the Government obtained its evidence in a manner that requires suppression. *See Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (BIA 1988).

43.     Eventually, children are also asked to state what forms of relief from removal they wish to seek and how long they will need to complete the applications for relief. Dkt. 59, ¶14. Even identifying defenses or other avenues to relief from removal, let alone prevailing on them, often requires substantial factual investigation and legal research. For example, a number of children facing removal have fled persecution in their home countries. However, the immigration laws put the burden on the child to prove eligibility for asylum. *See* 8 U.S.C. § 1158(b)(1)(B)(i). Establishing such eligibility requires the child to present significant amounts of evidence and sophisticated legal arguments. As a result, asylum claims brought by pro se children "frequently fail due to burdensome legal standards and incorrect application of legal principles . . . . even

THIRD AMENDED COMPLAINT - 14 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

when it has been determined that the child suffered egregious harm rising to the level of persecution and is likely to suffer persecution in the future."[12]

44.      As with asylum, children bear the burden of demonstrating eligibility for other forms of relief from deportation. *See* 8 U.S.C. § 1229a(c)(4) (stating that applicant for relief from removal in immigration proceedings bears burden to demonstrate both eligibility requirements of the particular form of relief, and, if applicable, merits relief as a matter of discretion). These other forms of relief include Special Immigrant Juvenile Status ("SIJS"), which is available to a child when a state juvenile court declares that the child's reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under state law, *see* 8 U.S.C. § 1101(a)(27)(J)(i); U-visas, which are available to children who have been the victims of certain serious crimes if they would be helpful to the authorities in an investigation or prosecution, *see id.* §§ 1101(a)(15)(U)(i)(III), 1184(p)(1); T-visas, which protect victims of "severe" forms of human trafficking, *see id.* § 1101(a)(15)(T)(i)(I); family visas, where a parent who is a U.S. citizen or lawful permanent resident is able to file a visa petition on their child's behalf, *see id.* §§ 1151-1154, as well as other forms of relief. Meeting the eligibility requirements for all of these forms of relief requires the child to carefully marshal both facts and law. The child must not only demonstrate substantive eligibility for relief, but also be able to follow procedures for submitting the appropriate applications to different agencies of the Government, along with the required supporting evidence.

45.      Because of their age, children lack the ability to assert defenses and claims to relief by themselves. "A child's age is far more than a chronological fact. It is a fact that generates commonsense conclusions about behavior and perception . . . . [that] apply broadly to children as a class." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2403 (2011) (internal quotation marks and citations omitted). These commonsense conclusions are grounded not only in "what any person knows [] about children generally," *id.*, but also in scientific studies that "continue to show fundamental differences between juvenile and adult minds." *Graham v. Florida*, 560 U.S. 48, 68 (2010) (citing amicus briefs from medical and psychological professional associations).

---

[12] *A Treacherous Journey* at 20.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

46.     For example, children possess a reduced capacity to comprehend the consequences of their actions and decisions, and they are often more receptive to adult influence, in part because many of them have been taught not to challenge authority and to please the adults around them. *See* Dustin Albert & Laurence Steinberg, *Judgment and Decision Making in Adolescence*, 21 J. Research on Adolescence 211, 220 (2011), *available at* http://behaviorchangeresearchnetwork.pbworks.com/w/file/fetch/49649607/Albert%20%26%20 Steinberg%20(2011).pdf (noting that "adults tend to make more adaptive decisions than adolescents," in part because "they have a more mature capacity to resist the pull of social and emotional influences and remain focused on long-term goals"). As a result, they are frequently more susceptible to suggestion and leading questions, and at times have difficulty distinguishing between people who are seeking to protect their interests and those who are not. Children in the immigration enforcement system are often even more vulnerable than other children, since many of them arrive in the United States after having experienced serious trauma in their countries of origin or during their journeys to the United States.[13]

47.     The interests at stake in these complex proceedings could scarcely be higher: children face expulsion from this country to a land where they often lack family or other support. Many of them fled their home countries in order to escape persecution, torture, or death; deportation to the country from which the child fled is often not in their best interest. *See* Cindy Carcamo, *In Honduras, U.S. Deportees Seek to Journey North Again*, L.A. Times, Aug. 16, 2014, *available at* http://www.latimes.com/world/mexico-americas/la-fg-honduras-deported-youths-20140816-story.html ("'There are many youngsters who only three days after they have been deported are killed, shot by a firearm,' said Hector Hernandez, who runs the morgue in San Pedro Sula. 'They return just to die.'"); *see also* Wendy Young & Megan McKenna, *The Measure of a Society: The Treatment of Unaccompanied Refugee and Immigrant Children in the United States*, 45 Harv. C.R.-C.L. L. Rev. 247, 254 (2010) (describing case of Edgar Chocoy, a child whose asylum claim was denied and who was then murdered 17 days after he was sent back to Guatemala);

---

[13] UNHCR Report at 6 (finding that 48% of children interviewed for study had been "personally affected by the augmented violence" in their countries of origin and that 21% had "survived abuse and violence in their homes by their caretakers").

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

Jacqueline Bhabha, *"Not a Sack of Potatoes": Moving and Removing Children Across Borders*, 15 B.U. Pub. Int. L.J. 197, 203 (2006) (noting that Chocoy was unrepresented in his immigration proceedings). [14]

48.     Moreover, the civil removal orders issued against children in immigration proceedings bear the same consequences as those issued against adults. Those consequences include not only bars to future admission to the United States (if the child would otherwise have been eligible for a visa), but also the prospect of criminal prosecution should they attempt to reenter the United States.

49.     Forcing children to appear in immigration court without representation ensures that thousands of children are deprived of a full and fair opportunity to identify defenses or seek relief for which they qualify. A 2014 report by the United Nations High Commissioner for Refugees, for example, suggests that over half of all unaccompanied children fleeing to the United States from Central America have potential claims under the asylum laws, while a slightly older report found that as many as 40% of unaccompanied children in removal proceedings were eligible for some form of immigration relief. [15] Despite such estimates, only a small number of children actually receive such relief. [16] This gap is likely due in large part to the absence of counsel. The presence of counsel makes a real difference for the children fortunate enough to receive legal representation. Data confirms what common sense and experience strongly suggest: children with lawyers are far more likely to identify and prevail on defenses to removal that the law makes available to them. *See* Transactional Records Access Clearinghouse, *New Data on Unaccompanied Children in Immigration Court*, Table 5 (July 15, 2014),

---

[14] *See also* Human Rights Watch, *"You Don't Have Rights Here": U.S. Border Screening and Returns of Central Americans to Risk of Serious Harm* (Oct. 2014), *available at* http://www.hrw.org/sites/default/files/reports/us1014_web.pdf (observing that in Honduras, young boys and girls are frequently targets for gang recruitment and sexual violence).

[15] UNHCR Report at 6; Olga Byrne & Elyse Miller, *The Flow of Unaccompanied Children Through the Immigration System: A Resource for Practitioners, Policy Makers, and Researchers*, Vera Institute of Justice 4 (Mar. 2012), http://www.vera.org/sites/default/files/resources/downloads/the-flow-of-unaccompanied-children-through-the-immigration-system.pdf.

[16] *See, e.g.*, *A Treacherous Journey* at 19 n.94, 38, 48.

THIRD AMENDED COMPLAINT - 17 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

http://trac.syr.edu/immigration/reports/359/ (describing disparity in outcomes between unrepresented and represented children).

50.     A child's inability to perform the basic functions of self-representation not only adversely affects her chances of succeeding in her immigration case, but also imposes insurmountable impediments on her ability to seek administrative and judicial review of a final removal order. Just like an adult, a child who wishes to appeal a removal order issued by an Immigration Judge must file an administrative appeal with the BIA within thirty days. *See* 8 C.F.R. § 1003.3(a). Regulations require the child to "identify the reasons for the appeal . . . in order to avoid summary dismissal." *Id.* § 1003.3(b). The child must also, among other things, "specifically identify the findings of fact, the conclusions of law, or both that are being challenged," express a preference as to oral argument, and state an intention either to file or not file a separate written brief in support of the appeal. *Id.*; *see also Matter of R-S-H-*, 23 I. & N. Dec. 629, 638 (BIA 2003) ("Moreover, the record does not reflect that the respondent raised any objections to the attorneys' presence at the hearing. Therefore, the respondent waived his opportunity to pursue this issue on appeal."). In addition, appeals are conducted based on the record developed before the Immigration Judge. A pro se child who cannot develop a robust record would have very little chance of prevailing on appeal, even if she could somehow manage to file the papers necessary to begin the appellate process.

51.     If the BIA affirms the child's removal order, the child has the theoretical right to seek judicial review of that order in the federal court of appeals via a petition for review filed within thirty days. *See generally* 8 U.S.C. § 1252; *INS v. St. Cyr*, 533 U.S. 289, 313-14 (2001). But as a prerequisite to obtaining federal court review, the child must first exhaust administrative remedies before the Immigration Judge and the BIA. *See* 8 U.S.C. § 1252(d) (stating that petition for review can be filed only after administratively final removal order). Absent exceptional circumstances, a reviewing federal court will not address arguments not raised before the agency. *See Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004) (finding that petitioners who were pro se at BIA were required to exhaust arguments there before raising them to court of appeal). None

THIRD AMENDED COMPLAINT - 18 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

of the child Plaintiffs, from one-year-old M.R.J., to eleven-year-old E.G.C., to 16-year-old F.L.B., can even comprehend this process, much less avail themselves of it.

52.     Past experience confirms that virtually all (if not all) children in immigration proceedings are unable to perform these appellate tasks. Experts in the field who have represented hundreds of children for years cannot recall ever seeing a pro se child appeal any issue even to the BIA, let alone to the federal courts. Decl. of David B. Thronson, Dkt. 59, ¶20; *see also* Decl. of Jojo Annobil, Dkt. 61, ¶18; Decl. of William O. Holston, Jr., Dkt. 57, ¶13.

53.     These limitations pose particular barriers to raising the claims that Plaintiffs have asserted in this case. Plaintiffs and the putative class members raise claims for appointed legal representation in their immigration proceedings, pursuant to the Immigration and Nationality Act ("INA") and the Due Process Clause. *See infra*, Section VII. By definition, such claims can be raised before an Immigration Judge only by children who lack legal representation. But as described above, children without legal representation are unable to assert or preserve even basic claims on their own behalf, much less make complex arguments about their entitlement to counsel in their immigration proceedings.

54.     Indeed, the undersigned have searched extensively for any case in which a pro se child filed a petition for review to a court of appeals asserting a right to counsel in immigration proceedings, but have found none. In light of the thousands of children's immigration cases that are decided every year, this absence is strong evidence that the normal channels of judicial review are simply not available for children seeking to litigate the claims raised in this case. Even if a pro se child could somehow file an appeal of her counsel claim to the BIA and then to the court of appeals, this would not result in a *meaningful* review of a claim for appointed counsel. For a child to obtain such review, she would have to not only navigate the formal complexities of a petition for review, but would also have to develop a record containing adequate evidence relevant to the statutory and constitutional issues before the Immigration

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

Judge and preserve all of the relevant issues for review. Children, by reason of their lack of capacity, cannot carry out these functions.[17]

55. For children like Plaintiff G.J.C.P. who have been ordered removed in absentia—due, in nearly all cases, to circumstances beyond their control—judicial review is even further out of reach.[18] An in absentia removal order, which can be immediately executed, *cannot be appealed*. *See Matter of Guzman*, 22 I. & N. Dec. 722, 723 (BIA 1999) (holding BIA lacks jurisdiction over appeal filed by respondent ordered removed in absentia). Thus, any claim, including a counsel claim, preserved prior to the order's issuance is of no immediate consequence, as the BIA and the federal courts cannot directly review it. Instead, in order to obtain any redress, these children must first file a motion to rescind the removal order and reopen their removal proceedings before the Immigration Judge. In most cases, these motions are subject to strict time, numerical, and substantive limitations and must comport with strict procedural requirements. *See* 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23(b)(4)(ii)-(iii); 8 C.F.R. § 1003.23(b)(1)(i)-(ii). Under the immigration statute, there are two primary situations where individuals who were ordered deported in absentia can reopen their cases: (1) where they did not receive proper notice of the hearing, and (2) where they did not appear at their hearing because of exceptional circumstances. *See id.* Establishing that either situation exists involves complex legal and factual inquiries.[19] For example, in order to prove that notice was improper, a person must consider whether the notice complied with the statutory standards regarding content and service, *see* 8 U.S.C. § 1229(a), and where it appears that service was proper, submit substantial evidence to

---

[17] EOIR's recently-issued "Friend of Court Guidance" makes clear that legal service providers cannot file and litigate appeals for children in their Friend of Court role. Because of their "advisory role," such individuals "'can file no pleadings or motions of any kind,' 'can reserve no exception to any ruling of the court, and of course cannot prosecute an appeal.'" The Office of the Chief Immigration Judge, "Friend of the Court Guidance," U.S. Dep't of Justice, Executive Office for Immigration Review 2 (Sept. 10, 2014), *available at* http://www.ilw.com/immigrationdaily/news/2014,0911-DOJ.pdf (quoting *In re Perry*, 148 N.E. 163, 165 (Ind. App. 1925)).

[18] This Court ruled that 8 U.S.C. 1252(g) stripped the Court of jurisdiction to entertain G.J.C.P.'s claim for appointed counsel, due to her in absentia order. *See* Dkt. 114 at 11. Plaintiffs continue to assert the claim here in order to preserve it for review.

[19] *See generally* Beth Werlin, *Practice Advisory: Rescinding an* In Absentia *Order of Removal* (Mar. 2010), *available at* http://www.legalactioncenter.org/sites/default/files/lac_pa_092104.pdf.

Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

overcome a presumption of proper delivery. *See*, *e.g.*, *Matter of M-R-A-*, 24 I. & N. Dec. 665 (BIA 2008). Likewise, in order to prove exceptional circumstances—which the statute says "refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien", 8 U.S.C. § 1229a(e)(1)—a person must submit evidence to document the claim and often must establish diligence in avoiding the in absentia order. *See*, *e.g.*, *Matter of J-P-*, 22 I. & N. Dec. 33, 34-36 (BIA 1998). Children like G.J.C.P. have no hope of understanding or accessing the administrative mechanisms for reopening their cases without legal representation. If they fail to move for reopening, they will have no avenue for appellate review (either administrative or judicial). Because the removal order is already effective, they can be deported at any time. And even if they somehow were to succeed in reopening, all they would win is another opportunity to litigate their cases in the same lopsided fashion as all of the other unrepresented children the Government is trying to deport.

### C. The Federal Government's Response to the Legal Needs of Children Facing Deportation

56. Although the Government initiates deportation cases against thousands of children each year, it does not ensure legal representation for many of them. This presents a tremendous problem because the vast majority of such children cannot afford private representation. Studies suggest that a significant portion of children who might be subject to removal proceedings are living in poverty and clearly financially unable to obtain legal representation. *See*, *e.g.*, Seth Motel and Eileen Patten, Pew Research Center, *Statistical Portrait of the Foreign-Born Population in the United States, 2011* Table 37 (2013), *available at* http://www.pewhispanic.org/2013/01/29/statistical-portrait-of-the-foreign-born-population-in-the-united-states-2011/#poverty-by-age-and-region-of-birth-2011 (a third of all foreign born individuals under 18 years old live in poverty); Jeffrey S. Passel and D'Vera Cohn, Pew Research Center, *A Portrait of Unauthorized Immigrants in the United States* (2009) *available at* http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/ (finding that a third of children of unauthorized immigrants live in poverty).

THIRD AMENDED COMPLAINT - 21 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

57.     Numerous advocates have pointed out the injustice of this practice, and called for the Government to provide representation for children facing deportation. *See, e.g.*, Wendy Young & Megan McKenna, *supra* ¶ 43; M. Aryah Somers, *Zealous Advocacy for the Right to Be Heard for Children and Youth in Deportation Proceedings*, 15 CUNY L. Rev. 189 (2011); Julie Myers Wood & Wendy Young, *Children Alone and Lawyerless in a Strange Land*, *The Wall Street Journal*, Sept. 22, 2013, *available at* http://online.wsj.com/news/articles/SB10001424127887324492604579083400349940432;[20] Sonia Nazario, *Child Migrants, Alone in Court*, *N.Y. Times*, Apr. 10, 2013, A23, *available at* http://www.nytimes.com/2013/04/11/opinion/give-lawyers-to-immigrant-children.html?_r=0.

58.     Since Plaintiffs filed the original complaint, the need for legal representation has remained acute. Shortly after the filing, the Government began to "prioritize" the immigration proceedings of recently-arrived children by placing their cases on expedited dockets, otherwise known as "rocket dockets." *See supra* n.3. News reports from across the country have documented the hearings taking place on these "rocket" dockets. *See, e.g.*, Meredith Hobbs, *Lawyers Say 'Rocket Dockets' Risk Due Process*, The Daily Report (Aug. 29, 2014), http://www.dailyreportonline.com/id=1202668537443/Lawyers-Say-Rocket-Dockets-Risk-Due-Process?slreturn=20140921161115 (reporting that, in the Atlanta Immigration Court, "unaccompanied children on the fast-track dockets are being given only 30 days or less from their first appearance until their second hearing, when they are generally required to plea to the charging documents"); Dianne Solis, *Rocket Dockets May Be Jettisoning Justice for Immigrant Children*, The Dallas Morning News (Aug. 27, 2014), http://www.dallasnews.com/news/metro/20140827-rocket-dockets-may-be-jettisoning-justice-for-immigrant-children.ece (reporting on Dallas children's rocket dockets); John Fritze, *Immigration Court Speeds Review of Cases Involving Children*, Baltimore Sun (Aug. 20, 2014), http://articles.baltimoresun.com/2014-08-20/news/bs-md-immigration-rocket-docket-20140820_1_immigration-cases-u-s-immigration-catholic-charities ("Baltimore Immigration

---

[20] Ms. Myers Wood was the Assistant Secretary of Homeland Security for Immigration and Customs Enforcement under President George W. Bush.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

Court, facing an increase in the number of cases involving immigrant children who crossed the border illegally, is expediting reviews to more quickly decide whether the children should be deported, according to attorneys with clients before the court."); Kirk Semple, *Advocates in New York Scramble as Child Deportation Cases Are Accelerated*, N.Y. Times (Aug. 4, 2014), http://www.nytimes.com/2014/08/05/nyregion/advocates-scramble-as-new-york-accelerates-child-deportation-cases.html; Julie Kay, *Miami Immigration Court Adopts 'Rocket Docket' to Handle Unaccompanied Minor Cases*, Daily Bus. Rev. (Aug. 4, 2014) http://www.dailybusinessreview.com/id=1202665758127/Miami-Immigration-Court-Adopts-Rocket-Docket-to-Handle-Unaccompanied-Minor-Cases?slreturn=20140916180220 (stating that three Immigration Judges "appealed to local immigrant advocacy groups . . . for pro bono help for the children. They said they would be rushing 150 kids a day through the immigration process"); Molly Hennessy-Fiske, *Young Immigrants Must Risk Deportation for Chance to Gain Legal Status*, L.A. Times (Aug. 3, 2014), http://www.latimes.com/nation/immigration/la-na-immigration-law-20140803-story.html#page=1 (describing "fast-tracked unaccompanied youths' initial hearings" in Los Angeles).[21]

59.  After the hearing on the motion for preliminary injunction in this case, the Government issued guidance stating that Immigration Judges are not *required* to expedite cases by limiting the number or length of continuances available to children who are seeking legal representation. Brian M. O'Leary, Docketing Practices Relating to Unaccompanied Children Cases in Light of the New Priorities (Sep. 9, 2014), at 2; *see also* Brian M. O'Leary, Docketing Practices Relating to Unaccompanied Children Cases and Adults with Children Released on Alternatives to Detention Cases in Light of the New Priorities (Mar. 24, 2015), at 2. Yet, in addition to news

---

[21] *See also* Decl. of William O. Holston Jr., Dkt. 57, ¶¶6-10 (Immigration Judge stated that the court has received guidance requiring them to expedite children's cases; court previously provided unrepresented children two to three months after their first hearing to find an attorney, but since August has provided as little as one week); Decl. of Scott Bratton, Dkt. 60, ¶4 (describing rocket docket in Cleveland); Decl. of Jojo Annobil, Dkt. 61, ¶¶9-15 (describing rocket docket in New York City); Decl. of Erin Apte, Dkt. 62, ¶¶ 3-5 (Immigration Judge provided pro se children in Seattle with three weeks to find attorneys); Decl. of Sonia Gutierrez, Dkt. 64, ¶7 (Immigration Judge provided pro se children in Los Angeles with about five weeks to find attorneys).

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

reports, evidence from legal services providers and observers shows that in practice, many Immigration Judges throughout the country are giving children far less time than they did previously to find lawyers or prepare their cases. Judges are also forcing children to proceed without representation, including by ordering them removed in absentia, and ordering them to plead to charges, fill out asylum applications, take voluntary departure, or be ordered removed when they do appear.

60.     Numerous children have already received in absentia removal orders as a consequence of these rocket dockets. One news article reported that between July 18, 2014 and July 28, 2015, of the approximately 29,200 children who were scheduled for hearings in immigration court, Immigration Judges issued over 6,300 in absentia removal orders against children who failed to appear in court. *See* David Rogers, *Obama Plan Leaves Child Migrants Adrift*, Politico (Aug. 11, 2015), http://www.politico.com/story/2015/08/obama-plan-leaves-child-migrants-adrift-121254#ixzz3iWQ2IbRV. But as the experiences of G.J.C.P. and J.E.V.G. illustrate, and as the testimony of legal services providers shows, many such children likely failed to appear in court for reasons beyond their control, such as hearing notices being issued to incorrect addresses, hearing notices that were received days *after* the hearing actually took place, or hearing notices that were never received at all. *See* Decl. of Tin Thanh Nguyen, Dkt. 63, ¶¶12-13 (to the best of declarant's recollection, Immigration Judge at the Charlotte Immigration Court ordered removed in absentia all children who did not appear to hearings on July 31, 2014 and August 12, 2014; one child who appeared in court had received fewer than four days' notice); Decl. of Simon Sandoval-Moshenberg, Dkt. 34, ¶¶9-12 (describing children living in Virginia who received notice only two days prior to a hearing in Los Angeles Immigration Court); Decl. of Stacy Tolchin, Dkt. 31, ¶¶3-5 (same). *See also* Odette Yousef, *Lawyers Fear Speedy Deportations Harm Minors*, WBEZ 91.5 (Aug. 27, 2014), http://www.wbez.org/news/lawyers-fear-speedy-deportations-harm-minors-110715 (reporting that legal service providers filed 200 change of venue motions on one day for children who were scheduled for hearings at the Chicago Immigration Court but no longer lived in the area).

THIRD AMENDED COMPLAINT - 24 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

61.     For these and other reasons, children like G.J.C.P. and J.E.V.G. are far more likely to appear in court when they have legal representation. As a statistical matter, it is very likely that they would not have been ordered removed had they had legal representation. Children with representation appear in court at vastly higher rates than do children without legal representation. *See* Decl. of Stephen Kang, Dkt. 25, Exh. P (collecting data establishing that over 93% of represented children appear for all court proceedings, whereas only 27.5% of unrepresented children appear for all proceedings).

62.     While the Government has taken limited steps to afford legal representation to some children facing deportation, its efforts have fallen well short of ensuring representation for every child it seeks to deport with this new-found vigor and speed. For the past couple of years, the Government has funded legal representation for a fraction of the children in ORR detention facilities, and then initiated programs in Houston, Texas, and Los Angeles, California to afford legal representation to certain children released from ORR custody. But these programs failed to provide all children even in those two regions with representation, and more recent and broader-based efforts will also fall far short of providing comprehensive coverage.

63.     In October 2013, Plaintiffs' counsel sent a letter to Defendants urging them to take additional steps to ensure that all children in immigration proceedings are provided legal representation. Ex. A, Letter regarding Counsel for Immigrants in Removal Proceedings. In January 2014, Plaintiffs' counsel met with officials from DHS, DOJ, and ORR to discuss the concerns expressed in the letter.

64.     In June 2014, the Government announced a new "strategic partnership" to "facilitat[e] the effective and efficient adjudication of immigration proceedings involving certain children who have crossed the border without a parent or legal guardian." *See* justice AmeriCorps Legal Services for Unaccompanied Children, Corporation for Nat'l & Comm. Serv., *available at* http://www.nationalservice.gov/build-your-capacity/grants/funding-opportunities/2014/justice-americorps-legal-services (last visited June 9, 2014). Under this program, the Government has awarded $1.8 million to legal services providers in order to support living allowances for 100 legal fellows who represent children under 16 in removal proceedings in selected areas of the

THIRD AMENDED COMPLAINT - 25 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

country. *See* Dep't of Justice Office of Public Affairs, *Justice Department and CNCS Announce $1.8 Million in Grants to Enhance Immigration Court Proceedings and Provide Legal Assistance to Unaccompanied Children* (Sept. 12, 2014), *available at* http://www.justice.gov/opa/pr/justice-department-and-cncs-announce-18-million-grants-enhance-immigration-court-proceedings; *see also* Equal Justice Works, *Equal Justice Works Receives $1.2 Million for justice AmeriCorps Partnership*, http://www.equaljusticeworks.org/news/09-12-14-justice-americorps.

65.     Justice AmeriCorps, even if it continues to be funded in future years, will still fall far short of meeting the need created by the Government's policy of deporting children without representation, for several reasons. First, the program does not ensure representation for every child even for those populations it explicitly targets. Second, the program funds representation only for children younger than 16, thereby excluding a substantial number of children who face removal, including several of the Plaintiffs. Announcement of Federal Funding Opportunity, Corp. for Nat'l and Comy. Serv., 2014 justice AmeriCorps Legal Services for Unaccompanied Children 31 (June 6, 2014), *available at* http://www.nationalservice.gov/sites/default/files/upload/JusticeAmeriCorpsNOFO.pdf(defining "[u]naccompanied children" as "children under the age of 16"). And finally, this initiative devotes only limited resources to the problem. After its announcement, advocates noted that the Government's program "at best . . . would only touch a fraction of all the unaccompanied minors expected to appear in court in the coming months." Kirk Semple, *Youths Facing Deportation to Be Given Legal Counsel*, N.Y. Times, June 6, 2014, A11, *available at* http://www.nytimes.com/2014/06/07/us/us-to-provide-lawyers-for-children-facing-deportation.html?_r=0.

66.     In late 2014, the Government announced plans to award the U.S. Conference of Catholic Bishops and the U.S. Committee for Refugees and Immigrants an additional $9 million over a 12-month period (September 30, 2014 to September 29, 2015) to provide legal representation to some unaccompanied children through a program overseen by ORR. *See Announcement of the Award of Two Single-Source Program Expansion Supplement Grants To Support Legal Services*

THIRD AMENDED COMPLAINT - 26 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

*to Refugees Under the Unaccompanied Alien Children's Program*, 79 Fed. Reg. 62,159-01 (Oct. 16, 2014). The program is estimated to provide representation to 2,600 children in nine immigration courts, *id.*, but fails to cover all children released to sponsors in its target cities.

67.     In June 2015, the Government issued a Request for Proposals as part of an additional program that would fund direct representation of certain children who were previously in ORR custody and are in immigration proceedings in one of nine cities. Department of Health and Human Services, *Legal Service Providers Solicitation Notice, RFP15-233-SOL-00264* (Jun. 15, 2015), *available at*

https://www.fbo.gov/index?s=opportunity&mode=form&id=a0ad02223e2e3aa94eda83de4b4891 f8&tab=core&_cview=1. Yet, this and other government-funded counsel programs have simply not met the need for legal representation.  As of September 2015 (the most recent publicly-available data), children in more than 32,700 pending immigration cases remained unrepresented. Transactional Records Access Clearinghouse, *Juveniles — Immigration Court Deportation Proceedings*, http://trac.syr.edu/phptools/immigration/juvenile/ (last visited Oct. 16, 2015).

68.     Several important actors within the Government have also indicated more generally that they would support a system that provided representation for all children. In a House Committee on Appropriations Report, the Committee commented on the existence of pilot programs created "to explore ways to better serve vulnerable populations such as children and improve court efficiency through pilot efforts aimed at improving their legal representation," but specified "that such pilots shall not require the U.S. Government to bear any expense for legal representation for any alien in removal proceedings, except to the extent required by Federal court order." *See* H.R. Rep. 113-448, at 42 (2014).[22]

---

[22] The Administration had previously requested an allocation of $5,824,000 for EOIR to "develop, implement and evaluate a pilot program to provide counsel for unaccompanied alien children." *See* White House Proposed Budget for FY 2015, Department of Justice, General Administration, Federal Funds, *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/jus.html.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

69.     Former Attorney General Eric Holder, previously a Defendant in this case, also indicated support for the relief sought in this case, stating that "[i]t is inexcusable that young kids—. . . six-, seven-year-olds, fourteen-year-olds—have immigration decisions made on their behalf, against them, . . . and they're not represented by counsel. That's simply not who we are as a nation. It's not the way in which we do things." Senate Judiciary Committee Hearing on Oversight of the Justice Department at 1:30:00-1:30:17 (Mar. 6, 2013) (video available at http://www.judiciary.senate.gov/meetings/oversight-of-the-us-department-of-justice-2013-03-06). More recently, he stated that although children "may not" have a constitutional right to legal representation, "we have policy reasons and a moral obligation to insure [sic] the presence of counsel" in children's immigration proceedings. Attorney General Eric Holder, *Remarks at the Hispanic National Bar Association 39th Annual Convention* (Sep. 12, 2014) (transcript available at http://www.justice.gov/opa/speech/remarks-attorney-general-eric-holder-hispanic-national-bar-association-39th-annual).[23]

70.     Even the materials that Defendants distribute to unaccompanied children in their custody describe the importance of legal representation for those seeking relief from deportation. *See* Office of Refugee Resettlement, Legal Resource Guide - Know Your Rights Handout at 5 (Jul. 8, 2014), *available at* https://www.acf.hhs.gov/sites/default/files/orr/lrg_3_kyr_handout_e07_08_14.pdf ("You should always speak with a lawyer to see if you qualify for any form of legal relief."); *id.* at 4 ("If you think you might qualify for legal relief, it is very important that you speak with a lawyer who can help explain it to you further.").

71.     In the meantime, the Government continues to send unrepresented children like the Plaintiffs in this case to face off against ICE trial attorneys who argue for their deportation before Immigration Judges.

### D.     The Plaintiffs

---

[23] The Administration also previously supported Senate Bill S. 744, the bipartisan comprehensive immigration reform legislation. That bill includes a provision requiring appointed counsel for a large subset of children in the putative class at issue here—all "unaccompanied alien children." *See* S. 744, 13th Cong. § 3502 (2013).

THIRD AMENDED COMPLAINT - 28 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

**J.E.F.M.**

72.    J.E.F.M. is an 11-year-old boy, and a native and citizen of El Salvador. He presently resides in Washington State. He is the youngest of four children born to his parents. His father was a former gang member, who then converted to Christianity and later became a pastor. J.E.F.M.'s mother was also a pastor. His parents met at church and together they started a rehabilitation center for people leaving gangs. Gang members retaliated against the center for housing young people trying to leave the gangs. First, they warned J.E.F.M.'s parents to stop assisting former gang members. Then they killed J.E.F.M.'s cousin. Two weeks later, gang members murdered J.E.F.M.'s father in the street in front of their house, while J.E.F.M. and his siblings watched. J.E.F.M.'s mother continued to be threatened after this incident, so she fled the country, leaving her children with their grandmother.

73.    Approximately seven years later, the children also became targets of gang members in El Salvador. Gang members demanded that the children join and threatened them with harm if they did not. Rather than enter the gang, J.E.F.M. fled with his two older siblings. At the time he was only nine years old.

74.    J.E.F.M. and his two siblings entered the United States around July 2013, were apprehended by U.S. Customs and Border Protection ("CBP"), and then placed in the custody of ORR. They were released to a family member fifteen days later. They have been residing in Washington State since their release.

75.    In September 2014, he appeared, without counsel, before an IJ in Seattle, Washington to plead to the charges of removability and to assert any defenses against his removal. During that hearing, the IJ continued the case until May 2015, warning that if he and his siblings, J.F.M. and D.G.F.M., did not have an attorney at the May hearing, their mother would have to represent them. *See* Dkt. 78 ¶3. Before that hearing took place, however, J.E.F.M. and his siblings were scheduled for their asylum interviews with USCIS. They were subsequently able to obtain pro bono representation for the asylum interviews with a USCIS officer. USCIS granted J.E.F.M. asylum at the end of May. Dkt. 154-1 at A-1 & A-2. The IJ in his case subsequently terminated proceedings against J.E.F.M. This Court then dismissed his claims as moot. Dkt. 174 at 7. He

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

remains a Plaintiff here solely to preserve for review his claim to represent the class. He was not financially able to pay for legal representation. J.E.F.M appears by his next friend, Bob Ekblad. Mr. Ekblad is a minister who has worked closely with J.E.F.M. and his family; he is familiar with J.E.F.M.'s immigration case and is truly dedicated to his best interests in this case.

**J.F.M.**

76.     J.F.M. is a 14-year-old boy and a native and citizen of El Salvador. He presently resides in Washington. He is the older brother of J.E.F.M. He also saw his father killed, was later threatened by gang members, and left El Salvador at the same time and for the same reasons as his younger brother.

77.     Like his brother, J.F.M. appeared, without counsel, before an IJ in Seattle, Washington in September 2014, and was later represented by pro bono counsel before USCIS and granted asylum. Subsequently, the IJ terminated the children's cases in immigration court. He remains a Plaintiff here solely to preserve for review his claim to represent the class. J.F.M. was not financially able to pay for legal representation. He appears by his next friend, Bob Ekblad. Mr. Ekblad is a minister who has worked closely with J.F.M. and his family; he is familiar with J.F.M.'s immigration case and is truly dedicated to his best interests in this case.

**D.G.F.M.**

78.     D.G.F.M. is a 17-year-old girl and a native and citizen of El Salvador. She presently resides in Washington. She is the older sister of J.E.F.M. and J.F.M. She also saw her father killed, was threatened by gang members, and left El Salvador with her two younger brothers at the same time and for the same reasons.

79.     Like her brothers, D.G.F.M. appeared, without counsel, before an IJ in Seattle, Washington in September 2014, and was later represented by pro bono counsel before USCIS and granted asylum. Subsequently, the IJ terminated the children's cases in immigration court. She remains a Plaintiff here solely to preserve for review her claim to represent the class.

80.     D.G.F.M. was not financially able to pay for legal representation. She appears by her next friend, Bob Ekblad. Mr. Ekblad is a minister who has worked closely with D.G.F.M. and her

THIRD AMENDED COMPLAINT - 30 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

family; he is familiar with D.G.F.M.'s immigration case and is truly dedicated to her best interests in this case.

**F.L.B.**

81.     F.L.B. is a 16-year-old boy, and a native and citizen of Guatemala. He presently resides in Seattle, Washington. He is the fifth of eight children born to his parents. Throughout F.L.B.'s childhood, his father, an alcoholic who abused F.L.B. and his siblings, resided in a different city and only visited occasionally. Moreover, F.L.B.'s father did not make any financial contributions to the home.

82.     When he was 10 years old, F.L.B. dropped out of school to work with his father in order to provide for himself, his mother, and his two younger siblings. After two years of living and working with his father, F.L.B. returned to his mother's home because he was no longer able to bear his father's abuse and excessive drinking. However, after six months at home he had to leave again due to the family's poor financial situation. F.L.B. moved back to the town where he had worked with his father, but this time lived with acquaintances. He only ever saw his father by chance, and seldom saw his mother.

83.     After more than a year of working and living outside the family's home, F.L.B. set out for the United States, hoping to be able to support himself and have the opportunity to enroll in school. He spent approximately one month traveling through Mexico and crossed the United States border in August 2013, at the age of 14. United States Border Patrol agents apprehended him in the desert and placed him in the custody of ORR. With no family in the United States, F.L.B. was released to the custody of a family acquaintance in October 2013. He has been residing in Seattle, Washington, since his release from ORR custody.

84.     F.L.B. had his first removal hearing since his release from ORR custody in September 2014. The judge *sua sponte* granted him a continuance until May 2015, but warned him that if he did not have an attorney present at the next hearing, the boy should be ready to represent himself or have a guardian do so. See Dkt. 118 ¶2, Aldana Madrid Decl. At his May 2015 hearing, F.L.B. again appeared unrepresented. After asking him why he did not have an attorney with him, the IJ proceeded to require F.L.B. to state whether his Notice to Appear had been served on

THIRD AMENDED COMPLAINT - 31 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

him and to respond to the allegations in the charging document. See Dkt. 157, Ex. A at 2-3. The IJ then told F.L.B. to return to his next hearing, scheduled for August 2016, with a completed asylum application. Dkt. 157 ¶¶13-14 . He warned F.L.B. that if he appeared without the completed application, his application might be denied. *Id*. However, F.L.B. has no resources to retain counsel and the legal service providers in the Seattle area are stretched well beyond capacity to take on the cases of children in removal proceedings.

85.     F.L.B. appears by his next friend, Casey Trupin. Mr. Trupin is the Project Coordinator for the Children and Youth Project at Columbia Legal Services in Seattle, Washington; he is familiar with F.L.B.'s ongoing immigration proceedings and is truly dedicated to F.L.B.'s best interests in this case.

**M.A.M.**

86.     Plaintiff M.A.M. is a 17-year-old boy, and a native and citizen of Honduras. He presently resides in Oxnard, California. M.A.M. has limited communication skills and special education issues, as a result of which he has limited ability to recount the suffering that he and his family endured in Honduras.

87.     M.A.M. spent his first eight years in Honduras, raised primarily by his maternal grandmother. During that time, M.A.M.'s mother left him and came to the United States, where she received Temporary Protected Status ("TPS"). Although M.A.M.'s grandmother cared for him, she could not shield him from life's brutality there. At some point prior to his eighth birthday, someone attacked M.A.M.'s father with a machete, leaving him profoundly disabled. M.A.M.'s half-brothers' father was kidnapped and murdered during those years as well.

88.     Eventually, M.A.M.'s grandmother grew elderly and ill. His father was not involved in his life, and no one else could care for him. As a result, M.A.M. came to the United States at the age of eight. Since 2006, he has resided with his mother in California. Although she has TPS, the law does not permit her to extend that status to her son.

89.     Despite the lack of an adult conviction, M.A.M. was swept into the net of interior immigration enforcement. ICE arrested M.A.M. and took him into custody in September 2011, when he was only 13 years old, and placed him into removal proceedings. Rather than transfer

THIRD AMENDED COMPLAINT - 32 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

M.A.M. to ORR custody, however, ICE retained custody over him until his mother came forward, after which ICE released him into her care.

90.     The Los Angeles Immigration Court already has held multiple hearings where M.A.M. was unrepresented by counsel. A nonprofit legal services organization assisted him in filing a self-petition for Special Immigrant Juvenile visa status, which was eventually granted by USCIS. *See* Dkt. 154-1. He now is eligible to apply before the IJ for adjustment of status to lawful permanent residence in order to obtain relief from removal. However, he continues to be unrepresented in removal proceedings. *See generally* Dkt. 95 ¶¶ 81-86; Ex. E. At his most recent removal hearing in October 2015, DHS opposed termination of M.A.M.'s court proceedings, which would have allowed USCIS to adjudicate his adjustment application in a non-adversarial setting. As a result, M.A.M. remains subject to adversarial court proceedings. His next removal hearing is scheduled for February 2016. He and his mother are indigent. They cannot afford to hire private counsel for his upcoming hearing. The Los Angeles-based, Government-funded legal representation program rejected M.A.M.'s immigration court case because he fell outside their scope of service (because M.A.M. was never in ORR custody).

91.     M.A.M. appears by his next friend and mother, Rosa Pedro. Ms. Pedro maintains a close personal relationship with M.A.M., is familiar with his ongoing immigration proceedings, and is truly dedicated to his best interests in this case.

**A.E.G.E.**

92.     Plaintiff A.E.G.E. is a four-year-old boy and a native and citizen of El Salvador. He presently resides in Los Angeles, California. A.E.G.E. was conceived as the result of a rape his mother suffered when she was only 15 years old. The rapists threatened to harm her again if she reported the crime. After A.E.G.E.'s birth, his young mother struggled to care for him. She eventually fled to the United States before his first birthday. She left her son in the care of an aunt, but he was not safe. A.E.G.E.'s other family members feared for his life in El Salvador.

93.     A.E.G.E. was left at the border by a relative in Eagle Pass, Texas in April 2014. He was detained and then transferred to ORR custody, where he remained for several weeks. His "Foster Father" during that time reported that A.E.G.E. "[s]till takes milk in bottle. Teaching him to

THIRD AMENDED COMPLAINT - 33 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

brush his teeth." On May 9, 2014, A.E.G.E. was released to the care of his mother in Los Angeles, California. She is a Lawful Permanent Resident. Although A.E.G.E. may be eligible for that same status, or for asylum based on the threats to himself and his family, he obviously cannot pursue that relief without legal assistance.

94.     A.E.G.E. is scheduled for a removal hearing in April 2016 in Los Angeles, California. He has no attorney to represent him at that hearing, despite his mother's attempt to find one. He is not able to afford legal representation. This Court previously dismissed A.E.G.E. from this suit over Plaintiffs' objection, finding that his removal proceedings "might never be commenced." Dkt. 114 at 7-8. Now that A.E.G.E. has been scheduled for a removal hearing, his claim is live. He is also named as a Plaintiff here to preserve his claims for review.

95.     A.E.G.E. appears by his next friend, Ana Deutsch. Ms. Deutsch is a licensed therapist who has worked extensively with victims of violence. She is a Co-Founder and Clinical Director at the Program for Torture Victims in Los Angeles, California. Ms. Deutsch is familiar with A.E.G.E.'s immigration case and is truly dedicated to his best interests in this case.

**G.J.C.P.**

96.     Plaintiff G.J.C.P. is a 15-year-old girl, and a native and citizen of El Salvador. She presently resides in Van Nuys, California. In El Salvador, she lived with her mother, stepfather, two half-sisters, and two cousins. G.J.C.P. has not had a relationship with her father since she was approximately two years old.

97.     G.J.C.P. was forced to leave her home in El Salvador after gang members began harassing her and her 13-year-old cousin. These gang members offered the young girls drugs, pressured the girls to become romantically involved with them, and asked them to join the gang. G.J.C.P. refused, even though she had previously witnessed gang members similarly harassing one of her school friends. This friend refused the gang members and later turned up dead. G.J.C.P. was thus afraid the same thing would happen to her and that she would be harmed for refusing the gang members' advances. Moreover, she had witnessed two of these same gang members brutally beating a young man on the street while she was out with her mother. G.J.C.P. became so fearful for her safety that she rarely left her house alone; her mother dropped her at

THIRD AMENDED COMPLAINT - 34 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

school every morning, and another adult picked her up from school in the afternoon.

98.     Fearing for her safety and her life, G.J.C.P. and her two cousins left El Salvador to travel to the United States. U.S. Border Patrol agents apprehended G.J.C.P. and her cousins near Hidalgo, Texas shortly after they entered the United States in May 2014. G.J.C.P. was first transferred to a holding facility, and then to an ORR shelter. She remained there until approximately June 2014, when ORR released her to the custody of her grandmother, Blanca Griselda Zelaya. Ms. Zelaya has legal status in the United States through the grant of a U-visa.

99.     As instructed by ORR shelter staff, Ms. Zelaya submitted paperwork on G.J.C.P.'s behalf to transfer her immigration case from Texas to the Los Angeles Immigration Court, the closest to where Ms. Zelaya and G.J.C.P. currently reside. When Ms. Zelaya and G.J.C.P. moved to a new address, she contacted the court about her new address, but court personnel told her that she needed to wait to hear from the court.

100.     Ms. Zelaya and G.J.C.P., however, never received any information from the court. Instead, when Ms. Zelaya called the EOIR hotline to find out more information about G.J.C.P.'s case, she discovered that the Immigration Judge had already ordered G.J.C.P. removed in absentia in August 2014.

101.     G.J.C.P. does not have an attorney to represent her in her immigration case and to help her file a motion to rescind her in absentia order and reopen her case. G.J.C.P. lacks both the knowledge and the capacity to file those papers on her own. Nor does she know how to present her claims for relief, even if her case were reopened. The legal services providers and pro bono resources in the Los Angeles area are already operating at capacity, and Ms. Zelaya does not have the resources to hire a private attorney to represent G.J.C.P. This Court has dismissed G.J.C.P. from this suit over Plaintiffs' objection. Dkt. 114 at 11. She is named as a Plaintiff here to preserve her claims for review.

102.     G.J.C.P. appears by her next friend and grandmother, Ms. Zelaya. Ms. Zelaya maintains a close personal relationship with G.J.C.P., is familiar with her immigration matters, and is truly dedicated to her best interests in this case.

**J.E.V.G.**

103.     Plaintiff J.E.V.G. is an 18-year-old boy, and a native and citizen of El Salvador. He presently resides in Houston, Texas. His father died when J.E.V.G. was about six years old. After his father's death, J.E.V.G. was left with his mother and an older sister. The family struggled to survive without their primary breadwinner. Gang members were active in J.E.V.G.'s town. They threatened young people like J.E.V.G., telling them they could not wear certain types of shoes or walk in certain parts of town. It was common knowledge that those who ignored those threats were beaten or killed by the gangs, and J.E.V.G. knew of a few individuals in his town who were beaten for not abiding by the gang members' instructions and threats.

104.     Shortly after his seventeenth birthday, J.E.V.G. set out to seek a better and safe life in the United States. He entered the United States near McAllen, Texas in July 2014. U.S. Border Patrol agents apprehended him and placed him in ORR custody. He was eventually transferred to a shelter in Phoenix, Arizona. In August 2014, J.E.V.G. was released to the care of his half-sister, Santos Angela Vasquez, who is a Lawful Permanent Resident. Ms. Vasquez provided authorities with her address in Houston, Texas, where J.E.V.G. currently resides. J.E.V.G. was instructed to await notice of a future court date, but notice never came.

105.     In September 2014, an Immigration Judge held a hearing in J.E.V.G.'s case and ordered him removed in absentia. J.E.V.G., who did not receive notice of the hearing, was not present in court. Nor was an attorney present to represent J.E.V.G. at that hearing. At the time, he was 17 years old and unable to pay for legal representation. He lacked both the knowledge and the capacity to file a motion to reopen his case on his own.

106.     Following his addition to this case, the Government filed a motion to reopen J.E.V.G.'s removal proceedings after a review of his file "uncovered some discrepancies" indicating that he did not receive notice of his hearing. *See* Dkt. 97 at 10 n.6; *see also* Dkt. 95 ¶¶ 109-112; Ex. F. J.E.V.G. then appeared without legal representation before an IJ in Houston, Texas in February 2015 to plead to the charges of removability and to assert any defenses against his removal. J.E.V.G.  subsequently obtained counsel to represent him in his removal proceedings. His next hearing is scheduled for late October 2015.

107.     J.E.V.G. appears by his next friend and sister, Santos Angela Vasquez. Ms. Vasquez

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

maintains a close personal relationship with J.E.V.G., is familiar with his immigration matter, and is truly dedicated to his best interests in this case.

**E.G.C.**

108.    E.G.C. is an 11-year-old boy, and a native and citizen of Mexico. He presently resides in Snohomish, Washington. E.G.C. grew up in Mexico in an abusive home environment, suffering domestic violence at the hands of both his parents. In late 2013, when he was only nine years old, he fled to the United States with his mother and his sisters in an attempt to escape the turmoil rocking his home state of Michoacan. The family arrived at the U.S. border seeking asylum in November 2013. DHS took them into custody and then paroled them into the United States, after which they were placed into consolidated removal proceedings. E.G.C.'s mother and sisters subsequently returned to Mexico, taking E.G.C.'s sisters back with her but leaving him in the care of family in Washington State because he was too afraid to go back. E.G.C.'s father was kidnapped by a criminal organization and is presumed dead.

109.    E.G.C. is scheduled for a removal hearing in December 2015 before an IJ in Seattle, Washington. He has no legal representation in his immigration case. E.G.C. has no resources to hire private counsel. He does not qualify for representation through the Seattle-based, Government-funded programs because the Government has not designated him as an unaccompanied child ("UC") and he therefore falls outside their scope of service. Moreover, the legal service providers in Washington State are stretched well beyond capacity to take on the cases of children in removal proceedings.

110.    E.G.C. appears by his next friend, Sonia McLeod. Ms. McLeod is a case manager at the University District Youth Center, where she works with youth to access housing and other needed resources. She is familiar with E.G.C.'s ongoing immigration proceedings and is truly dedicated to E.G.C.'s best interests in this case.

**A.F.M.J.**

111.    A.F.M.J. is an 11-year-old girl, who was born in Mexico. When she was about seven years old, her U.S. citizen father was murdered. Her mother believes the murderer, a man in her town, had a history of criminal activity. Her mother reported the crime to, but the authorities did

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

not investigate and witnesses were too scared to come forward. The murderer roamed free and boasted about the killing. A.F.M.J.'s mother heard rumors that she would suffer the same fate as her partner if she continued urging the police to investigate the crime. Someone later burglarized A.F.M.J.'s home in a manner that raised suspicion, once again, the police declined to investigate. Instead, they warned A.F.M.J.'s mother that she would be risking her life if she insisted on casting suspicion on her partner's murderer.

112.    A.F.M.J., her two siblings, and her mother fled in September 2014 to seek safety in the United States. Her mother requested asylum. DHS took them into custody and subsequently paroled them into the country. She now lives in Royal City, Washington.

113.    A.F.M.J.'s immigration case is consolidated with that of her mother and siblings. At their third hearing, held in Seattle, the IJ told A.F.M.J.'s mother that he has waived the children's presence in court, and that the next hearing will go forward regardless of whether they have an attorney.

114.    A.F.M.J. has a distinct claim to derivative U.S. citizenship through her father and her own asylum claim, but these claims have not been addressed at any hearing. A.F.M.J.'s next hearing is in late October 2015. She has no legal representation in her immigration case. A.F.M.J. has no resources to hire private counsel and she does not qualify for representation through the Seattle-based, Government-funded programs because she falls outside their scopes of service (she is not currently in ORR custody and she is not an unaccompanied child). Other organizations in Washington State are stretched well beyond capacity to take on the cases of children in removal proceedings. A.F.M.J. appears by her next friend and mother, Maria Jimenez. Ms. Jimenez maintains a close personal relationship with A.F.M.J., is familiar with her immigration matters, and is truly dedicated to her best interests in this case.

**L.J.M.**

115.    L.J.M. is a three-year-old girl born in Mexico. She is the younger sister of A.F.M.J.. She presently resides in Royal City, Washington. Her U.S. citizen father was murdered when her mother was pregnant with her. She came to the United States in the same circumstances as A.F.M.J. in September 2014.

THIRD AMENDED COMPLAINT - 38 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

116.    The procedural history of L.J.M.'s immigration case mirrors that of her sister A.F.M.J. She too has a distinct claim to derivative U.S. citizenship through her father and her own asylum claim, which has not been addressed at any hearing.

117.    L.J.M.'s immigration case is consolidated with those of her siblings and mother. She has had three removal hearings, and the IJ waived her presence at any subsequent hearings. L.J.M.'s next hearing is in late October 2015, and she does not have legal representation for those proceedings. She does not have the resources to hire private counsel, and she does not qualify for representation through the Seattle-based, Government-funded programs because she falls outside their scopes of service. Other legal service providers in Washington State are stretched well beyond capacity to take on the cases of children in removal proceedings. L.J.M. appears by next friend and mother, Maria Jimenez. Ms. Jimenez maintains a close personal relationship with L.J.M., is familiar with her immigration matters, and is truly dedicated to her best interests in this case.

**M.R.J.**

118.    M.R.J. is a one-year-old boy, and a native and citizen of Mexico. He is the half-brother of A.F.M.J. and L.J.M. His father and mother separated while the family was still in Mexico. He came to the United States in the same circumstances as his half-sisters, in September 2014.

119.    M.R.J.'s immigration case is consolidated with those of his siblings and mother in Seattle, Washington. He has had three removal hearings, and the IJ waived his presence at any subsequent hearings. M.R.J.'s next hearing is in late October 2015. Even though M.R.J. has his own claim to asylum, this claim has not been addressed at any hearing. Like his sisters, M.R.J. does not have legal representation for those proceedings. He does not have the resources to hire private counsel, he does not qualify for representation through the Seattle-based, Government-funded programs because he falls outside their scopes of service, and other legal service providers in Washington State are stretched well beyond capacity to take on the cases of children in removal proceedings. M.R.J. appears by his next friend and mother, Maria Jimenez. Ms. Jimenez maintains a close personal relationship with M.R.J., is familiar with his immigration matters, and is truly dedicated to his best interests in this case.

THIRD AMENDED COMPLAINT - 39 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

**J.R.A.P.**

120.    J.R.A.P. is a seven-year-old boy. He is a native and citizen of Honduras. He currently resides in Miami, Florida. While pregnant with J.R.A.P., his mother learned that his father was in a gang, and ended their relationship. J.R.A.P.'s father was subsequently arrested and imprisoned. When J.R.A.P. was very young, his mother traveled to the United States, leaving him in the care of his paternal grandparents in Honduras. J.R.A.P. visited his father a few times in prison, but his father has never played an active role in his life. When J.R.A.P.'s mother learned that his father was considering leaving the gang, she feared the gang would retaliate by harming J.R.A.P.

121.    In the fall of 2013, J.R.A.P. arrived in the United States. Immigration authorities took custody of him soon after his arrival. After several weeks, J.R.A.P. was released to the care of his mother in Miami. J.R.A.P. attends kindergarten. He is surrounded by loving family including a three-year-old U.S.-citizen sister, a young aunt and uncle who are U.S. citizens, and his maternal grandfather. After J.R.A.P. arrived in the United States, his father called his mother and threatened to kill her and her new partner if she returned to Honduras.

122.    J.R.A.P. attended his first removal hearing in October 2015 before an IJ in Miami. A friend of the court appeared with him at that initial hearing, but that person is not his lawyer. Although J.R.A.P.'s mother followed up with a local legal services organization to try to obtain legal representation for her son, J.R.A.P. remains on a wait list and without a lawyer. He has no resources to hire a private attorney. His next removal hearing is scheduled for March 2016.

123.    J.R.A.P. appears by his next friend, Katherine Peguero. Ms. Peguero is a close friend of J.R.A.P.'s family. She is familiar with his ongoing proceedings. Ms. Peguero is truly dedicated to J.R.A.P.'s best interests in this case.

**K.N.S.M.**

124.    K.N.S.M. is a nine-year-old girl. She is a native and citizen of Honduras. K.N.S.M. is currently residing in Ontario, California, where she is attending the fourth grade. While she was living in Honduras, K.N.S.M. was physically assaulted by her aunt while under her care. Her aunt hit her in the face with a pot because K.N.S.M., who was five years old at the time, had accidentally scratched another pot. K.N.S.M. had to be hospitalized due to her injuries. Her aunt

THIRD AMENDED COMPLAINT - 40 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

was arrested as a result of the assault, but the police eventually let her go with only a condition that she report periodically to the authorities. After that, K.N.S.M.'s aunt threatened K.N.S.M. and her mother. The aunt said she would pay them back for getting her arrested. K.N.S.M. even spotted her aunt stalking her at her school. Because they no longer felt safe, K.N.S.M. left Honduras with her mother and came to the United States.

125.    K.N.S.M. and her mother arrived in the United States in May of 2014. Soon after crossing the border, they were picked up by immigration authorities in Texas. K.N.S.M. and her mother were interviewed by the immigration authorities for several hours, and then released. K.N.S.M. was released under an Order of Release on Recognizance. Since arriving in the United States in May 2014, K.N.S.M. has been living with her mother. She has not seen or heard from her father since she left Honduras.

126.    K.N.S.M. attended her first removal hearing in September 2015 before an IJ in Los Angeles, California. She did not have an attorney to represent her at that hearing, and her mother does not have the resources to hire an attorney to help K.N.S.M. with her immigration case. Her next removal hearing is scheduled for April 2016.

127.    K.N.S.M. appears by her next friend and mother, Eloisa Sarahi Mejia Sevilla, who is familiar with her ongoing proceedings and is truly dedicated to her best interests in this case.


## V.    LEGAL BACKGROUND

128.    Plaintiffs and the putative class raise statutory and constitutional claims challenging the Government's failure to ensure legal representation for them in their immigration proceedings. Specifically, Plaintiffs contend that the Immigration and Nationality Act ("INA") and the Due Process Clause of the Fifth Amendment mandate that the Government ensure that all children in immigration proceedings have legal representation if they are financially unable to pay for such representation.

129.    The INA and immigration regulations require that all persons in removal proceedings have "a reasonable opportunity" to present, examine, and object to evidence. 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(a)(4). In addition, all persons in removal proceedings,

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

whatever their age, have the right to be advised of the charges against them, 8 U.S.C.

§ 1229(a)(1)(D); 8 C.F.R. § 239.1, and "the privilege of being represented, at no expense to the

Government, by counsel of the alien's choosing." 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. §§

238.1(b)(2), 1240.10(a)(1).[24]

130.    Existing regulations address the rights of children in some respects, but do not come

close to ensuring fair hearings. One regulation precludes Immigration Judges from accepting

admissions of removability from "an unrepresented respondent who is . . . under the age of 18,"

but permits such admissions if the child is accompanied by a relative or friend. 8 C.F.R. §

1240.10(c). The BIA has undermined even the minimal protection this regulation provides by

holding that Immigration Judges can accept factual admissions from children that, taken

together, are sufficient to prove the child's removability. *See Matter of Amaya*, 21 I. & N. Dec.

583, 587 (BIA 1996). Similarly, another regulation requires DHS to serve charging documents

for a minor under 14 years of age upon the person with whom the minor resides, and "whenever

possible," the minor's "near relative, guardian, committee, or friend." 8 C.F.R. § 103.8(c)(2)(ii).

But this regulation does not impose any obligations on such individuals, and the BIA has

concluded that these regulations even permit service upon the director of the facility where the

minor is currently detained. *See Amaya*, 21 I. & N. Dec. at 585.

131.    At a more general level, the BIA has long interpreted the statutory rights provided in 8

U.S.C. §§ 1229, 1229a, as creating a general right to a fair hearing in the deportation context.

*Matter of Exilus*, 18 I. & N. Dec. 276, 278-79 (BIA 1982). Similarly, the Ninth Circuit has made

clear that "every individual in removal proceedings is entitled to a full and fair hearing" of his

claims. *Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) (en banc).

---

[24] The immigration statutes also contain certain protections specific to "unaccompanied alien children," defined as individuals under the age of 18 without lawful immigration status in the United States "with respect to whom: (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). "Unaccompanied alien children" who are not from "contiguous countries" are entitled to additional legal protections. *See, e.g.*, 8 U.S.C. § 1232(b)-(c) (custody provisions); 8 U.S.C. § 1232(a)(5)(D)(iii) (regarding counsel); 8 U.S.C. § 1232(c)(5) (directing HHS to ensure unaccompanied children are represented "to the greatest extent practicable"); 8 U.S.C. § 1232(c)(6) (regarding child advocates).

THIRD AMENDED COMPLAINT - 42 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

132.     These statutory rules implement a constitutional command. The Supreme Court held over a century ago that the Fifth Amendment guarantees a noncitizen the right to due process in any proceeding where the Government seeks his deportation. *See Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) ["The Japanese Immigrant Case"]. And as applied to children, both prior Supreme Court precedent from the juvenile delinquency context and more recent Ninth Circuit precedent involving a child facing deportation demonstrate that all children, with their limited capacity to present complex factual and legal arguments, are entitled to legal representation in immigration proceedings. *In re Gault*, 387 U.S. at 36; *Lin v. Ashcroft*, 377 F.3d 1014, 1030, 1032-34 (9th Cir. 2004). This is all the more true given the adversarial nature of the proceedings and the grave interests at stake. *See generally Turner v. Rogers*, 131 S. Ct. 2507, 2517 (2011).

## VI.     CLASS ACTION ALLEGATIONS

133.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals. Plaintiffs seek injunctive relief[25] that applies generally to the Plaintiff Class, as described below.

134.     The Plaintiff Class consists of:

-     All individuals under the age of eighteen (18) who are in immigration proceedings on or after July 9, 2014, without legal representation in their immigration proceedings[26] and who are financially unable to obtain such representation.[27]

---

[25] This Court ruled that 8 U.S.C. 1252(f)(1) bars this Court from entertaining Plaintiffs' request for classwide injunctive relief. *See* Dkt. 114 at 22. Plaintiffs continue to assert the claim here in order to preserve it for review.

[26] As noted *supra* note 5, Plaintiffs define "immigration proceedings" as any proceeding that occurs before an Immigration Judge or the Board of Immigration Appeals. Plaintiffs define "legal representation" as representation by a lawyer, a law student or graduate supervised by a lawyer, or a BIA-accredited representative. *See Franco-Gonzalez, et al. v. Holder*, 828 F. Supp. 2d 1133, 1147 (C.D. Cal. 2011) (defining Qualified Representative for purposes of providing legal representation to mentally incompetent individuals in immigration proceedings as including "(1) an attorney, (2) a law student or law graduate directly supervised by a retained attorney, or (3) an accredited representative, all as defined in 8 C.F.R. § 1292.1").

[27] The Complaint and original Motion for Class Certification were filed on July 9, 2014. *See* Dkts. 1, 2. This Court then struck the Motion in November 2014, explaining that it would give Plaintiffs a new submission deadline after ruling on Defendants' Motion to Dismiss. *See* Dkt. 94.

THIRD AMENDED COMPLAINT - 43 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

135.     The Plaintiff Class is so numerous that joinder of all members is impracticable. Although

the number of individuals under the age of 18 who are in immigration proceedings, financially

unable to obtain counsel, and therefore are proceeding pro se is not known with precision, most

reports indicate that there are thousands of such children. *See supra* Part IV.A.

136.     Common questions of law and fact bind the members of the Plaintiff Class. These

questions include, but are not limited to, the following:

- Whether the Due Process Clause of the U.S. Constitution and/or federal statutory
  law requires the Government to provide legal representation for the members of
  the Plaintiff Class;
- Whether existing procedures suffice to protect the Plaintiff Class members' right
  to a full and fair hearing as required by the Due Process Clause of the U.S.
  Constitution and/or federal statutory law.

137.     The claims of the named Plaintiffs are typical of the claims of the Plaintiff Class as a

whole. Plaintiffs know of no conflict between their interests and those of the Plaintiff Class. The

members of the Plaintiff Class are ascertainable and can be identified through notice and

discovery. In defending their own rights, the individual Plaintiffs and their next friends will

defend the rights of all proposed Plaintiff Class members fairly and adequately.

138.     Plaintiffs are represented in this case by counsel with deep knowledge of immigration

law and extensive experience litigating class actions and complex cases, including the only class

action that has secured appointed legal representation for a class of immigrants. Plaintiffs'

attorneys have the requisite level of expertise to adequately prosecute this case on their behalf

and on behalf of the Class.

139.     Defendants have acted or refused to act on grounds generally applicable to each member

of the Plaintiff Class by refusing to recognize that the members of the Plaintiff Class have a

---

After the Court did so, Plaintiffs submitted their renewed motion for class certification in April
2015. *See* Dkt. 117. The Court thereafter denied the motion without prejudice to Plaintiffs
refiling a motion for class certification. *See* Dkt. 160. Plaintiffs previously defined their class as
"All individuals under the age of eighteen (18) who are or will be in immigration proceedings on
or after July 9, 2014, without legal representation in their immigration proceedings." *See* Dkt. 1
at 23.

THIRD AMENDED COMPLAINT - 44 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

statutory and constitutional right to legal representation in their immigration proceedings, and by refusing to provide that representation for such individuals.

140.     A class action is superior to other methods available for the fair and efficient adjudication of this controversy because joinder of all members of the Plaintiff Class is impracticable. Moreover, members of the Plaintiff Class remain unrepresented in immigration proceedings and lack the ability to assert the claims made here. Absent the relief they seek here, there would be no other way for the Plaintiff Class to individually redress the wrongs they have suffered and continue to suffer.

## VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Violation of the Immigration and Nationality Act[28]

### (Against All Defendants by All Plaintiffs)

141.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

142.     The INA requires that all individuals in removal proceedings be afforded a reasonable opportunity to, inter alia, examine and present evidence and witnesses. *See* 8 U.S.C. § 1229a(b). These provisions require that unrepresented children be provided a fair hearing in their immigration proceedings. The only way to ensure that these children receive a fair hearing is by providing them with legal representation.

143.     Plaintiffs and the Plaintiff Class have suffered and will imminently suffer irreparable injury as a proximate cause of the Government's failure to provide them with legal representation in their immigration proceedings, and are therefore entitled to injunctive relief to avoid any injury.

### SECOND CAUSE OF ACTION

### Violation of the Due Process Clause of the Fifth Amendment

---

[28] This Court ruled that 8 U.S.C. 1252(b)(9) stripped the Court of jurisdiction to entertain Plaintiffs' statutory claim for counsel. *See* Dkt. 114 at 22. Plaintiffs continue to assert the claim here in order to preserve it for review.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

**(Against All Defendants by All Plaintiffs)**

144.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

145.     The Due Process Clause requires that unrepresented children in immigration proceedings be provided legal representation.

146.     Plaintiffs and the Plaintiff Class have suffered and will imminently suffer irreparable injury as a proximate cause of the Government's failure to provide them with legal representation in their immigration proceedings, and are therefore entitled to injunctive relief to avoid any injury.

## VIII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

     a.   Certify a class pursuant to Federal Rule of Civil Procedure 23 in accordance with this Complaint's allegations and the accompanying Motion for Class Certification;

     b.   Declare that the Defendants' failure to ensure legal representation for Plaintiffs and the Plaintiff Class violates constitutional and statutory law, pursuant to the Court's equitable powers and the Declaratory Judgment Act, 28 U.S.C. § 2201;

     c.   Issue an injunction directing Defendants to ensure that Plaintiffs and other members of the Plaintiff Class receive legal representation in their immigration proceedings;

     d.   Alternatively, appoint counsel to represent Plaintiffs and other members of the Plaintiff Class in their immigration proceedings, pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A(a)(1);

     e.   Grant any other relief the Court deems just, equitable, and appropriate, including, but not limited to, fees under the Equal Access to Justice Act, and any other applicable statute or regulation.

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

Dated this 4th day of December, 2015.

Respectfully submitted,

s/ Matt Adams
Matt Adams, WSBA No. 28287
Glenda M. Aldana Madrid, WSBA No. 46987
NORTHWEST IMMIGRANT
  RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
(206) 587-4025 (fax)

s/ Ahilan Arulanantham
Ahilan Arulanantham, Cal. State Bar. No. 237841 (*pro hac vice*)
ACLU IMMIGRANTS' RIGHTS PROJECT
ACLU OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5211
(213) 417-2211 (fax)

Theodore J. Angelis, WSBA No. 30300
Todd L. Nunn, WSBA No. 23267
Heidi Craig Garcia, WSBA No. 41399
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
(206) 623-7580
(206) 623-7022 (fax)

Cecillia Wang, Cal. State Bar. No. 187782 (*pro hac vice*)
Stephen Kang, Cal. State Bar No. 292280 (*pro hac vice*)
ACLU IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
(415) 343-0950 (fax)

Carmen Iguina, Cal. State Bar No. 277369 (*pro hac vice*)
ACLU OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5211
(213) 417-2211 (fax)

Kristen Jackson, Cal. State Bar. No. 226255 (*pro hac vice*)
Talia Inlender, Cal. State Bar. No. 253796 (*pro hac vice*)

THIRD AMENDED COMPLAINT - 47 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977
(213) 385-9089 (fax)

Kristin Macleod-Ball (*pro hac vice*)
Melissa Crow, D.C. Bar No. 453487 (*pro hac vice*)
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
202-507-7500
202-742-5619 (fax)

Margaret Chen, WSBA No. 46156
ACLU OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, WA 98164
(206) 624-2184

*Counsel for Plaintiffs-Petitioners*

THIRD AMENDED COMPLAINT - 48 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

**CERTIFICATE OF ECF FILING AND SERVICE**

I certify that on December 4, 2015, I arranged for electronic filing of the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties of record:

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No. 46987
NORTHWEST IMMIGRANT
 RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, WA 98104
(206) 957-8646
(206) 587-4025 (fax)

THIRD AMENDED COMPLAINT - 49 of 49
Case No. 2:14-cv-01026-TSZ

**Northwest Immigrant Rights Project**
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611